**CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC. &
Subsidiaries, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 06–305T.

United States Court of Federal Claims.

Oct. 21, 2009.

David F. Abbott, Mayer Brown, LLP, New York City, NY, for the plaintiff. With him were Joel V. Williamson, Thomas L. Kittle–Kamp, Brian W. Kittle, Marcia G. Madsen, Nichole M. Reuling, Michael R. Emerson, Megan E. Wernke and Matthew C. Houchens, Mayer Brown, LLP, of counsel.

David N. Geier, Trial Attorney, Tax Division, United States Department of Justice, for the defendant. With him were Joseph A. Sergi, Adam R. Smart and Karen M. Groen, Trial Attorneys, Tax Division, United States Department of Justice, Washington, D.C.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The plaintiff, Consolidated Edison Company of New York, Inc. (Con Ed), and its subsidiaries, brought this claim to recover funds allegedly overpaid to the Internal Revenue Service (IRS) for the 1997 tax year,

when the IRS disallowed certain rental, interest and transaction cost deductions taken by the plaintiff, associated with a leveraged lease transaction the plaintiff entered into in 1997. This complex, leveraged lease transaction, referred to in a number of ways by the parties, including "leveraged lease," "lease-leaseback," or "lease-in, lease-out," also known as a "LILO" transaction,[1] took place between Consolidated Edison Leasing, Inc. (CEL), a wholly-owned subsidiary of Consolidated Edison Development, Inc. (CED)[2] and Electriciteitsbedrijf Zuid–Holland, N.V. (EZH), a Dutch utility. The Facility that was the subject of the LILO agreement was a gas-fired, combined cycle cogeneration plant (the RoCa3 Facility) located in The Netherlands. The RoCa3 Transaction involved the lease of an undivided 47.47% interest in EZH's RoCa3 Facility for a term of 43.2 years (which constituted 80% of the Facility's estimated remaining useful life on the closing date of 54 years) by the plaintiff, pursuant to a Lease Agreement, and a shorter term sublease of this same undivided 47.47% interest in the RoCa3 Facility back to EZH, for a term of 20.1 years, pursuant to a Sublease Agreement, and various other related agreements.

In order to determine the appropriateness of tax deductions claimed by a taxpayer, each transaction seeking qualification for relevant tax benefits under applicable Internal Revenue Code (IRC) sections and related regulations must be evaluated on its own merits, based on the documents which established the transaction and on the specific facts that led to the transaction. Consequently, in order to evaluate the complex transaction at issue, a five-week trial was held, over 1,600 exhibits containing over 25,000 pages were submitted, and lengthy post-trial briefings on the legal and factual issues raised in this case were filed by both parties. Additionally, the parties stipulated to a set of basic, undisputed facts. After presiding at the trial and conducting a thorough review of the transcripts, the testimony, the exhibits entered into the record and the submissions filed by

the parties, the court has made extensive findings of fact, which are incorporated throughout this opinion. The conclusions of the court offered in this opinion are based on the specific and unique facts which led to, and were part of, the RoCa3 Transaction.

According to the company's former Chairman and Chief Executive Officer, Con Ed originated in 1823 as a gas company in New York State. In 1884, following the merger of a group of gas companies, the company was named the Consolidated Gas Company. During the 1930s, it became the Consolidated Edison Company of New York, following the merger of many smaller electric and gas companies in the area.

In the mid-to-late 1990s, Con Ed was a publicly held, "vertically integrated" utility company, organized under the laws of the State of New York. The company generated, transmitted and distributed electricity and provided customer service. As of December 31, 1996, Con Ed provided services to over eight million people in New York City and Westchester County, New York. In addition, Con Ed maintained a vertically integrated steam business and delivered natural gas to one million customers in Westchester County and parts of New York City, including the Bronx, Manhattan, and parts of Queens.

The New York Public Service Commission (PSC), which regulates the electric industry in New York, regulated all of Con Ed's operations prior to the deregulation of New York's electricity utilities, which took place during the mid–1990s. The PSC sought to deregulate electric companies in order to encourage competition in the electricity industry. After engaging in a study on deregulation, the PSC ordered Con Ed and certain other major electric utilities in New York State to file plans describing how they would restructure their operations to bring about a more competitive marketplace, including for electric generation, and to propose corporate structures, including unregulated subsidiaries, that would advance the PSC's restructuring goals. The order contemplated Con Ed's

---

**1.** For ease of reference, the opinion will use the term LILO.

**2.** Con Ed was the parent company of CED at the time of the Transaction. The plaintiff in this case is Consolidated Edison Company of New York, Inc., and its related subsidiaries.

investment through development companies, investment funds, joint ventures and other vehicles, but noted that Con Ed's proposed investment in energy infrastructure projects (domestic and international) would be through established investment funds. On May 2, 1995, Con Ed requested permission from the PSC to invest up to 5% (approximately $504 million) of its consolidated capital in unregulated subsidiaries. On July 12, 1996, the PSC issued an order deferring action on Con Ed's May 2, 1995 request, but granting Con Ed the authority to invest up to $50 million in unregulated subsidiaries that would subsequently invest and/or participate in energy infrastructure projects and market technical services. As Con Ed further explored options to enable it to comply with the PSC's deregulation order, an internal Con Ed memorandum, dated September 18, 1996, discussed seeking approval from the Con Ed Board of Trustees to form and invest up to $50 million in a wholly-owned subsidiary that could, in turn, invest in energy infrastructure development projects and market technical services worldwide. One month later, on October 18, 1996, Con Ed established a development company, initially named Gramercy Development, Inc. (GDI), which, on September 24, 1997, changed its name to Consolidated Edison Development, Inc. (CED).[3] As of December 15, 1997, Con Ed owned 100% of the outstanding stock of the development company.

In March 1997, the development company (GDI/CED) entered into an agreement with International Energy Partners, L.P. (IEP), pursuant to which the Con Ed subsidiary was given preferred rights to participate in certain investment opportunities identified by IEP. A number of potential projects were reviewed. Early on in this relationship, GDI/CED and IEP gained a minority ownership investment in a relatively small power facility in Eastern Guatemala, known as Generadora Electrica del Norte, Limitada. The development company additionally contemplated investing in other projects in Guatemala, as well as projects in Peru, Indonesia and the Philippines. In 1998, GDI/CED participated in a utility project in China. After review of each proposed project, the development company made individual risk assessments as to whether to proceed.

In September 1997, the PSC and Con Ed agreed that Con Ed would be restructured as a holding company comprised of unregulated subsidiaries. The agreement also required Con Ed to divest at least 50% of its New York City electric generating, fossil fueled, megawatt capacity plants to unregulated third parties by the end of 2002, and permitted the new holding company to invest up to 5% of its consolidated capital in unregulated subsidiaries.[4] Consolidated Edison, Inc. (CEI), therefore, was formed on January 1, 1998, as a holding company, and Con Ed and several other unregulated subsidiaries became subsidiaries of CEI. According to Kevin Burke, Chairman and Chief Executive Officer, and President of CEI at the time of the trial, and formerly Vice President for Corporate Planning, prior to establishing the holding company structure, investments that Con Ed pursued had to be approved by the PSC. However, under the new holding company structure, Con Ed could pursue certain opportunities, up to a percentage of its consolidated capital, in energy and non-energy fields, without prior PSC approval. Between 1999 and 2001, Con Ed sold much of its electrical generating capacity, after which the remaining electric generating assets owned by Con Ed were connected with, or ancillary to, its steam generation business.

According to Joan Freilich, the former Comptroller, Chief Financial Officer (CFO) and member of the Boards of Con Ed and CEI, Con Ed, as a subsidiary of CEI, sought

---

3. Unfortunately, the parties' submissions use interchangeable names, often failing to distinguish between the designations: plaintiff, CED, GDI, CEL (Consolidated Edison Leasing, Inc.), CEL Trust (Consolidated Edison Leasing Trust) and Con Ed.

4. Other unregulated subsidiaries consisted of Consolidated Edison Solutions, Inc., formed to provide electricity and natural gas to commercial and residential customers in the Northeast; Consolidated Edison Energy, Inc., formed to market specialized energy capacity and risk management services to wholesale customers in the Northeast and mid-Atlantic states; and Consolidated Edison Communications, formed to build and manage communication networks.

to enter into one or more LILO investments in order to offset losses it was expected to sustain as a result of deregulation of the electric utilities in New York State and the resulting divestiture of some of its assets. According to Ms. Freilich:

> Con Ed was entering a lot of new areas at this time in terms of the competitive markets, different areas away from the geographic area and the regional markets that we were familiar with. And we certainly, to the extent we were looking at assets, including leasing, we wanted to go to familiar assets, which we understood, which we felt that we could better evaluate, both before and after acquisition.

Among other investments, the development company was investing in long-term "greenfield" projects, and was expected to operate at a loss into 2001, due to the up-front costs associated with these projects. According to Charles Muoio, a former management employee and ultimately Chief Executive Officer of the development company, the "greenfield" projects were "new project[s], [that] can take you four or five years before you actually start getting cash flow out of the project." [5]

A LILO transaction is designed to provide a pretax profit that, for accounting purposes under Financial Accounting Standards (FAS) 13,[6] is front-loaded into the early years of the transaction. According to testimony at the trial, separate phases accounting does not change the total income attributed to the transaction, but changes the timing of the recognition of income. Several witnesses for both parties testified at the trial that such a tax advantage is normal and expected in leveraged leases. Furthermore, as a result of deregulation, the development company (GDI/CED) specifically sought international LILO investments in order to diversify its assets and develop strategic alliances abroad. According to numerous senior level employees of the plaintiff and its subsidiaries, including Ms. Freilich; Mr. Muoio, a former Chief Executive Officer of the development company; Ms. McCartney, a former Chairman of the Board of the development company; and Mr. Burke, GDI/CED went about evaluating prospective investments in a very deliberate manner, rejecting many proposed opportunities prior to choosing the RoCa3 Transaction.

On December 15, 1997, the RoCa3 Transaction with EZH was entered into by the development company, at the time known as CED, through its wholly owned subsidiary, Consolidated Edison Leasing, Inc. (CEL). CEL set up a Trust, the CEL Trust, with Wilmington Trust Company, a third party Trustee, to enter into the Lease Agreement, Sublease Agreement, and the other agreements that were involved in the RoCa3 Transaction.[7]

The history of the RoCa3 Transaction relates back to May 1997, when the development company (GDI/CED) began discussions with Cornerstone Financial Advisors L.P. (Cornerstone) to obtain advice on possible leasing investments. Cornerstone was subsequently retained to provide financial services in connection with the RoCa3, LILO Transaction with EZH, at issue in this case, as well as several other possible LILO transactions involving various energy assets in The Netherlands.

At the time the RoCa3 Transaction was being explored, EZH was one of four national power-generating companies in The Netherlands, engaged in the business of coordinating and transporting electrical energy in

---

**5.** As Mr. Burke testified: "Greenfield projects are generally thought of as, start with a green field and propose to build a plant, be responsible for all of the engineering, construction, and then eventually operation and maintenance of that plant. And it is referred to as a greenfield because it starts with basically nothing there."

**6.** Number 13 of the Financial Accounting Standards (FAS 13) addresses lease accounting for lessors and lessees taking part in leveraged leases. FAS 13 enables earlier recognition of income (also referred to as accelerated income or front-loaded income) relative to other transactions with similar cash flows. Additionally, FAS 13, ¶ (42)(c) allows nonrecourse debt used in a leveraged lease to be excluded from the liabilities side of a balance sheet, keeping the debt-equity ratio from increasing the way it would if, instead, there were recourse debt.

**7.** The parties have stipulated that: "[t]he role of the trust has no effect on the tax treatment of the Transaction."

the southern part of The Netherlands. Since 1941, EZH had been an energy company which owned assets, including several energy generating facilities in The Netherlands. The issued capital stock of EZH was owned by several municipalities in the southern part of The Netherlands. EZH's RoCa3 Facility opened for commercial operation in 1996 and delivered heat, electricity and carbon dioxide to its customers.

On August 25, 1997, Cornerstone notified GDI/CED of the possibility of entering into a leveraged lease with EZH regarding the RoCa3 Facility. On September 26, 1997, Cornerstone, on behalf of the development company, by that time named CED, and Banc One Leasing (Banc One),[8] another entity which invested in the RoCa3 Facility, submitted a proposal to EZH to enter into a LILO agreement with respect to the RoCa3 Facility. EZH, however, did not execute that proposal. On October 21, 1997, CED submitted a proposal directly to EZH, also involving the RoCa3 Facility, which EZH accepted on October 22, 1997. CED stipulated that its proposal was subject to: (a) participation of lenders on terms acceptable to CED; (b) issuance of necessary approvals within CED; (c) receipt of satisfactory opinions (including a tax opinion) and accounting determinations; (d) satisfactory third party expert letters and reports concerning (i) the reasonableness of the interest rate on the third party nonrecourse loan, the debt defeasance and related matters, (ii) insurance matters, (iii) environmental matters, (iv) an engineering report, and (v) an appraisal report; and (e) negotiation of documentation mutually acceptable to EZH and CED. According to Robert Holzman, a representative of Cornerstone and a witness at trial, Cornerstone assisted CED's due diligence efforts, and hired some of the experts to review the Facility and the proposed Transaction, including credit due diligence, asset due diligence, environmental due diligence, legal and regulatory due diligence, and accounting due diligence.

In furtherance of its extensive due diligence efforts, prior to entering the RoCa3 Transaction, and because the plaintiff's entering the RoCa3 Transaction was contingent on the results of the due diligence reports, CED retained the law firms of Shearman & Sterling, LLP as its United States legal counsel, and Loeff, Claeys, Verbeke as its Dutch legal counsel, as well as Deloitte & Touche LLP (Deloitte) as its appraiser, Duke Engineering and Services (Duke Engineering) as its independent engineer, and Tauw Milieu, International (Tauw Milieu), as its environmental consultant. Con Ed and CED representatives testified at trial that CED based its decision to hire each of these firms on their reputations and/or their prior relationships with CED.

The results of key due diligence evaluations are summarized briefly below. The record, however, includes the detailed studies documenting CED's and Con Ed's comprehensive due diligence efforts. Upon review, and reinforced by credible testimony at the trial of those involved in the preparation of the various reports submitted to CED and Con Ed prior to the RoCa3 Transaction, the reports appear to have been thoroughly and carefully prepared by knowledgeable experts and, therefore, deserving of credibility. The court notes that a number of the expert reports were commissioned by the same companies whose names have appeared as performing some of the pre-transaction reviews in several other cases in which the deductions claimed on leveraged lease transactions have been disapproved. The reports in the record before the court, however, are specific to the RoCa3 Transaction and Facility and should be reviewed on their own merits, and not compared to separate, unrelated transactions, which do not even invoke electric generating facilities.

- Duke Engineering concluded in its Report, titled "EZH—RoCa CHP Station Unit No. 3 Due Diligence Engineering Report," that various aspects of the quality of the RoCa3 Facility (Plant Life Expectancy; Availability; Reliability;

---

**8.** According to Mr. Muoio, the President of CED during the time of the RoCa3 Transaction, Banc One was involved because CED wanted to invest alongside experienced leveraged leasing industry participants. Ultimately, when the transaction was completed, Banc One Leasing, Inc., separately invested in a leveraged lease for the remaining undivided interest in the RoCa3 Facility.

Efficiency; Environmental Compliance; and Plant Staff Support, Training, and Incentives) were above average and others (Operability; Plant Safety; Site Plan and Structures; and Future Plant Improvement/Renewal) were average. The Report stated:

> The evaluation rates each of the above 10 areas either below average, average or above average. Average is defined as how a typical U.S. combined cycle or European CHP CC plant would measure up to the criterion. However, we noted that this plant compared favorably with other Dutch and European plants of similar size and design that DE & S [Duke Engineering & Services] has reviewed in that it had been designed for high efficiency and high availability as discussed in Section 3.

The useful life of the RoCa3 Facility was reported by Duke Engineering as above average, at least a total of 55 years. The Duke Engineering Report also addressed the assets and services CED would need to operate the RoCa3 Facility and concluded that, given Con Ed's extensive and lengthy experience and expertise as a utility running many power plants, it would have the ability to operate the RoCa3 Facility.

- Deloitte reported in its Appraisal of the RoCa3 Electric Generation Facility, among other conclusions, that:

> The fair market values of the Sublessor's Lease Interest, the Facility and the Undivided Interest are equal to US$148,200,000, US$316,000,000 and US$150,000,000, respectively, as of the Closing Date.[9] The equity investment of the Investor is at least 20 percent of the value of the interest of the Sublessor's Lease Interest as of the Closing Date,

and,

> Based on the comparative costs of the reasonably anticipated alternatives expected to be available to the Sublessee on the Sublease Basic Termination

Date, the Sublessee is not expected to be under any economic compulsion to exercise the Sublease Purchase Option.

The Deloitte Report concluded that the remaining useful life of the Facility as of the closing date was at least 54 years and, as of the lease termination date, would be at least 10.8 years. Furthermore, Deloitte found that there was no economic or non-economic factor which would create a material inducement or cause EZH to exercise the Sublease Purchase Option, and that on the Lease Termination date, the remaining useful life of the RoCa3 Facility was expected to be at least 20% of the Facility's remaining useful life as of the December 15, 1997 closing date. Therefore, the Deloitte Report concluded that, upon termination of the Sublease, the Sublessor's Lease Interest would be commercially viable and expected to be able to be placed with an unrelated party.

- Tauw Milieu, a Dutch company, following on-site inspections, issued its Report titled "EZH—RoCa3 Power Station: Due Diligence Environmental, Safety and Health Report." The Report concluded that the RoCa3 Facility's overall environmental condition was "very good," with no direct evidence indicated of any significant contamination problems affecting the site. "[P]roper operating, maintenance and upgrade procedures, and all appropriate regulatory requirements are followed[.]" No major non-compliances were identified in the Report, and only minor non-compliances were identified, which could require administrative action or a minimum investment. According to the Report, the only health and safety non-compliances were minor, and likely would mainly entail personnel costs to remedy. The Report described the Facility as "a state of the art power station. The Facility employs best available technology to minimize environmental impact, is well managed and is in good condition. . . . Tauw is of the

---

9. The plaintiff's interest in the Facility was equal to 47.47%. Banc One held an interest in the remainder of the RoCa3 Facility for its own LILO Transaction.

opinion that the Facility doesn't present any significant environmental concern." Tauw concluded that EZH has a positive attitude and compliant approach toward health and safety issues.

- The law firm of Shearman & Sterling, LLP was asked to provide outside legal counsel regarding a "Cross–Border Lease/Leaseback Transaction," "Amendments to the [IRS] Code and Treasury Regulations Impact on Leveraged Lease Financing Transactions," and also to give specific advice on the "EZH RoCa3 Facility Lease." The "Cross–Border Lease/Leaseback Transaction" Memorandum, provided by Shearman & Sterling on November 20, 1997, identified the types of risks to be considered when entering into such a transaction, including the conditions under which a leveraged lease transaction will be considered a valid lease by the IRS and United States courts, and whether the transaction serves a valid business purpose. The analysis on "Amendments to the Code and Treasury Regulation Impact on Leveraged Lease Financing Transactions," and on the impact of these amendments on leveraged lease financing transactions, concluded that "none of the examined amendments [since 1985] were enacted with retroactive effect." The Final Tax Opinion of Shearman & Sterling, on the RoCa3 Facility Lease stated:

> Based upon the foregoing and in reliance thereon and subject thereto, and based upon an analysis of the Code, the Treasury Regulations promulgated thereunder (including proposed, temporary and final regulations), revenue rulings and revenue procedures of the Internal Revenue Service, court decisions and such other laws and facts as we have deemed relevant and necessary, it is our opinion that for Federal income tax purposes:
>
> 1. Each of the Lease and the Sublease is a "true lease"; the Trust will be treated as the lessee under the Lease and as the sublessor under the Sublease; the Trust will be treated as a grantor trust pursuant to Sections 671 et *seq.* of the Code; the Investor will be the owner and sole beneficiary of the Trust and the Investor will be entitled and required to take into account each item of income, gain, loss, deduction and credit of the Trust with respect to its interest in the Facility, the Lease, the Sublease and the Loan evidenced by the Loan and the Security Agreement.
>
> 2. The Investor should be entitled to rental deductions under Section 162 of the Code for scheduled installments of the Lease Basic Rent payable under the lease in the amounts and the periods to which such installments relate, as specified in the lease, in accordance with Section 467(b)(1) of the Code. The Investor should be entitled to include in gross income all scheduled installments of Sublease Basic Rent (and Sublease Renewal Rent, if any) receivable under the Sublease during the Sublease Term in the amounts and in the periods to which such installments relate, as specified in the Sublease, in accordance with Section 467(b)(1) of the Code. Neither the Lease nor the Sublease constitutes a "disqualified leaseback" or "long-term agreement" within the meaning of Section 467(b)(4) of the Code.
>
> 3. The Loan evidenced by the Loan and Security Agreement constitutes a debt obligation of the Trust and all amounts payable thereon as interest with respect thereto will be deductible by the Investor, when accrued in accordance with the terms thereof, pursuant to Section 163 of the Code and the Treasury Regulations promulgated thereunder.
>
> 4. The Investor will be entitled to deductions for amortization of Transaction Expenses on a straight-line basis over the Lease Term, the Sublease Term and the Term of the Loan evidenced by the Loan and Security Agreement, respectively, and we believe that the allocation of the Transaction Expenses in accordance with

the terms of the Pricing File constitutes a reasonable allocation thereof.

5. The German lease constitutes a financing rather than a "true lease," under which the German Lessor is a secured lender and the Lessor is a borrower and owner of the German Equipment.

6. Provided that the Closing Date is prior to the effective date of the Final Treasury Regulations under Section 467 of the Code, a court should not construe such final Treasury Regulations to apply to Lease Basic Rent, Sublease Basic Rent or Sublease Renewal Rent, if any, unless either the Lease or the Sublease constitutes a "disqualified leaseback" or a "long-term agreement," within the meaning of Section 467(b)(4) of the Code.

In addition, the Dutch firm of Loeff Claeys Verbeke issued an opinion on the impact of Dutch law on the Transaction.

A Standard & Poor's credit analysis of EZH also was performed, which concluded that if a rating were requested, companies like EZH are likely to be rated at or above an A rated company. CED also asked Cornerstone to assist in obtaining an accounting opinion regarding whether the RoCa3 Transaction qualified as a leveraged lease for accounting purposes. The accounting firm of Arthur Anderson LLP was hired and performed the accounting analysis on the RoCa3 Transaction, and concluded in a memorandum provided to Cornerstone that the Transaction qualified as a leverage lease for accounting purposes.

Prior to the closing of the RoCa3 Transaction, CED employees and representatives on their behalf prepared numerous documents and briefings used by CED and Con Ed management during their internal review of the Transaction. Among these was a late-stage, "Leasing White Paper," dated December 9, 1997, and submitted to then Chairman of Con Ed's Board, Eugene McGrath. The Leasing White Paper summarized the nature of leveraged leasing transactions, projected the benefits and risks, projected earnings of such transactions, and projected a 90%, anticipated success if such a transaction were to be challenged by the IRS, under current regulations, based on tax counsel advice, and noted that the RoCa3 Transaction was under consideration. The Leasing White Paper also stated, "the transactions [referring generally to leveraged leasing LILO transactions] will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate." On December 10, 1997, CED personnel presented a resolution to approve involvement in the RoCa3 Transaction to the CED Board of Directors. On the same day, the CED Board authorized investment participation in the RoCa3 Transaction, subject to the approval of the holding company, CEI, and provision of the necessary funds. At a CEI Board of Directors meeting on December 12, 1997, the CEI Board gave authorization to CED to proceed with the investment strategy described in the December 9, 1997 Leasing White Paper.

Thereafter, on December 15, 1997, EZH and CED's subsidiary, CEL, directly or through CEL Trust,[10] entered into the RoCa3 Transaction, along with third parties, by executing a series of agreements including, among others: (1) the Participation Agreement; (2) the Lease Agreement; (3) the Lease Certificate of Acceptance; (4) the Sublease Agreement; (5) the Sublease Certificate of Acceptance; (6) the Loan and Security Agreement; (7) the Sublessee Loan Agreement; (8) the Tax Indemnity Agreement; (9) the IJssel Agreement; (10) the Rotte Agreement; (11) the Sublease Deposit, Pledge and Repledge Agreement; (12) the Sublessee Pledge and Security Agreement; (13) the Custody Agreement; (14) the Facility Operating Agreement; (15) the Common Facilities Use Agreement; (16) the Facility Support Agreement; (17) the Access Agreement; and (18) the Assignment Agreement.[11]

---

10. CEL Trust is the entity that entered the RoCa3 Transaction by executing the documents that officially created the Transaction, and is the entity of the plaintiff on the documents responsible for making payments, receiving payments and exercising decisions during the life of the investment in the RoCa3 Facility.

11. The recitals of the Assignment Agreement provide that on December 13, 1995, EZH sold and

Among the key instruments governing the RoCa3 Transaction, addressed below, are the Participation Agreement; the Lease Agreement; the Hollandsche Bank–Unie (HBU) Nonrecourse Loan documents; the Sublease Agreement; the Rotte Agreement; and the IJssel Agreement establishing the Defeasance Accounts.

● **The Participation Agreement**

In brief, the Participation Agreement established the agreements made by the various parties to promote participation in the RoCa3 Transaction. These included conditions precedent to the parties' willingness to close the RoCa3 Transaction, as well as a complex list of documents to be provided, and representations and warranties to be made by CEL Trust and EZH. In addition, the Participation Agreement addressed Credit Arrangements, Refinancing Rights, Investment and Holdings of Funds, Transfer of Interests, General and Tax Indemnity Conditions, Limitations on Liability, as well as a number of other items, including jurisdiction, service of process, language, currency and confidentiality.

● **The Lease Agreement**

By way of the Lease Agreement, EZH, as lessor, conveyed to CEL Trust,[12] as Trustee

for CED, a Lease Interest of an undivided 47.47% in the RoCa3 Facility for a Lease Term of 43.2 years, commencing on December 15, 1997 and ending on February 24, 2041. CEL Trust then entered into a Sublease Agreement with EZH, and subleased an undivided interest in the RoCa3 Facility for a sublease term of 20.1 years to EZH. Section 7(a) of the Lease Agreement provides that, prior to the Sublease Termination Date, CEL Trust, at its own expense, is required to maintain, repair and preserve the RoCa3 Facility, in accordance with the standards set forth in section 7(a) of the Sublease Agreement, and that by entering into the Sublease Agreement with EZH, and prior to the Sublease Termination Date, CEL Trust was deemed to have complied with its maintenance, repair and preservation obligations as defined by the Lease Agreement. At the end of the Sublease Basic Term, three separate Options could be exercised pursuant to the agreement, the terms of which will dictate the parties' relationship for the remainder of the Lease Term. These include the Sublease Purchase Option, which could be exercised by EZH, the Sublease Renewal Option and the Retention Option, either of which could be exercised by CEL Trust.

According to the Lease Agreement, CEL Trust was required to make two rent pay-

---

transferred title to a steam turbine generator and a gas turbine generator (the German Equipment) to Asea Brown Boveri AG & Co. Leasing KG (ABB). Furthermore, recitals of the Assignment Agreement also provide that on that same day, EZH entered into two separate German Leases with ABB, one lease for each generator, by which EZH leased, under German Law, the German Equipment from ABB for a period of 13.5 years from April 24, 1996 through October 24, 2009.

The German Leases each provide ABB with an option to "put" the respective German Equipment to EZH by providing written notice of its election to EZH no later than nine months prior to October 24, 2009. If ABB exercises one of its puts, then upon receipt of full payment from EZH of the Lessor's Unamortized Investment Balance and all other amounts of Rent and Supplemental Rent due and payable as of October 24, 2009, the German Lessor is required to transfer all of its legal and beneficial rights, title and interest in the German Equipment at issue to EZH. If, however, ABB does not exercise its put under either of the applicable German Leases, EZH may purchase the German Equipment under that German Lease. Furthermore, pursuant

to the Assignment Agreement, EZH assigned to CEL Trust and Banc One Trust all of its Lease Rights under the two German Leases. The Assignment Agreement sets forth various rights and obligations of the parties to the agreement. While this arrangement complicated the RoCa3 Transaction, the German investor provided an advance promise of its cooperation with regard to the terms of the Transaction.

Furthermore, in 1999, EZH shareholders entered into a stock purchase agreement with PreussenElektra AG, a German utility, pursuant to which EZH shareholders sold their stock to PreussenElektra AG. Thereafter, in 2000, the parent company of PreussenElektra AG merged with another company to form E.ON AG, a publically traded German company. A subsidiary of E.ON AG, E.ON Energy AG, acquired the shares of EZH as part of the merger. On December 11, 2000, CED was informed that EZH had changed its name to E.ON Benelux Generation N.V.

12. CEL entered into a Trust Agreement with Wilmington Trust Company, to act for the benefit of CEL as Trustee of the RoCa3 Facility Trust, generally referred to in this opinion as CEL Trust.

ments to EZH during the term of the Lease. An immediate Initial Basic Rent Payment in the amount of $120,112,270.36 was due on the closing date, December 15, 1997. CEL Trust paid this amount to EZH by combining CEL Trust's equity commitment of $39,320,000.00, with an $80,792,270.36 nonrecourse loan, at 7.10% interest, to CEL Trust, from HBU. To secure the prompt payment of principal and interest, and all other amounts due with respect to the Loan Certificates issued pursuant to HBU's Nonrecourse Loan, CEL Trust assigned to HBU a lien (the Lien of the Loan Agreement), including on the Lease Agreement, the Sublease Agreement, all rents, profits, revenues and other income from the property, subject to the Lien of the Loan Agreement, and CEL Trust's right to receive rent from EZH. Additionally, so long as the Lien of the Loan has not been discharged, EZH is to pay its sublease rents, except for certain specifically excluded payments, to HBU. At the time of the RoCa3 Transaction, although no longer, HBU was a wholly-owned subsidiary of ABN AMRO Bank, N.V. (ABN AMRO). Section 10(c) of the Participation Agreement provides that HBU is regularly engaged in banking, is making the loan in the ordinary course of its business, its day-to-day operations are separate from ABN AMRO Bank, it has not transferred any part of the loan or risks associated with making such loan to any person or affiliate thereof (including ABN AMRO) with obligations under the operative documents, and the Operative Documents contain all of the agreements on the part of the lender or any affiliate thereof, relating to the transactions contemplated by the Operative Documents. As noted above, and testified to by plaintiff's expert witness, Dr. David M. Ellis, a leveraged lease typically has nonrecourse debt in order to qualify as a leveraged lease for accounting purposes under FAS 13. Paul Bent, an expert witness who testified at trial for the defendant, also remarked that it is standard practice for a lender in a leveraged lease to finance up to 80% of the purchase price with nonrecourse debt, although the percentage can vary. In this case, HBU's loan provided about 67% of the financing of the RoCa3 Transaction. A payment schedule for repayment of the nonrecourse loan from HBU, to

begin on January 2, 2004, and certain triggering events for prepayment, including CEL Trust's election of the Retention Option, are set forth in the Loan Certificate.

The RoCa3 Transaction was effected when CEL transferred its $39,320,000.00 equity investment to the Wilmington Trust Company Account, which, in turn, assigned its rights in the account to CEL Trust. HBU also transferred its rights in another funded account, held by ABN AMRO, in the amount of $80,792,270.36, to CEL Trust. CEL Trust subsequently transferred and assigned these two accounts to EZH in satisfaction of the Initial Basic Rent Payment of $120,112,270.36. CEL Trust's second and Final Basic Rent Payment, in the amount of approximately $831,525,734.00, is due on the Lease Termination Date, February 24, 2041.

The Lease Agreement lists a series of events which would constitute Lessor Events of Default, including the following:

(a) EZH breaches the covenant of quiet enjoyment provided in section 4(c) of the Lease after the Sublease Term, and does not timely cure the breach;

(b) EZH fails to perform or observe in any material respect its covenants, obligations, or agreements under the Lease Agreement or sections 11(d) and (e) of the Participation Agreement, and EZH cannot timely cure such failure;

(c) EZH is declared bankrupt and does not successfully appeal such determination in a timely manner;

(d) EZH is dissolved or liquidated, other than by reason of an allowed merger, if the rights of CEL Trust or CEL are adversely affected;

(e) EZH proposes or enters into an arrangement for the benefit of its creditors;

(f) EZH fails to maintain the Letter of Credit;

(g) EZH defaults under the German Lease and the German Lessor exercises its remedies under the German Lease or gives notice of its intent to do so;

(h) A termination of the German Lease without EZH obtaining title to the German Equipment;

(i) A payment default under the Sublessee Loan Agreement as of the last day of the Sublease Basic Term, unless EZH has already purchased Lessor CEL Trust's interest in the Facility;

(j) EZH fails to pay the Settlement Amount which has not been timely resolved.

The Lease Agreement also provides that if a Lessor Event of Default occurs and the Sublease is not in effect, then: (a) EZH is to pay CEL the Settlement Amount, set forth in Exhibit D to the Lease Agreement; (b) CEL Trust's Lease Interest is to be automatically assigned to the Designated Successor Lessee (which is any entity chosen by EZH, so long as that entity is organized under the laws of The Netherlands); and (c) CEL Trust is to transfer its rights in certain collateral, subject to the prior payment of the Settlement Amount, to the Designated Successor Lessee, except as otherwise provided. The Lease Agreement further provides that if a Lessee or Lessor Event of Default occurs while the Sublease is in effect, the sole action that may be taken by either EZH or CEL Trust is to exercise any of its remedies or take other appropriate action under the Sublease.

● **Sublease Agreement**

The Sublease Agreement between CEL Trust and EZH sets out the terms of the Sublease, in which CEL Trust was the Sublessor and EZH was the Sublessee of an undivided 47.47% interest in the RoCa3 Facility. The Sublease took effect on the closing date, December 15, 1997. The Sublease was entered into for a period of 20.1 years, expiring on January 1, 2018. The Sublease Basic Term is for approximately 46.53% of the Lease Term. The Sublease Agreement requires EZH to "maintain, overhaul, inspect, test, repair and service" the Facility at its own expense during the Sublease Basic Term on a basis comparable to EZH's maintenance of similar facilities that it owns, leases or operates and in line with "Prudent Industry Practice," in compliance with applicable Dutch Law, any insurance requirements and the requirements of the German Documents, and to keep the appropriate records, at a level and in a manner that will maintain any existing manufacturers' warranties. Under the Sublease Agreement, EZH is required to pay annual sublease rents to CEL Trust, beginning January 2, 1998 through January 2, 2018, as follows: on December 15, 1997: $0.00; on January 2, 1998: $424,960.00; on each January 2 from January 2, 1999 to January 2, 2007: $8,999,161.52; on January 2, 2008: $8,964,978.83; on January 2, 2009: $7,358,487.86; on January 2, 2010: $7,362,962.76; on January 2, 2011: $7,362,950.30; and on each January 2 from January 2, 2012 to January 2, 2018: $7,362,950.33.

The Sublease Agreement obligates EZH to pay the periodic Sublease Rents under any and all circumstances, including any setoff, counterclaim, recoupment or defense it may have against the plaintiff. EZH is to pay its Sublease Rent Payments, except for certain excluded payments, directly to HBU in satisfaction of CEL Trust's obligation to HBU under the Loan Certificates. The Sublease further provides that EZH may only sub-sublease the Facility if it complies with stated conditions and agreements. In the event of a sub-sublease, EZH retains liability for all obligations under the Operative Documents of the Transaction. Furthermore, any modifications that EZH makes to the Facility are permitted under the Sublease Agreement, so long as they do not impair the operation, remaining useful life or residual value of the Facility. As discussed in greater detail below, CEL Trust established the Sublessee Loan for the benefit of EZH to allow EZH to defer payment on the Sublease from 1997 through a portion of 2004. On each stated date set forth in the Sublessee Loan Agreement, CEL Trust is to lend to EZH the amount due on the annual Sublease Basic Rent, at an interest of 7.43% per annum.

The Lease or the Sublease may be terminated prematurely by the occurrence of certain Premature Termination Events described in the Sublease Agreement, such as: (a) a Burdensome Buyout Event; (b) a Voluntary Termination for Economic Obsolescence; (c) an Early Purchase Option; (d) a

Sublease Facility Event of Loss; or (e) a Sublessee Event of Default. In the event of a termination, a specific termination value would be determined.

A Sublessee Event of Default is defined in the Sublease Agreement, as follows:

(a) EZH fails to make payments of Sublease Basic Rent, Sublease Renewal Rent, Sublease Termination Value, Sublease Special Termination Value, Fair Market Sales Value of Sublessor's Lease Interest, Sublease Purchase Option Price or Sublease Supplemental Rent required to be paid pursuant to the Sublessee Loan Agreement;

(b) Representations or warranties made by EZH are discovered to be untrue, inaccurate, or misleading in any material respect and EZH cannot timely cure such default;

(c) EZH fails to perform or observe in any material respect its covenants, obligations, or agreements and EZH cannot timely cure such default, with certain limited exceptions;

(d) EZH is declared bankrupt and does not successfully appeal such determination in a timely manner;

(e) EZH is dissolved or liquidated, other than by reason of an allowed merger, if the rights of CEL Trust or CEL are adversely affected;

(f) EZH proposes or enters into an arrangement for the benefit of its creditors;

(g) EZH fails to maintain required insurance;

(h) EZH fails to maintain the Letter of Credit;

(i) EZH fails to maintain and protect HBU's security interest in the Facility;

(j) CEL Trust fails to have a first priority perfected security interest in the IJssel Deposit, unless waived by CEL Trust and CEL;

(k) EZH fails to arrange for the Lease Collateral Deposit as of the last day of the Sublease Basic Term (unless it has purchased CEL Trust's Lease Interest);

(l) If CEL Trust elects the Sublessee Renewal Option, and EZH fails to obtain necessary governmental approvals or fails to take any required action with respect to the Loan Certificates, including the purchase thereof, provided that certain conditions are met;

(m) A payment default under the Sublessee Loan Agreement as of the last day of the Sublease Basic Term, unless EZH has already purchased CEL Trust's Lease Interest;

(n) Termination of the Leasehold Right, the Building Right, or the Turbine Building Right;

(o) Foreclosures on liens on the Facility having a value in excess of $1 million;

(p) Defaults under the German Lease and the German Lessor exercises its remedies under the German Lease or gives notice of its intent to do so;

(q) Termination of the German Lease without EZH obtaining title to the German Equipment;

(r) Failure by EZH to pay ground rent due under the Notarial Deed of Establishment;

(s) Failure by Stichting RoCa to pay the Sale Remedy Purchase Price as defined in the Change of Law Agreement;

(t) The Pledge fails to constitute a first priority security interest in the Euro-Clear securities, continuing for 30 days;

(u) EZH exercises the Sublease Purchase Option and fails to comply with its terms as of the last day of the Sublease Basic Term.

● **Defeasance Accounts**

The parties entered into complex agreements to finance the project. EZH established two Defeasance Accounts, the Sublease Deposit (the Debt Defeasance Account) and the IJssel Deposit (the Equity Defeasance Account). On December 12, 1997, EZH established the Rotte Foundation, "to purchase debt instruments, to make deposits, and to grant security interests in its assets to third parties to secure EZH's payment obligations...." EZH made the Sublease Pay-

ment Amount to the Rotte Foundation by transferring and assigning its rights in the ABN AMRO account. The Rotte Agreement provided that EZH's payment obligations are limited to the Sublease Deposit. The IJssel Foundation was established on December 12, 1997, by EZH, to purchase debt instruments, make deposits, and grant security interests in its assets to third parties to secure certain payment obligations of EZH under the Sublease. These accounts, established by EZH, help mitigate and give more certainty to the economic impacts of its Sublease payment obligation that could result from fluctuating currency rates. EZH was a company functioning with the Dutch Guilder and the payment of EZH's Sublease obligations were to be in United States dollars.

The Rotte Foundation granted CEL Trust a first priority right of pledge in the Sublease Deposit. CEL Trust repledged a first priority right of pledge to HBU as security for CEL Trust's obligation to repay the secured loan amounts. The Sublease Deposit, Pledge and Repledge Agreement provides that the Sublease Deposit or Payment Amount of $80,792,270.36, was to be deposited by EZH on the Closing Date. EZH made the Sublease Deposit by transferring and assigning its rights in an ABN AMRO Account, which had an interest rate of 7.10% per annum or 6.98% compounded semi-annually. Under the Sublease Deposit, Pledge and Repledge Agreement, the Sublease Deposit is to be used, to the extent available, to pay EZH's annual rent obligations to CEL Trust during the Sublease Basic Term. Furthermore, if ABN AMRO makes the payment obligations it agreed to make under the Sublease Deposit, Pledge and Repledge Agreement, the remaining payments that ABN AMRO agreed to make at any time will equal the remaining principal and interest payments due on the HBU Loan. Notwithstanding the Sublease Deposit, EZH remains liable for all Sublease Obligations. Bankruptcy of EZH or any other Sublessee does not terminate or otherwise affect the rights, obligations and liabilities of the parties with respect to the Sublease Deposit. Additionally, if ABN AMRO's long-term, unsecured, senior debt obligations rating falls below A2 by Moody's or A by Standard & Poor's, EZH may replace the Sub-lease Deposit with Acceptable Substitute Credit Protection at its own option and expense. This would be contingent upon EZH finding a new lender to purchase the Loan Certificates from HBU for a purchase price of at least the principal remaining and any outstanding interest thereon. Further, if EZH were to replace the Sublease Deposit with Acceptable Substitute Credit Protection, EZH would be required to provide CEL and HBU first priority security interest in such security.

The IJssel Deposit was established pursuant to the IJssel Agreement, when EZH transferred $31,252,643.73 to the IJssel Foundation on the day after closing of the Transaction, to be deposited and credited to the IJssel Account, held at Credit Suisse First Boston, and to be used to purchase United States Government Securities (Treasury STRIPS). Treasury STRIPS (Separate Trading of Registered Interest and Principal of Securities) are zero-coupon Treasury bonds with a face value payable at maturity, requiring the United States to make a one-time payment at a specific future date, the maturity date, although purchased at a discount from face value. EZH granted CEL Trust a first priority interest in the IJssel Deposit as security for its payment obligations. The Treasury STRIPS contained in the IJssel Deposit were to cover the equity portion of the Sublease Basic Rent, if made, and the equity portion of the Purchase Option Price, if paid, with a maturity date prior to the date such amount is due, and with a value at maturity at least equal to each such amount. The maturity dates on the Treasury STRIPS were in 2011 for one, 2017 for another, and 2018 for the rest. The IJssel Agreement provides that, notwithstanding the agreement for the IJssel Deposit to cover certain payments, EZH remains liable for all Payment Obligations. Furthermore, EZH may terminate the IJssel Agreement, but not prior to the termination of the Sublease and the Payment Obligations. Both the Sublease Deposit and the IJssel Deposit were established to help EZH repay its Sublease Obligation. Nonetheless, the Sublease Obligation remained on EZH. As further security for its obligations under the Operative Docu-

ments, the Participation Agreement requires EZH to maintain one or more Letters of Credit in favor of and for the benefit of CEL and CEL Trust. EZH obtained such Letters of Credit on December 15, 1997 to secure EZH's obligations to those entities.

● **Additional Agreements**

Among the additional agreements entered into as part of the RoCa3 Transaction are: the Sublessee Loan Agreement, the Facility Operating Agreement, the Facility Support Agreement, the Access Agreement, and the Tax Indemnity Agreement. The Sublessee Loan Agreement allows EZH to defer its Sublease Basic Rent Payments from 1997 through part of 2004, and provides that CEL Trust shall lend to EZH the amounts due in those years. In brief, the Sublessee Loan Agreement provides that the amounts borrowed by EZH were equal in amount and timing to the Sublease Basic Rent owed to CEL Trust from 1998 through 2003 and, in 2004. In 2004, the amount of the Sublessee Loan from CEL to EZH equals a portion of the Sublease Basic Rent. From 1998 through 2003, the amounts of the Sublessee Loans made by CEL Trust to EZH were equal in amount and timing to the amounts set forth for the Sublease Basic Rents for the same time period. In 2004, the amount of the Sublessee Loan made from CEL Trust to EZH was equal to a portion of the 2004 Sublease Rent. Thus, under the Agreement, EZH would not make payments from the Sublease Deposit or from any other source between 1998 and the first part of 2004. EZH borrowed the following amounts from CEL Trust, pursuant to the Sublessee Loan, on January 2, 1998: $424,960.41; on each January 2 from January 2, 1999 to January 2, 2003: $8,999,161.52; and on January 2, 2004: $669,041.51.

The Facility Operating Agreement was entered into by EZH, CEL Trust and Banc One Trust, and was created "to establish their respective rights and obligations in respect of matters relating to the operation of the Facility" during the Lease Term. It provides that EZH shall be the original Opera-

tor of the RoCa3 Facility, and that during the CEL Trust and Banc One Trust Sublease Terms, EZH may not be removed as Operator of the Facility, unless there is an uncured Facility Operating Agreement Default or a Sublessee Event of Default, and CEL Trust and Banc One Trust, who together possess the necessary two-thirds of Entitlement Shares [13] in these circumstances for an effective vote, agree to remove EZH as Operator. During the Sublease, the Sublease principally governs EZH's duties and responsibilities. However, certain decisions, such as a Final Shutdown, require a two-thirds vote by the Leaseholders, not including EZH as the Operator.

After the Sublease terminates, the Facility Operating Agreement provisions with respect to the Operator and CEL Trust would come into effect. The Facility Operating Agreement mandates that the Operator at that time is responsible for operating the RoCa3 Facility in accordance with "Prudent Industry Practice" and has the responsibility for decisions regarding maintenance and operations of the RoCa3 Facility; need and timing of any modifications, including those required to keep the RoCa3 Facility in compliance with Dutch law; scheduling outages for modifications; determining the nature and timing of capital expenditures and other operating expense budgets; and integrating the RoCa3's Facility with other units at the Station Site. The Facility Operating Agreement also provides that, after the respective terms of the Subleases, EZH or any successor Operator is entitled to receive monthly fees from CEL Trust and Bank One Trust, according to their respective entitlement shares, for EZH's or successor's continued operation of the RoCa3 Facility.

The Facility Support Agreement provides that EZH grants CEL Trust and Banc One Trust, or anyone subleasing from those two entities, the right to use certain equipment, parts, and supplies necessary or useful for operating, maintaining, repairing, testing, renewing or inspecting the Facility. This includes access to the high-voltage transmission grid for the transmission of its share of

**13.** Entitlement Shares equal any Leaseholder's adjusted undivided interest percentage and a Fa-

cility users' adjusted undivided interest. CEL Trust holds 47.47% of the shares.

the electricity generated by the RoCa3 Facility, in addition to the use of other systems required for the proper functioning of the Facility. Furthermore, EZH agreed to provide certain services, such as waste disposal services, access to water and laboratory testing facilities. The agreement also provides that Facility Users are required to pay EZH a fee for the equipment, parts, services and supplies provided. The Access Agreement provides that EZH grants to CEL Trust an easement on the Station Site as necessary for the leasing and operation of the Facility.

The Tax Indemnity Agreement provides that CEL and EZH intend that the Lease and Sublease be treated as a "true lease" for United States federal and state income tax purposes, that EZH would be treated as the Lessor and Sublessee and that CEL Trust would be treated as Lessee and Sublessor of the undivided 47.47% interest. That agreement further provides that during the Lease Term, neither EZH nor the German Lessor will take any written position inconsistent with the Tax Assumptions set forth in Section 2 of the Tax Indemnity Agreement, unless it is required to avoid a tax penalty; and EZH will not claim Lease Basic Rent payable under the Lease as an item of gross income on a United States federal, state or local income tax return in a manner inconsistent with the tax treatment of such Lease Basic Rent assumed by CEL. Furthermore, the Tax Indemnity Agreement provides that, on the date of closing, EZH was not a party to, nor did it have any present intention or understanding to enter into any written or oral agreements or like arrangements, other than as set forth in the Operative Documents and in the Specified Documents, legally requiring or economically compelling the exercise or non-exercise of the Sublease Purchase Option, or altering any of the agreements or terms or conditions set forth in the Operative Documents. Moreover, throughout the first five years of the Sublease, there will not be any written or oral agreements not described in the Operative Documents.

The Tax Indemnity Agreement also includes the following Transaction assumptions:

(a) The Trust [CEL Trust] will be treated as a grantor trust or otherwise disregarded for federal income tax purposes, and CEL, as the owner of the Trust will be required to take into account all items of gain, loss, deduction and credit in connection with its Undivided Interest;

(b) The Lease and Sublease will each be treated as "true leases"; EZH will be treated as the Lessor of the Undivided Interest, CEL Trust will be treated as the Sublessor and EZH will be treated as the Sublessee;

(c) CEL will amortize the transaction expenses on a straight-line basis, one-third of which over the Lease Term, one-third over the Sublease Renewal Term, and one-third over the term of the Loan. That the Lease and Sublease will each be treated as "true leases," EZH will be treated as the Lessor of the Undivided Interest, and CEL Trust will be treated as the Sublessor, and EZH will be treated as the Sublessee;

(d) CEL will be allowed annual rental deductions under Section 162 of the I.R.C. for the Lease Basic Rent during the Lease Term as set allocated in Exhibit A to the Lease Agreement;

(e) CEL is required to take into account items of income, gain, loss and deductions in accordance with the accrual method of accounting;

(f) The obligations evidenced by the Loan Certificate will constitute indebtedness of CEL Trust and CEL will be entitled to interest deductions in connection therewith under I.R.C. section 163;

(g) CEL always will have sufficient income to utilize the Interest Deductions, Amortization Deductions and Rent Deductions; and

(h) CEL will not be subject to I.R.C. section 467(b)(2) with respect to Lease Basic Rent, Sublease Basic Rent or Sublease Renewal Rent.

● **Options**

Under the terms of the Transaction, the Sublease Basic Term ends on January 2, 2018, at which time three Options may be exercised, either by EZH or CEL Trust in accordance with the terms of the Agree-

ments: (1) the Sublease Purchase Option, exercisable by EZH; (2) the Sublease Renewal Option; or (3) the Retention Option, the latter two both exercisable by CEL Trust if EZH does not exercise the Sublease Purchase Option.

## 1. Sublease Purchase Option

At the end of the Sublease Basic Term, EZH may exercise the Sublease Purchase Option to purchase CEL Trust's remaining Lease Interest in the Facility for the Sublease Purchase Option Price of $215,450,949.20.[14] EZH can accomplish this payment, either by transferring, in cash, the full amount to CEL Trust, or by transferring $123,615,472.00, in cash, together with the delivery of STRIPS from the IJssel Deposit, valued at their respective maturity dates. The scheduled balance of the Sublease Deposit, as of January 2, 2018, plus the value of the United States Government Obligations remaining in the IJssel Deposit (on their respective maturity dates), together, would equal the Sublease Purchase Option Price. EZH also would be liable for the Final Sublease Basic Rent Payment of $7,326,950.33, which would be satisfied by using one of the Treasury STRIPS from the IJssel Deposit, valued at that amount upon maturity. Furthermore, EZH would assume CEL Trust's obligation to make the Final Basic Rent Payment, therefore owing the Final Basic Rent Payment to itself. Such exercise of the Sublease Purchase Option would result in EZH buying back the remainder of the lease term and, therefore, CEL Trust would then transfer the Sublessee Loan to EZH. If EZH exercises the Sublease Purchase Option, and if ABN AMRO has made all the payments it is required to make under the Sublease Deposit to HBU, the HBU Loan will be paid in full. Under the Sublease Purchase Option,

after the $123,615,472.00 balance of the Loan from HBU is repaid, HBU will release its Lien on the Lease. CEL Trust then may distribute the $7,326,950.33 it receives as the Final Sublease Basic Rent Payment to CEL, along with all subsequent payments from the IJssel Deposit (totaling $91,835,477.24). Therefore, the total amount receivable by CEL, upon Sublease termination, under the Sublease Purchase Option, will be $99,162,427.57, in addition to $5,221,000.00 from a Treasury STRIP with a maturity date of November 15, 2011.

If EZH does not exercise the Sublease Purchase Option, CEL Trust can either exercise the Sublease Renewal Option, which would require EZH to renew the Sublease for 16.5 years, and pay Sublease Renewal Rents, or it can exercise the Retention Option and cause the undivided 47.47% interest to be returned to CEL Trust for the remaining Lease Term.

## 2. Sublease Renewal Option

Under the Sublease Renewal Option, the Sublease would remain in effect at CEL Trust's option from January 2, 2018 through June 15, 2034. The Sublease Renewal Rents from EZH to CEL Trust would be $18,225,000.00, due annually from January 2, 2019 to January 2, 2026, and $14,546,488.08 due on January 2, 2027, at which point the Sublease Deposit would be exhausted. The Sublease Renewal Rents are set at a rate of 90% of the projected fair market value. Under the Sublease Renewal Option, EZH will be required to maintain an acceptable Letter of Credit in favor of CEL and CEL Trust, securing its obligations under the Sublease Renewal Option. EZH will be responsible for paying the fees associated with the maintenance of this Letter of Credit. The Sublease Deposit, Pledge and Repledge Agree-

14. On November 14, 2007, the parties filed a joint request to amend stipulation paragraph 231 of the Joint Stipulation Regarding Undisputed Facts, in which they note that "[p]aragraph 231 incorrectly states that the Sublease Purchase Option Price is equal to $275,450,950.25." To correct this mistake the parties state that, in other paragraphs of the joint stipulation of undisputed facts, they have "stipulated that the Sublease Purchase Option Price is equal to $215,450,949.20." However, on the replace-

ment page provided as an attachment to the parties' joint request to amend stipulation paragraph 231, the parties have marked the Sublease Purchase Option Price as being $215,450,950.20. Some of the calculations in this opinion do not compute exactly as the parties claim in their joint stipulation regarding undisputed facts. The court will use the number provided in the parties' joint request of $215,450,949.20, although some of the calculations still do not compute exactly.

ment will not be terminated in the event the Sublease is renewed. Accordingly, the Sublease Deposit continues with its scheduled investments and withdrawals. The schedule is set forth in Annex B of the Sublease Deposit, Pledge and Repledge Agreement and would be exhausted on January 2, 2027. The Sublease Renewal Period would terminate on July 15, 2034, at which point EZH would return the undivided 47.47% interest to CEL Trust, which would hold the interest, or lease the interest to a third party, until the end of the Lease Term on February 24, 2041. The time remaining on the lease after the end of the Sublease Renewal Term is referred to as the "Shirt–Tail Period," and lasts from June 15, 2034 through the end of the Lease Term on February 24, 2041. If the Sublease Renewal Option were to be exercised, CEL Trust would be responsible for the operation, maintenance and output of the RoCa3 Facility during the Shirt–Tail Period, or could lease its undivided interest to EZH or another party. CEL Trust would have continuing nonrecourse debt service payments to make to HBU, which would equal $18,225,000.00 on each January 2, from January 2, 2018 to January 2, 2026, and $14,546,488.08 on January 2, 2027. If the Sublease Renewal Option is elected, the Lease Agreement provides that CEL Trust will be required to make the Final Basic Rent Payment of $831,525,734.00 on February 24, 2041.

If CEL Trust elects the Sublease Renewal Option, the Lease Agreement provides that CEL, on behalf of CEL Trust, shall, with a limited exception, fund two deposits to provide collateral for the Final Basic Rent Payment. These deposits are the Lease Collateral Deposit and the Trustee Treasury Collateral. Alternately, CEL or CEL Trust may elect to use Acceptable Substitute Collateral, as discussed further below.

Unless CEL or CEL Trust elects to use Acceptable Substitute Collateral, the Lease Agreement provides that CEL will make deposits in the Lease Collateral Deposit. These deposits will be made with an AA/Aa2 rated financial institution, will bear a fixed rate of interest and will be available to make scheduled payments. The Lease Collateral Deposit will be pledged to EZH to secure the Final Basic Rent Payment owed on February 24, 2041. Deposits will be equal to $3,678,511.92 on January 2, 2027 and thereafter $18,225,000.00 on each January 2 from 2028 to, and including, 2034, and then $8,251,875.00 on June 15, 2034. On the date of the last scheduled deposit into the Lease Collateral Deposit, it would have a balance of $176,210,292.09.

Unless CEL or CEL Trust elects to use Acceptable Substitute Collateral, the Lease Agreement provides that, under the Sublease Renewal Option (and the Retention Option, also discussed more fully below), CEL, pursuant to the Participation Agreement, will purchase United States Government Obligations on each date, and with maturity amounts set forth in the Participation Agreement, and maturity dates as close to, but not later than, the Lease Termination Date (February 24, 2041). CEL would then deposit those United States Government Securities in a custodial account established by CEL, for the benefit of CEL Trust, with a security interest in EZH's favor (Trustee Treasury Collateral) to secure a portion of CEL Trust's obligations to make the Final Basic Rent Payment.

The payment of the Final Basic Rent Payment is a recourse liability of CEL to the extent of $141,671,596.40. This amount would be satisfied by the creation of the Trustee Treasury Collateral (if CEL chooses to create that account), or the Acceptable Substitute Collateral, to the extent CEL used such collateral to replace the Trustee Treasury Collateral. CEL has a recourse liability to EZH for the remaining portion of the approximately $831.5 million to the extent of amounts, if any, CEL receives from the CEL Trust after the Sublease Basic Termination Date (January 2, 2018).

According to the Joint Stipulations Regarding Undisputed Facts, the total amount of the final payment due pursuant to the Sublessee Loan Agreement ($414,931,341.00), plus the amount of the Trustee Treasury Collateral ($141,671,596.40) and the Lease Collateral Deposit would total $831,525,734.00 as of February 24, 2041, as-

suming that (i) CEL funds the Lease Collateral Deposit and the Trustee Treasury Collateral, and (ii) that CEL is able to earn an interest rate of 6.86% on the Lease Collateral Deposit from June 15, 2034 until February 24, 2041.

Alternately, in lieu of the Lease Collateral Deposit and the Trustee Treasury Collateral, CEL or CEL Trust may provide Acceptable Substitute Collateral in the form of (1) a Letter of Credit, and (2) a first priority security interest in either cash or United States-backed securities, or (3) any other collateral that is acceptable to EZH in its sole discretion, so long as, in each case described above, the property comprising the Acceptable Substitute Collateral provides for payments on the same dates and in the same amounts as the payments that would have been made from the replaced collateral. The Lease Agreement provides that, if CEL or CEL Trust chooses to fund either the Trustee Treasury Collateral or Lease Collateral Deposit, they may, at any time during the Lease Term, replace either with Acceptable Substitute Collateral.

### 3. Retention Option

If CEL Trust exercises the Retention Option, EZH would be required to return the Sublessee's undivided interest to CEL Trust on January 2, 2018 through the end of the Lease Term, February 24, 2041. The Sublease Deposit, Pledge and Repledge Agreement will be terminated and EZH will be required to maintain an acceptable Letter of Credit in favor of CEL Trust securing its obligations under the Sublessee Loan. A condition of the Retention Option is that CEL Trust must prepay the nonrecourse loan when the Retention Option is elected. In the event that CEL Trust is unable to make reasonably acceptable arrangements for the prepayment of the nonrecourse loan, and if HBU timely notifies both CEL Trust and EZH of this failure on or before the forty-fifth day prior to the Sublease Basic Termination Date, the Sublease Renewal Option will be deemed to have been exercised. Furthermore, under the Retention Option, EZH may withdraw the projected Sublease Deposit balance of $123,615,471.96. Such Option

would result in CEL and CEL Trust's exposure to the risks and opportunities with respect to the operations of the RoCa3 Facility during the Retention Option Period, including the opportunity to benefit from the economic successes of the RoCa3 Facility and bear the risks and costs, including any economic failures. Under the Retention Option, CEL also would be required to either fund the Trustee Treasury Collateral and the Incremental Collateral Pledge, under which it would enter a custody arrangement to hold, on behalf of EZH, either United States Government Obligations, or other corporate bonds with ratings of at least Aa2 and AA, with fixed rates of interest and maturity amounts to secure the Final Basic Rent Payment, or, CEL or CEL Trust could elect to provide Acceptable Substitute Collateral in the form of a Letter of Credit and a first priority security interest to EZH, either in cash or in United States Government-backed securities, or in any other collateral acceptable, in EZH's sole discretion, to meet the requirements of the Agreement. Such collateral would be considered Acceptable Substitute Collateral and payments must be provided on the same dates and in the same amounts as the payments that would have been made from the replaced collateral.

In the event that CEL elects to fund the Incremental Collateral Pledge and the Trustee Treasury Collateral, and CEL is able to earn an interest rate of 6.86% on the Incremental Collateral Pledge from the date it is funded until February 24, 2041, the total amount of the final payment due pursuant to the Sublessee Loan Agreement, plus the amount of the Lease Collateral Deposit and Trustee Treasury Collateral and projected value of the Incremental Collateral Pledge will total $831,525,734.00 on February 24, 2041. The payment of the Final Basic Rent Payment in the amount of $831,525,734.00 is a recourse liability of CEL to the extent of $141,671,596.40, which could be satisfied by the creation of the Trustee Treasury Collateral account or the Acceptable Substitute Collateral. In addition, CEL has a recourse liability to EZH for the remaining portion of the $831,525,734.00 to the extent of amounts, if any, CEL receives from CEL Trust after

the Sublease Basic Termination Date, January 2, 2018.

### ● Income Reporting and Deductions

CED, as a subsidiary of Con Ed, reported no income from the RoCa3 Transaction for 1997. In 1998, 1999 and 2000, CED reported income from the RoCa3 Transaction as $8,096,792.00, $7,664,972.00, and $10,477,019.00, respectively. These amounts were the same as those reported for accounting purposes. Con Ed and CEI reported $835,744,192.00 in Taxable Income and $291,003,408.00 in Tax Liability for the year 1997. Con Ed reported $399,693.00 in rental income for 1997. Furthermore, Con Ed claimed the following deductions on its 1997 federal income tax return with respect to the EZH RoCa3 Transaction: rent paid to EZH in the amount of $1,072,652.00, pursuant to IRC § 162(a)(3) and calculated under IRC § 467; interest expense allocated to 1997 and attributable to the nonrecourse debt incurred by way of the HBU loan in the amount of $254,944.00, pursuant to IRC § 163(a); and amortization of the fees and expenses paid in connection with the Transaction in the amount of $9,698.00, pursuant to IRC § 162(a). As was annually normal for Con Ed, the IRS audited the reporting. In response to Con Ed's filing, the IRS's proposed adjustments in connection with the RoCa3 Transaction, resulting in an increase of $937,331.00 in Con Ed's 1997 Taxable Income. The IRS assessed against Con Ed a deficiency in the amount of $328,066.00. Con Ed paid this amount on November 3, 2005 and filed a claim for refund with the IRS on December 2, 2005, which was subsequently denied on March 15, 2006, leading to the present case.[15]

### DISCUSSION

### I. Spoliation of Evidence

As an initial matter, the defendant filed a "Spoliation of Evidence Claim," as part of its case, in which the defendant alleged that the plaintiff "destroyed emails in 2000, at a time when it was anticipating litigation." According to the defendant, in 2000 the plaintiff anticipated or should have anticipated litigation, and had a duty to preserve any possibly relevant emails and email attachments, which discussed the RoCa3 Transaction, and which could be relevant to the government's claims and defenses. Specifically, the defendant claimed that the plaintiff destroyed potentially relevant emails when it failed to backup or save emails prior to a migration of the email server at CED to the Con Ed email server that took place in 2000, at which time the defendant argues plaintiff had "knowledge of the likelihood of litigation," and "anticipated that it was going to be a party to a lawsuit." The defendant did not allege that specific emails or other relevant documents were destroyed, and that, as a result of that destruction, specific testimony should be excluded. Rather, the defendant argued that Con Ed's failure to preserve emails incident to the 2000 migration from the Linux-based email system to the new Microsoft-based email system resulted in prejudice to the defendant. Defendant argued, for example, that comments on the revisions of documents may have been lost. Defendant also asserted that officers and directors of CED "frequently testified that they did not recall with specificity contemporaneous thoughts and impressions," and that "in other situations an officer or director for Plaintiff would testify to remembering events occurring in a certain way, only to admit that they may have in fact occurred in a different manner when shown a document contradicting that recollection." Therefore, according to the defendant, "[w]ithout all of the emails from this time period, the United States was deprived of the opportunity to fully probe the recollection of the Plaintiff's witnesses and was thereby prejudiced." Although the email migration did not occur until November 2000, defendant argues that plaintiff had the duty to preserve emails, either (1) following the preparation of an October 23, 1997 memoran-

---

15. Con Ed recently filed another complaint in this court on October 2, 2009, Case no. 09–652T, in part seeking deficiency interest for the underpayment of income taxes for its 1997 tax year, the tax year which is the subject of the present opinion. The new complaint notes that, depending on the outcome of the present case, Case No. 06–305T, the calculation of interest claimed in this new complaint could be impacted.

dum by in-house, tax attorney Andrew Scher on the proposed RoCa3 project or (2) following the release of IRS Revenue Ruling 99–14, titled, "Business Expenses; Interest; Lease–In/Lease–Out Transactions," on March 11, 1999, which was published on March 29, 1999.

As a sanction for the plaintiff's alleged failure to preserve the email traffic, the defendant requested "an adverse inference that the destroyed information, if now available, would have been favorable to the United States and harmful to Consolidated Edison." In the alternative, the defendant requested that "Plaintiff be prohibited from relying upon testimony of witnesses to the extent such testimony concerns the existence of emails discussing the EZH LILO Transaction where such emails have not been produced to the United States."

The defendant contended that, in November 2000, when CED migrated its email accounts from the separate CED, Linux-based, "client-side" email system to the parent company's Microsoft Outlook Exchange-based, "server-side" email system, emails contained on the hard drives of CED employees were destroyed. It was known that the emails from the old system would not migrate to the new system, but, the company decided that a backup of the entire email system would not be made prior to the changeover. Instead, CED employees were instructed to save "important" emails on their own hard drives in preparation for the migration. The defendant pointed out, for example, that among the emails that did not migrate, and were not otherwise saved, were those of Charles Muoio, who was president of CED during the time of the RoCa3 Transaction, but who left CED in 1999. As a result, neither Mr. Muoio, nor any other employees of CED, saved Mr. Muoio's emails during the changeover. The defendant maintained that its case has been prejudiced by the plaintiff's failure to preserve such CED emails, because the defendant was precluded from being able to examine the emails generated by CED during the time period surrounding the development of the RoCa3 Transaction.

The defendant argued that litigation was anticipated in the October 23, 1997 memorandum drafted by in-house tax attorney, Andrew Scher, on the proposed RoCa3 Transaction, which indicated that CED's tax position on the Transaction was based on "a relatively aggressive reading of Internal Revenue Code § 467." Mr. Scher's memorandum indicated that there was a risk that the tax benefits of the Transaction may not be fully realized, either because "(i) the IRS and the courts will disagree with the CED's interpretation of § 467 under the currently existing law, or (ii) during the term of the Head Lease, the proposed § 467 regulations would be finalized and the EZH transaction will not be grandfathered." As a second basis for its motion, according to the defendant, IRS Revenue Ruling 99–14, released on March 11, 1999, published March 29, 1999, "gave notice of its [the IRS's] decision to deny deductions generated as a result of entering into LILO transactions such as the one before the Court," and was acknowledged when Mr. Scher prepared a "Draft analysis of IRS Ruling as applied to the EZH and Nuon [16] transactions," which, thus, discussed the application of Revenue Ruling 99–14 to the EZH/RoCa3 Transaction.

The plaintiff's argument in response to defendant's motion was that, in 2000, at the time of the migration of CED's email system to the Con Ed system, the plaintiff did not, and should not have, anticipated litigation and, therefore, was not under a duty to preserve CED emails at the time. The plaintiff argues that, in fact, it did not anticipate litigation until 2004, and that the earliest it could have anticipated litigation was December 13, 2002, at the conclusion of the audit process of the plaintiff's 1997 tax return, when the IRS issued a Notice of Proposed Adjustment (NOPA). In the alternative, the plaintiff proposes as the date plaintiff anticipated litigation when Mr. Scher "determined that Consolidated Edison was unlikely to be able to resolve the dispute with the IRS in the Service's [IRS's] Appeals process," in late 2004 or early 2005. The plaintiff asserts that it has produced all available relevant material, with the exception of those documents and communications protected by attorney-client privilege. Opposing the defen-

---

**16.** The Nuon transaction was another LILO transaction in The Netherlands.

dant's spoliation claim, the plaintiff asserts that the primary purpose of the 2000 migration of CED's email system to the Con Ed network was to make the email system more reliable, stable, and to bring it into conformance with the rest of the parent company. There is no contradictory information in the record. The possible loss of emails that may have been relevant to this case was a by-product of a much larger corporate task in which the existing CED emails did not migrate onto the new system and were, thereby, lost. The plaintiff explains that, prior to the email migration, CED's emails were maintained by a Linux "client-side" server and only existed on the server until downloaded and viewed by the email account holder, at which point these emails then only existed on the user's hard drive. Furthermore, CED's previous Linux based system did not have a central backup or catastrophic backup system. In contrast, copies of emails sent via a "server-side" system, such as Con Ed's new Microsoft Outlook Exchange-based system, are maintained on the server even after downloaded and viewed by the email account holder. According to the plaintiff, emails from the old client-side system could not be backed up centrally, or migrated onto Con Ed's Microsoft-based server-side email system. These facts led to the plaintiff's decision to direct that, prior to the migration, CED employees should copy important emails from the Linux-based system to their hard drives, and instructed employees on how to do so, with assistance available, if requested.

Plaintiff's employee, Dawson Newberry, who was in charge of information technology systems for CED, confirmed that because there was no central backup for the old system, all emails would have been destroyed during the migration unless they were specifically designated by individual users to be saved. Mr. Newberry indicated that instructions were given regarding individuals saving emails, and that the burden to save emails was on the individual user, since CED itself could not centrally save the emails on a user's hard drive. Although emails were undoubtedly lost in the migration, no intent on the part of CED or Con Ed to destroy emails, including any possibly relevant to the RoCa3 Transaction, has been established.

The plaintiff argued that the government has failed to meet its burden of proof as to the reasonable anticipation of litigation element of its spoliation claim and asserts that "Con Edison could not have reasonably anticipated litigation until years after the November 2000 conclusion of the period covered by the Government's claim." The plaintiff also rejected the defendant's spoliation claim for failure to carry its burden to demonstrate "that any electronic communications purportedly lost would have been favorable to the Government and therefore any such destruction caused harm or prejudice to the Government's ability to present its case." The plaintiff opposed the defendant's motion, asked for dismissal of the government's spoliation claim and for the court to deny the defendant's request for sanctions.

The IRS began to audit Con Ed's 1997 tax return in 1999. According to uncontested testimony offered by the plaintiff, Con Ed's tax returns were routinely audited every year and the plaintiff came to expect a corporate tax audit. Moreover, in past years, Con Ed had been able to settle multiple disputes with the IRS through administrative channels, rather than by litigation, and reasonably expected a similar resolution of disputes with the IRS regarding the 1997 tax year, including disputed deductions from the RoCa3 Transaction, as well as at least one other issue. Although an audit may have been anticipated by the plaintiff, based on the prior history of Con Ed's dealings with the IRS, litigation was not necessarily anticipated. Indeed, the only course reasonably anticipated by the plaintiff during the time the plaintiff performed its risk analysis leading up to its decision to engage in the RoCa3 Transaction, was a possible administrative challenge, with which it was familiar, and which historically had allowed the plaintiff to resolve disputes without resorting to litigation. In May 2001, Mr. Scher, in his role as a tax attorney and Assistant General Counsel of Con Ed, became responsible for collecting documents responsive to the IRS Information Document Requests (IDRs). Mr. Scher

testified that he collected a large number of documents, including relevant emails.

As noted above, in 2005, the IRS disallowed the deductions reported from the RoCa3 Transaction and proposed adjustments amounting to an increase of $937,331.00 in Con Ed's 1997 tax year obligation. The IRS assessed Con Ed a deficiency for 1997 in the amount of $328,066.00, which Con Ed paid on November 3, 2005. Subsequently, on December 2, 2005, Con Ed filed a refund claim with the IRS, which was denied on March 15, 2006. Thereafter, the plaintiff's refund claim was filed in this court.

Also relevant to understanding the events underlying defendant's spoliation claim is a previous motion filed by the defendant to compel filed in this case, one of a series of motions to compel, brought by the parties during discovery, pursuant to Rule 37(a)(2)(B) of the Rules of the United States Court of Federal Claims (RCFC). In the defendant's motion to compel, the government requested that the court compel the plaintiff to produce three documents generated in 1997: a letter prepared by outside counsel Shearman & Sterling discussing tax risks, another letter prepared by the same law firm discussing tax changes and an internal memorandum prepared by in-house counsel Scher regarding the application of IRC § 467. Prior to the motion, and during its dealings with the IRS, the plaintiff had released a number of documents on its privilege log. During the IRS audit process, Con Ed acknowledged that it had produced certain documents, otherwise protected as attorney-client communications and, thereby, effected a subject matter waiver of the attorney-client privilege. In opposition to the defendant's motion to compel production of the three documents, the plaintiff, therefore, argued that the documents requested were created in anticipation of litigation and were protected by the work product doctrine.[17]

In the plaintiff's memorandum responding to the defendant's motion to compel, the plaintiff stated:

The Tax Risk Letter, the Tax Change Letter, and the In–House Memorandum were all created in anticipation of litigation. Con Edison N.Y. recognized that any contemplated lease-leaseback transaction that it entered into, including the EZH Investment, was certain to lead to an IRS audit and extremely likely to result in litigation. Although each of the three documents at issue addresses a different legal issue, each document was created to prepare for the anticipated IRS audit and subsequent tax refund litigation.

Also of note in the motion to compel proceeding was the submission of an affidavit from in-house attorney Scher, executed on May 10, 2007, in support of plaintiff's position to withhold the requested documents based on the work product doctrine. Mr. Scher stated in his affidavit that the "Tax Risk Letter, the Tax Change Letter and the In–House Memorandum were all created in anticipation of litigation," and that "Con Edison N.Y. has not waived work product protection with respect to the Tax Risk Letter, the Tax Change Letter and the In–House Memorandum, and they remain protected as opinion work product." Following an *in camera* review of the three documents and the submissions in support of each party's position, including Mr. Scher's affidavit, this court issued an order on June 11, 2007, confirming an earlier oral decision, and finding that the specific documents at issue, the Tax Risk Letter and the Tax Change Letter, both written on November 20, 1997, and the In–House Memorandum, written on October 23, 1997, were not protected from discovery under the work product privilege. At the hearing, as memorialized in the court's order, "[t]he court concluded that the plaintiff's documents sought by defendant did not meet the test of preparation in anticipation of litigation, and were not protected from disclosure under the attorney work-product privilege."

The court concluded that the Shearman & Sterling Tax Risk memorandum, prepared in November 1997, was prepared as part of a decision-tree process as to whether or not to

---

17. " '[W]ork-product protection,' means the protection that applicable law provides for tangible material (or its intangible equivalent) prepared in anticipation of litigation or for trial." Fed. R.Evid. 502(g)(2).

engage in the Transaction, not an analysis of anticipated litigation, and turned it over to the defendant, as requested. The second document, also prepared by Shearman & Sterling in November 1997, analyzed tax code and regulatory changes. The court also turned it over to the defendant, as requested, based on a review of the document as a general review of the tax code and regulatory issues on leveraged lease financing transactions, not created in anticipation of litigation, with nothing indicated respecting the RoCa3 Transaction or anticipated tax litigation over the RoCa3 Transaction.

The court struggled more with the third disputed document addressing the Con Ed proposed RoCa3 project, generated by in-house counsel Scher in October 1997, because of the affidavit filed by Mr. Scher in support of plaintiff's response to the motion to compel in May 2007. The October 23, 1997 memorandum prepared by Mr. Scher states as its purpose, "to provide a broad overview of the proposed EZH transaction, and the intended tax benefits to be derived from the transaction." As noted above, the Scher memorandum concludes only that there is a risk that "the IRS and the courts will disagree with the CED's interpretation of [IRC] § 467 under the currently existing law," but does not conclude that any of the documents were prepared in anticipation of litigation. In Mr. Scher's May 2007 affidavit filed in support of the plaintiff's response to the defendant's motion to compel, however, Mr. Scher stated that "[t]he Tax Risk Letter, the Tax Change Letter and the In–House Memorandum" (Mr. Scher's memorandum) all "were prepared in connection with Con Edison NY's decision to enter a leasing transaction with N.V. Electriciteitsbedrijf Zuid–Holland ('EZH')," and "were all created in anticipation of litigation."

Mr. Scher also stated in his affidavit, filed with this court in May 2007 in support of plaintiff's work product privilege claim, that:

5. Due to the large tax deductions associated with lease-leaseback transactions and the unsettled legal questions regarding application of certain Code provisions, including section 467, to lease-leaseback transactions, coupled with the fact that Con Edison NY's federal income tax returns for each of the 20 tax years preceding the year of the EZH transaction had been audited by the IRS, Con Edison N.Y. had ample reason to believe that any contemplated lease-leaseback transaction that it entered into was likely to be challenged on audit by the IRS and might result in litigation.

6. Con Edison N.Y. retained Shearman & Sterling to provide legal advice regarding the potential outcome of litigation regarding the tax aspects of the EZH transaction.

7. As part of the legal advice requested from Shearman & Sterling, Con Edison N.Y. requested advice concerning the arguments likely to be made by the IRS in any litigation regarding the tax aspects of the EZH transaction. This advice was set forth in the "Tax Risk Letter."

8. As part of the legal advice requested from Shearman & Sterling, Con Edison N.Y. requested legal advice concerning the potential retroactive application of new statutes or regulations to the EZH transaction. This advice was set forth in the "Tax Change Letter."

9. The Tax Risk Letter and the Tax Change Letter attempt to identify potential tax risks that needed to be considered prior to Con Edison NY's participation in any lease-leaseback transactions.

10. The In–House Memorandum was written at the request of the then General Counsel of Con Edison NY, Peter O'Shea, and discusses the anticipated tax treatment of the lease-leaseback transaction, the likelihood that it would be scrutinized by both the IRS and a court, and the potential arguments which might be made by the IRS regarding the tax aspects of the EZH transaction.

The court concluded that, based on the words of and a contemporaneous context reading of the In–House Memorandum, the memorandum assessed risk, but did not "anticipate litigation," with any degree of certainty, and that, therefore, the In–House Memorandum should be turned over to the defendant and was not protected by the work product privilege. This conclusion was ar-

rived at despite Mr. Scher's affidavit in opposition to the motion to compel and the plaintiff's claim of work product privilege for the document during discovery before this court. The court has concluded that Mr. Scher's affidavit in opposition to defendant's motion to compel was prepared as a retrospective comment, many years after his 1997 memorandum was prepared and offered only to urge a work product privilege once the attorney-client privilege had been waived and in order to keep documents from being turned over to the defendant.

The court also notes that such was not the only inconsistent behavior on the part of Mr. Scher. At trial, Mr. Scher was found to be nervous, self-preservationist, contradictory and plagued by selective memory. He was considered by the court an unreliable witness, perhaps willing to write or say whatever he thought would assist his then current assignment. At trial, Mr. Scher testified that although in 1997, the company anticipated a tax audit, because they were audited every year, "[w]e have [sic] no reason to believe this would lead to litigation." During his testimony, Mr. Scher also disavowed the plaintiff's memorandum in opposition to the motion to compel and the statement that the RoCa3 Transaction was "extremely likely to result in litigation," as not written by him. He stated that he could only speak for himself and did not "know what Con Edison as a company was anticipating in 1997." Moreover, in his testimony, Mr. Scher wavered and indicated that he "probably" read his affidavit before signing it, may have reviewed it and may have made changes, without recalling any specifics. The inconsistencies between the text of the 1997 Scher Memorandum, which anticipated a near certain audit, and that litigation "might result," but was actually a risk analysis of the proposed RoCa3 Transaction which did not predict the inevitability of litigation or the outcome of litigation, as opposed to his conclusion in the later affidavit claiming the work product privilege for documents prepared in "anticipation of litigation," as a basis for withholding documents during discovery,[18] do not encourage credibility of his testimony.

"'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *United Med. Supply Co. v. United States*, 77 Fed.Cl. 257, 263 (2007) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)); *see also Multiservice Joint Venture, LLC v. United States*, 85 Fed.Cl. 106, 112 (2008); *Morse Diesel Int'l, Inc. v. United States*, 81 Fed.Cl. 220, 221 (2008). Sanctions for spoliation arise out of the court's inherent power "'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)), *reh'g denied*, 501 U.S. 1269, 112 S.Ct. 12, 115 L.Ed.2d 1097 (1991); *see also United Med. Supply Co. v. United States*, 77 Fed.Cl. at 263–64; *Pueblo of Laguna v. United States*, 60 Fed.Cl. 133, 135–39 (2004). The inherent power of courts is broad, but must be exercised by judges cautiously, based on the specific facts of the case presented. According to the United States Supreme Court, because of their very potency, inherent powers "must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). "In invoking the inherent power to punish conduct which abuses the judicial process, a court must exercise discretion in fashioning an appropriate sanction." *Chambers v. NASCO, Inc.*, 501 U.S. at 44–45, 111 S.Ct. 2123 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. at 764, 100 S.Ct. 2455). Alternately, although not at issue in this case, when spoliation violates a court order or otherwise disrupts the court's discovery regime, sanctions may be imposed under RCFC 37, which is essentially identical to Rule 37 of the Federal Rules of Civil Procedure. *United Med. Supply Co. v. United States*, 77 Fed.Cl. at 264. The court in *United Medical Supply* noted that "[s]poliation may result in a variety of sanctions, with 'the oldest and most venera-

---

**18.** *See* RCFC 26(b)(3)(A) and Federal Rules of Civil Procedure (Fed.R.Civ.P.) 26(b)(3)(A).

ble remedy' being an 'adverse inference,' under which the finder of fact may infer that the destroyed evidence would have been favorable to the opposing side." *Id.* at 263 (quoting Jonathan Judge, *Reconsidering Spoliation: Common–Sense Alternatives to the Spoliation Tort,* 2001 WIS. L. REV. 441, 444 (2001)); *see also Multiservice Joint Venture, LLC v. United States,* 85 Fed.Cl. at 112 (quoting *United Med. Supply Co. v. United States,* 77 Fed.Cl. at 263).

In *Jandreau v. Nicholson,* the United States Court of Appeals for the Federal Circuit wrote:

> The general rules of evidence law create an adverse inference when evidence has been destroyed and "(1) ... the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) ... the records were destroyed with a culpable state of mind; and (3) ... the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002) (internal citation and quotation marks omitted); *see also* 31A C.J.S. *Evidence* § 168 (2007); 2 Kenneth S. Brown, McCormick On Evidence § 264 (6th ed.2006). The burden is on the party seeking to use the evidence to show the existence of each criterion. *Residential Funding,* 306 F.3d at 107.

**19.** The court notes that in *Jandreau v. Nicholson,* the issue of an adverse inference for negligent behavior was raised, but not addressed, given the plaintiff's agreement in that particular case that there was no evidence of negligence. *Jandreau v. Nicholson,* 492 F.3d at 1375–76.

**20.** The relevant circuit for this court, the United States Court of Appeals for the Federal Circuit, has not definitively addressed whether a finding of bad faith is required before a court can find spoliation or impose an adverse inference or other sanction. Because many of the spoliation cases decided to date by the Federal Circuit have been patent cases in which the Federal Circuit applies the law of the relevant regional circuit, the Federal Circuit has not had the opportunity to announce a position binding on this court as to a possible "bad faith" or other standard to trigger a spoliation of evidence sanction. *See*

*Jandreau v. Nicholson,* 492 F.3d 1372, 1375–76 (Fed.Cir.2007);[19] *see also Morse Diesel Int'l, Inc. v. United States,* 81 Fed.Cl. 220, 221–22 (2008); *Zubulake v. UBS Warburg, LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004). Other articulations differ somewhat. For example, in the United States Court of Appeals for the Second Circuit, a " 'culpable state of mind' for purposes of a spoliation inference, includes ordinary negligence. When evidence is destroyed in bad faith (i.e., intentionally or willfully), that fact alone is sufficient to demonstrate relevance." *Id.* at 431. In *Thompson v. United States Department of Housing & Urban Development,* 219 F.R.D. 93 (D.Md.2003), the United States District Court for the District of Maryland explained the three states of mind that could satisfy the culpability requirement for sanctions to be imposed as "bad faith/knowing destruction; gross negligence; and ordinary negligence." *Id.* at 101.[20]

In its motion, the defendant referenced the *United Medical Supply* case to support its claim, both to find spoliation based on the plaintiff's duty to preserve and to establish that spoliation does not require a finding of "bad faith." *United Med. Supply Co. v. United States,* 77 Fed.Cl. at 268. The facts in the *United Medical Supply* case are notably different and distinguishable from the present case. In *United Medical Supply,* the defendant, who was the party accused of spoliation, did not contest its duty to preserve the information at issue, nor that its employees repeatedly violated that duty. *Id.* at 265. In *United Medical Supply,* virtually

*United Med. Supply Co. v. United States,* 77 Fed. Cl. at 266. Consequently, judges of the United States Court of Federal Claims have taken differing positions on the "bad faith" requirement. *Compare, id.* at 268 ("[A]n injured party need not demonstrate bad faith in order for the court to impose, under its inherent authority, spoliation sanctions."), *with Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 703 (2002) (noting findings of bad faith are required before the court can determine that there was spoliation). While fully discussing the issues raised by a spoliation claim in the *United Medical Supply* case, a judge of this court discussed how the circuits are also split on this issue, with their views covering a broad spectrum. *United Med. Supply Co. v. United States,* 77 Fed.Cl. at 266 (and cases cited therein).

all of the spoliation offenses occurred after federal court litigation had begun, and the circumstances were serious enough for the court to observe that the "defendant misled plaintiff and this court," that the defendant "was regularly destroying documents" and that the "defendant mischaracterized the extent of its efforts to locate responsive documents and prevent further spoliation." *Id.* at 272, 273–74. In its ruling, the court concluded that employees of the United States "must be deemed purposely to have made false statements to this court." *Id.* at 274. The court in *United Medical Supply* found that "irrefutable evidence demonstrates that over an extended period of time, the United States acting through at least some of its employees, recklessly disregarded that duty [that documents relevant to a case be preserved], thereby undoubtedly damaging plaintiff's ability to present its case. . . ." *Id.* Nonetheless, the sanctions imposed did not include an adverse inference sanction, as is requested by the defendant in this case. *Id.* at 274–75.

▇ When deciding whether to impose sanctions based on spoliation in a particular case, given the potential harshness of negative inferences, the discretion of the court must be exercised in a common sense manner, individually, with respect to the facts of each case. As stated in *Fujitsu Limited v. Federal Express Corporation*:

> Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. . . . The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, *see West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999), and is assessed on a case-by-case basis. *See United States v. Grammatikos*, 633 F.2d 1013, 1019–20 (2d Cir.1980).

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891, 122 S.Ct. 206, 151 L.Ed.2d 146 (2001).

▇ A party need not "preserve every shred of paper, every e-mail or electronic document, and every backup tape," upon recognizing the threat of litigation. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y.2003). "Such a rule would cripple large corporations . . . that are almost always involved in litigation." *Id.* The *Zubulake* court offered the following guidance:

> anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. "While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."

*Id.* (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991) (quoting *William T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D.Cal.1984))). Furthermore,

> [w]hile a litigant is under no duty to keep or retain every document in its possession, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y.2003). . . . Relevant documents are those that a party should reasonably know are "relevant in the action, [ ] reasonably calculated to lead to the discovery of admissible evidence, [ ] reasonably likely to be requested during discovery and/or [are] the subject of a pending discovery request." *Id.* at 217 (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991)).

*Adorno v. Port Auth. of New York and New Jersey*, 258 F.R.D. 217, 227 (S.D.N.Y.2009) (brackets in original).

As to when the duty to preserve potential evidence arises, one trial court suggested:

> " 'The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that

the evidence may be relevant to anticipated litigation.'" *World Courier v. Barone*, No. C 06–3072 TEH, 2007 WL 1119196, at *1 (N.D.Cal. April 16, 2007) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)); *see AmeriPride Servs., Inc. v. Valley Indus. Serv., Inc.*, No. CIV S–00–113 LKK/JFM, 2006 WL 2308442, at *4 (E.D.Cal. Aug. 9, 2006) ("[A]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.").... Additionally, "[t]he obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials." *Nat'l Ass'n of Radiation Survivors [v. Turnage]*, 115 F.R.D. [543,] 557–58 [ (N.D.Cal.1987) ].

*Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, No. 06–3359, 2008 WL 4298331, at *3 (N.D.Cal. Sept.19, 2008).

■ "The scope of the duty to preserve extends to electronic documents, such as e-mails and back-up tapes." *AAB Joint Venture v. United States*, 75 Fed.Cl. 432, 441 (2007) (citing *Renda Marine, Inc. v. United States*, 58 Fed.Cl. 57, 61 (2003); *Thompson v. United States Dep't of Housing & Urban Dev.*, 219 F.R.D. at 100). The court in *Convolve, Inc. v. Compaq Computer Corporation,* wrote:

> Moreover, in the world of electronic data, the preservation obligation is not limited simply to avoiding affirmative acts of destruction. Since computer systems generally have automatic deletion features that periodically purge electronic documents such as e-mail, it is necessary for a party facing litigation to take active steps to halt that process. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y.2003). "Identifying the boundaries of the duty to preserve involves two related inquiries:

when does the duty to preserve attach, and *what* evidence must be preserved?" *Id.* at 216.

*Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 175–76 (S.D.N.Y.2004) (emphasis in original), *other matters clarified*, No. 00–5141, 2005 WL 1514284 (S.D.N.Y. June 24, 2005).

■ Once a showing of spoliation has been established, the burden shifts to the party against which the motion was made to show that the destruction of the evidence and failure to produce the documents did not prejudice the opponent. *See DaimlerChrysler Motors v. Bill Davis Racing, Inc.*, No. 03–72265, 2005 WL 3502172, at *1 (E.D.Mich. Dec.22, 2005). Moreover, "spoliation is not a substantive claim or defense but a 'rule of evidence' and thus is 'administered at the discretion of the trial court.'" *Hodge v. Wal–Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir.2004) (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir.1995)). If spoliation has occurred, the court should design sanctions "to: (1) deter parties from engaging in spoliation; (2) place the risk of erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he [or she] would have been in absent the wrongful destruction of evidence by the opposing party.'" *West v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (quoting *Kronisch v. United States*, 150 F.3d at 126).

■ In the case before this court, the specific spoliation issue presented concerns whether the responsibility of a party to preserve evidence is triggered, as "in anticipation of litigation," when, prior to court docketed litigation, the party is engaged with the IRS to administratively resolve an IRS challenge to the taxpayer's filed return. The plaintiff in the case before this court, for example, routinely was audited annually and was routinely engaged in extended discussions with the IRS following those annual audits. Such was the case regarding plaintiff's 1997 tax return.

As discussed above, the court previously ruled that the October 23, 1997 In–House Memorandum prepared by in-house attorney Andrew Scher on the EZH Transaction, indi-

cating that the IRS or the courts might "disagree" with plaintiff's interpretation of section 467 of the Internal Revenue Code, along with two additional documents prepared by the law firm of Shearman & Sterling on the EZH Transaction, were found not to have been prepared in anticipation of litigation and, therefore, not work product protected. The documents, therefore, were turned over to the defendant. Although each document was found relevant to the issues in the current case, the words of the documents were found not to reflect preparation in anticipation of litigation. During the hearing on the motion to compel, the court indicated to the parties that "an IRS audit contemplation does not trigger necessarily a contemplation of litigation." Based on a history of yearly audits, in which discussions with the IRS during annual audits had led to resolution of many differences between the plaintiff and the IRS over tax filings, the plaintiff certainly had reason to expect its 1997 tax filing would be audited. Based on past history, however, the plaintiff did not automatically anticipate litigation simply because the IRS questioned the plaintiff's annual tax submission.

■■■ Individual or corporate taxpayers should not have to immediately conclude that all audits by the IRS, or even extensive, IRS administrative proceedings to challenge results of those audits negative to the taxpayer, necessarily will lead to litigation. To the contrary, the IRS has an elaborate structure set up to administratively resolve disputes between the government and the taxpayer in an attempt to avoid litigation. Taxpayers engaged in IRS administrative proceedings generally anticipate, and certainly hope, that litigation will not have to ensue. Although there is a point in time during interaction with the IRS that it is reasonable to conclude that litigation is likely or should be anticipated, that determination will differ in every case based on the facts of the case. Mr. Scher's memorandum, as well as the two Shearman & Sterling memorandums, were prepared in 1997, prior to the consummation of the RoCa3 Transaction. The record in this case is replete with documents and testimony of the extent to which, before entering into the RoCa3 Transaction, Con Ed and CED carefully and extensively analyzed the economic, environmental and utility industry strengths and weaknesses of the RoCa3 Transaction. The fact that Con Ed and CED also analyzed the possible tax implications of the Transaction does not suggest that litigation was anticipated with any degree of certainty. Rather, the testimony and documents in the record establish that Con Ed and CED attempted to conduct a complete and thorough review of the proposed RoCa3 project before closing the Transaction. The RoCa3 Transaction was completed on December 15, 1997. Plaintiff's 1997 tax return was filed shortly thereafter, the following April.

Although the plaintiff understood prior to entering the RoCa3 Transaction that there were a number of possible benefits, as well as risks, associated with the RoCa3 Transaction, including that the IRS might not agree with the tax treatment the plaintiff assumed in its analysis, there was no clarity at the time the RoCa3 Transaction was finalized that certain, or even likely, litigation would ensue. Indeed, defendant has not demonstrated facts to the contrary. Although the IRS appears to have begun the audit of the plaintiff's 1997 tax return in 1999, the audit was not concluded until December 2002, well after the 2000 CED email migration. On December 13, 2002, the IRS issued a NOPA, to disallow the net loss items from the taxpayer's participation in the EZH Transaction. Although arguably after reading the detailed December 13, 2002 NOPA, the plaintiff may have had a clearer understanding of the government's position as articulated in that document, even then, the internal IRS Appeals process was only about to begin, and the plaintiff could have projected the IRS process as a means to a pre-litigation resolution. Plaintiff notes in an undisputed filing with the court, that another item challenged by the IRS in the 1997 audit, in fact, was resolved in the IRS Appeals process without litigation. Indeed, not every dispute with the IRS leads to litigation or "anticipates" litigation. If both parties are dealing in good faith regarding the disputed issues during the administrative process, the goal should be to avoid court-based litigation.

The record reflects that the IRS requested information and documents and that the plaintiff, ultimately led by Mr. Scher, responded to IDRs from the IRS, in connection with the audit of the plaintiff's 1997 tax return, and prior to the issuance of the NOPA in December 2002. For example, in a response to one IDR, the plaintiff transmitted a copy of an invoice showing payment to the Wilmington Trust, initial direct costs for the RoCa3 Facility, CEL's Certificate of Incorporation and a copy of share certificates issued by CEL to CED. That during the audit process, the IRS was requesting documents, or, according to Mr. Scher's testimony at trial, that in May 2001 he became responsible for collecting documents responsive to IRS document requests, is not dispositive evidence that the plaintiff anticipated litigation, given the ongoing audit process and continuing discussions towards an attempted, administrative resolution between the plaintiff and the defendant.

The plaintiff maintained that, although it "has always recognized that a reasonable person would have anticipated litigation sometime before the lawsuit was filed[,] [i]n this case, the evidence demonstrates that the most reasonable time for such a determination was when it became clear that, unlike most disputes in IRS Appeals, Con Edison's dispute regarding the EZH tax treatment was unlikely to be resolved." According to the record, after multiple meetings between IRS personnel and the plaintiff's representatives, negotiations ended in the summer of 2005, when the plaintiff's resolution proposals were not accepted by the IRS. On November 3, 2005, the plaintiff paid the assessed deficiency and, thereafter, filed for a refund with the IRS. There may well have been a point in time before the summer of 2005 when the plaintiff more definitely "anticipated litigation," but it was significantly after the 2000 email migration.

As discussed in *Deseret Management Corporation v. United States,* 76 Fed.Cl. 88, 92–95 (2007), albeit in the context of a party attempting to invoke the work product privilege, and not a spoliation claim, the courts are split among several circuits regarding when a party involved in the IRS administrative process should be deemed to anticipate litigation. In *Deseret Management Corporation,* the court quoted the Restatement (Third) of the Law Governing Lawyers § 87 cmt. h. (2000), to conclude broadly that litigation can include adversarial proceedings before an administrative agency when parties present evidence or legal argument regarding legally significant factual issues. The *Deseret* court, however, went on to apply a "circumstances of the case" test, to conclude that "document production during the IRS's appeals process *may be* conducted 'in anticipation of litigation,'" also in work product, privilege claims cases. *Deseret Mgmt. Corp. v. United States,* 76 Fed.Cl. at 94 (emphasis added). The lesson to be learned from the *Deseret Management Corporation* case is that the facts and circumstances of the individual case must be assessed to decide when litigation should be deemed by a court to be anticipated, either in a work product privilege dispute or in a spoliation claim.

In the instant case, during the formation of the RoCa3 Transaction, tax consequences and risks were evaluated, including preparation of in-house and outside legal counsel memoranda. Additionally, the plaintiff and the IRS were engaged in discussions regarding the plaintiff's claimed deductions, prior to the issuance of the NOPA by the IRS in December 2002. It was reasonable, however, for the plaintiff to conclude that the IRS audit and discussions between the parties could or would resolve the issues on which the IRS was questioning the taxpayer. As stated by the United States Supreme Court, in a somewhat different context, "the purpose of [a civil tax] audit is not to prepare for or conduct litigation, but to assess the amount of tax liability through administrative channels." *United States v. Baggot,* 463 U.S. 476, 480, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983). Moreover, as discussed above, based on a review of the contents of the Scher in-house and Shearman & Sterling memoranda, this court concluded that none of the memoranda at issue in the motion to compel was prepared in anticipation of litigation, because (1) they were prepared too early in the process for the plaintiff to have reasonably anticipated that its decision to enter the RoCa3 Transaction likely would result in litigation,

and (2) the contents of the memoranda indicated that the memoranda were not the "work product" of an attorney anticipating litigation, but instead contained advice that went into making an informed corporate decision to enter or not enter a transaction, as part of plaintiff's various other due diligence efforts to better understand the implications, including tax implications, of the proposed RoCa3 Transaction.

Several unique aspects of the instant litigation in this court make the spoliation and other issues both interesting and complex, particularly with respect to Attorney Scher's involvement and testimony in the litigation and the affidavit he offered in response to the motion to compel. On the motion to compel, the defendant argued that the attorney-client privilege had been waived as to Mr. Scher's and the Shearman & Sterling memoranda and that these documents should be turned over to the defendant. The plaintiff responded by invoking the work product privilege, indicating that the memoranda had been prepared in anticipation of litigation. The defendant, therefore, took the position that the three legal memoranda were prepared for business purposes and were not prepared in anticipation of litigation. The plaintiff's opposition to the defendant's motion to compel, supplemented by an affidavit from Attorney Scher, however, argued that the documents were prepared in anticipation of litigation. Now, for the purposes of the spoliation motion, the defendant is arguing that the Scher memorandum was prepared in anticipation of litigation and the plaintiff has taken the reverse position. Neither party has taken consistent positions. Even worse, Attorney Scher, plaintiff's in-house counsel and the CED corporate secretary at different times, personally has offered inconsistent positions. His "Affidavit of Andrew W. Scher in Support of Plaintiff's Response to Defendant's Motion to Compel," dated May 10, 2007, indicates the three legal memoranda "were all created in anticipation of litigation," but, during his in-person testimony offered at trial, he stated that he had "no reason to believe in 1997 that there would be litigation." This was particularly troubling because Mr. Scher was an Assistant General Counsel of Con Ed in their Law Department,

he "effectively became the General Counsel for Con Ed Development" (CED), and he functioned as corporate secretary at times for CED. Moreover, Mr. Scher was not unfamiliar with the world of tax law. At the time he joined the plaintiff's legal department, he had earned an LL.M. in taxation from New York University and had roughly ten years of experience in the field of tax law. He previously had worked for several law firms and also had worked as a Certified Public Accountant and forensic accountant.

There are numerous examples in the record of how Mr. Scher resorted to selective memory at trial, relying on his inability to recall details about his involvement in the RoCa3 Transaction, including his inability to remember his role in the RoCa3 Transaction once he arrived at Con Ed, or with whom he had had conversations regarding the Transaction. In addition, during his testimony at trial, Mr. Scher attempted on numerous occasions to minimize his role in the RoCa3 Transaction and to deny responsibility or involvement, although he was designated by the plaintiff as the RCFC 30(b)(6) deponent for the current litigation. He described himself as an "observer" to the Transaction, and stated that he only offered editorial comments to outside counsel Shearman & Sterling, despite his equivocation in response to questions and evidence in the record to the contrary. Furthermore, Mr. Scher had difficulty pinpointing how soon after he arrived at Con Ed he had become involved in the RoCa3 Transaction. At trial, after impeachment with his deposition, the approximate date was established as early October 1997, shortly after he arrived to work for the plaintiff. Moreover, the record also establishes that he had a central role in the collection of documents in response to the IRS IDRs during the 1997 tax return audit process, although in this regard, too, he had moments of forgetfulness. In addition, Mr. Scher claimed he had no experience in the leasing field when he first began working for Con Ed. He testified: Q. "So no practical leasing experience," A. "Not that I can think of right now." However, once again, he was impeached with his deposition on re-direct examination, when he read, " 'Answer: I had

some experience with leasing from my education and also from my prior employment but not a great deal.' "

Based on a careful review of the record before the court, and of Mr. Scher's equivocal testimony, the court prefers to rely on other testimony or exhibits in the record with overlapping information, and utilize Mr. Scher's testimony sparingly, when it was uncontested. The court's conclusions with respect to the events of 1997, when Mr. Scher issued his in-house legal opinion, and subsequent events raising the question of whether litigation was anticipated prior to the 2000 migration of CED's email server, therefore, are not based on conclusions offered by Mr. Scher.

In its spoliation motion, defendant also argued that CED had a duty to preserve the emails from the old Linux-based system in 2000, following the IRS's Revenue Ruling 99–14 released on March 11, 1999, and published on March 29, 1999. Rev. Rul. 99–14, 1999–1 C.B. 835 (Mar. 29, 1999). The defendant asserted that this IRS policy position should have given plaintiff a clear indication that litigation over the RoCa3 Transaction was all but certain and that the plaintiff should have begun preserving evidence starting in 1997 or 1999. The plaintiff, however, contended that Revenue Ruling 99–14 was just one piece in a multi-tiered set of IRS guidance. According to the plaintiff, because transactions on which Revenue Rulings bear are resolved and settled during the audit and appeals process regularly, this should not be the triggering event to determine when the plaintiff anticipated, or should have anticipated, litigation on the RoCa3 Transaction deductions, and, therefore, had a duty to preserve the emails at issue.

Revenue Ruling 99–14 was issued on March 29, 1999, after the EZH Transaction was consummated, but during the time that the plaintiff's 1997 tax return was in the audit process at the IRS. The holding of the Revenue Ruling states: "A taxpayer may not deduct, under §§ 162 and 163, rent and interest paid or incurred in connection with a LILO transaction that lacks economic substance." *Id.* at *13–14. Revenue Ruling 99–14 also indicates that: "The Service will scrutinize LILO transactions for lack of economic substance and/or, in appropriate cases, recharacterize transactions for federal income tax purposes based on their substance." *Id.* As is typical of Revenue Rulings, Revenue Ruling 99–14 discusses the facts of a specific case, discusses legal precedent and analyzes specific facts presented in the legal context, even noting that "[s]ome of the features of the LILO transaction discussed above are present in transactions that the Service will respect for federal income tax purposes." *Id.* at *13.

The purpose and impact of IRS Revenue Rulings is explained in 26 C.F.R. § 601.601 (2009), with the following statement:

> However, since each Revenue Ruling represents the conclusion of the Service as to the application of the law to the entire state of facts involved, taxpayers, Service personnel, and others concerned are cautioned against reaching the same conclusion in other cases unless the facts and circumstances are substantially the same.

26 C.F.R. § 601.601.

Revenue Ruling 99–14, by its terms, and in accordance with 26 C.F.R. § 601.601, emphasizes the fact specific nature of any Revenue Ruling. Moreover, Revenue Ruling 99–14 indicates that the IRS will "scrutinize LILO transactions" and "economic substance" will be the test. Rev. Rul. 99–14, 1999–1 C.B. 835, 1999 IRB LEXIS 132, at *13–14. As is discussed below, this was hardly new information, given existing case precedent. Furthermore, it was not unreasonable for the plaintiff to assume that during the IRS audit process, there would be discussions with government personnel about the application of Revenue Ruling 99–14 to the plaintiff's 1997 tax return. In addition, the audit with respect to the plaintiff's 1997 tax return addressed the RoCa3 Transaction, but also addressed at least one additional, unrelated issue, a depreciation issue (which according to the plaintiff, ultimately, was resolved without litigation). Therefore, a negotiated resolution of the plaintiff's total 1997 tax obligations, and all outstanding issues, including those related to the RoCa3 Transaction, without litigation, remained a genuine possibility, if not probability, based on past expe-

rience at the time Revenue Ruling 99–14 was issued.

Based on the above discussion, several questions are posed with respect to the defendant's spoliation motion: (1) was there a duty to preserve evidence prior to November 2000, when the CED email migration occurred; and (2) if so, what, if any, are the appropriate sanctions? The CED email migration was part of a much larger management initiative to streamline and integrate various parts of Con Ed onto one email system. There is no indication in the record before the court that there was a targeted effort to erase RoCa3 Transaction related email. Given the facts of the instant case, bad faith is not an issue. The issue in this case, rather, is whether or not there was a duty to preserve, triggered before the email migration in November 2000, which was ignored by the plaintiff. As discussed above, the contradictory positions asserted regarding when litigation should be or was anticipated, make this task more difficult.

It is the court's responsibility to review the facts of the case before it and conduct a review of the words and impact of the in-house counsel memorandum authored by Attorney Scher on October 23, 1997, and the March 29, 1999 Revenue Ruling 99–14, on which the defendant bases its spoliation motion. Having reviewed the record, including the relevant documents, testimony and submissions of counsel, the court concludes that the October 23, 1997 memorandum authored by in-house attorney Scher did not mark a point on the timeline in this case when litigation was, or necessarily should have been, anticipated. As decided previously by the court when granting the government access to documents requested in its motion to compel, the contents of the Scher memorandum did not suggest that its author or the plaintiff anticipated litigation, but rather that there was a possible risk that the IRS and the courts will disagree with CED's interpretation of 26 U.S.C. § 467. Even in his affidavit, submitted in 2007 in opposition to the defendant's motion to compel, Mr. Scher equivocates, suggesting that his 1997 memorandum was created "in anticipation of litigation" but that the issues only "might result in litigation." Mr. Scher was not a RoCa3 Transaction decision maker at either Con Ed or CED. He was assigned the task of writing advisory memoranda and the administrative task of collecting information for production to the IRS during the audit process of the plaintiff's 1997 tax return. His 1997 memorandum, on which the defendant seeks to hang its hat, was created more than five years before the IRS NOPA was issued and another two-and-a-half years (for a total of seven-and-a-half years) before consultations and negotiations on the plaintiff's 1997 tax return regarding the RoCa3 Transaction were deemed by both sides unresolvable at the agency level and, therefore, that litigation would ensue.

Revenue Ruling 99–14, published on March 29, 1999 was issued during the early part of the audit process on the plaintiff's 1997 tax liabilities. Because of the fact-based nature of Revenue Rulings, and because the broad standard of economic substance was already part of the case-based precedent, the discussions about and negotiations regarding IRS challenges to the plaintiff's 1997 tax return did not predetermine litigation. Based on its own past experience, the plaintiff had justifiable reason to believe that its 1997 tax return differences with the IRS, including those related to the RoCa3 Transaction, as well as other outstanding issues related to tax year 1997, could be administratively resolved without resort to litigation. Consequently, the court concludes that none of the documents on which the defendant bases its spoliation motion establish the plaintiff's obligation to preserve documents in anticipation of litigation, as a result of the October 23, 1997 memorandum or March 29, 1999 Revenue Ruling offered by defendant as the operative dates.

The court also notes that even if anticipation of litigation could have been inferred on or before those two dates, the imposition of sanctions, including the defendant's requested adverse inference or prohibition of certain witnesses' testimony, are harsh sanctions which the court must judiciously review, given the facts of each particular case. The court would prefer to decide cases before it after having the benefit of the relevant testi-

mony. In the instant case, the defendant cannot establish that, during the 2000 CED email migration, relevant emails were, in fact, lost, or that the defendant was prejudiced. Tremendous quantities of documents and testimony were offered in the case. Moreover, no testimony regarding any possible lost emails was key to the court's determination based on a review of the extensive record in the case.

Therefore, under the circumstances of the case, without intentional destruction of the emails in question, the court permitted the testimony to be offered, allowing the court to fully review the circumstances surrounding the RoCa3 Transaction. The court also has declined to exercise its discretion to impose the negative inference the defendant requests. In *United Medical Supply Co. v. United States*, in which significant amounts of relevant material had been destroyed after litigation had begun, and repeated reckless discovery violations were documented, the court still declined to impose an adverse inference sanction. *United Med. Supply Co. v. United States*, 77 Fed.Cl. at 274–75. Nor should this court prohibit the plaintiff from offering testimony of witnesses to the extent such testimony addresses the existence of emails discussing the RoCa3 Transaction without the production of the emails. It is the responsibility of the court to determine whether or not the RoCa3 Transaction lacked economic substance for federal tax purposes. To this end, an extensive record, including the Transaction and pre-Transaction documents, was developed by both parties. Moreover, both parties had lengthy opportunities to present evidence and cross-examine witnesses, allowing a fair opportunity to fully explore the issues.

## II. The RoCa3 Transaction Deductions: The Substance Over Form and Economic Substance Doctrines

On its consolidated United States Corporate Income Tax Return (Form 1120) for taxable year 1997, the plaintiff reported rent income received in the RoCa3 Transaction and deducted rent expenses, amortized transaction costs, and interest expenses resulting from the Transaction. Specifically, plaintiff reported $399,693.00 in rental income, and deducted rental expenses of $1,072,652.00, amortization of transaction costs of $9,698.00, and interest expenses of $254,954.00, related to a property interest and indebtedness incurred in connection with the RoCa3 Transaction, for a net loss of $937,331.00. Upon audit of plaintiff's 1997 federal income tax return, the IRS disregarded the income, and disallowed the deductions reported by plaintiff from the RoCa3 Transaction. The IRS's proposed adjustments in connection with the RoCa3 Transaction resulted in an increase of $937,331.00 in plaintiff's taxable income for 1997. As a result of all the proposed adjustments for tax year 1997, the IRS assessed the plaintiff a deficiency for 1997 in the amount of $328,066.00. The plaintiff paid this amount and filed a claim for refund (Form 1120X) with the IRS. The IRS denied the claim. Thereafter, the plaintiff filed the instant suit, seeking a refund for the amount of the deficiency.

Before the trial, the parties agreed that there were three issues to be resolved in this case:

(1) Whether the form of the Transaction will be respected for federal tax purposes.

(2) Whether the loan by Hollandsche Bank–Unie N.V. to the Plaintiff constitutes bona fide indebtedness and should be respected for federal tax purposes.

(3) Whether the investment by Con Edison N.Y. in the EZH lease and sublease transaction, which closed December 15, 1997, has economic substance.

The parties agree that the plaintiff has the burden of proof on each of these issues, including the validity of the deductions claimed by the plaintiff.

According to the defendant, the plaintiff is not entitled to the "tax sheltering benefits" it has claimed. The defendant states:

The Transaction as a whole reveals that CED did not in substance acquire a present leasehold interest in the RoCa3 Facility. Plaintiff also [did] not incur a genuine indebtedness or obtain a benefit from the use or forbearance of money. During the

taxable year in issue, Con Ed did not enjoy the benefits and burdens of owning an interest in the RoCa3 Facility had no debt or equity risk capital committed to or invested in the RoCa3 Facility, and possessed at most a contingent future interest in property akin to but even more ephemeral than an option.

In the alternative, the Transaction should be disregarded under the economic substance doctrine because it does not have a reasonable expectation of profit existing outside of the tax benefits and was not motivated by a valid non-tax business purpose.

The plaintiff, however, asserts that:

in entering into the transaction, CED reasonably projected that it would earn a substantial pretax profit and pay substantial federal income taxes on this profit. At a minimum, the transaction is projected to generate a pretax profit of at least $61 million and CED is expected to pay incremental income taxes of $21.3 million on this profit. Second, the tax benefit that arises from the transaction is deferral, not tax elimination. Third, the transaction was structured in order to obtain the highly favorable front-loading of earnings offered by Statement of Financial Accounting Standards No. 13, Accounting for Leases ("FAS 13"). Under FAS 13, the projected pretax profits from a leveraged lease are largely front-loaded into the lease's early years for financial reporting purposes.

In short, the RoCa3 Transaction possesses economic substance and satisfies all previously identified requirements to qualify for true lease status under the tax law. It therefore merits respect as a true lease transaction.

■ In a tax refund case, there is a presumption of the correctness of the findings of the Commissioner of Internal Revenue. *See United States v. Fior D'Italia, Inc.,* 536 U.S. 238, 243, 122 S.Ct. 2117, 153 L.Ed.2d 280 (2002) ("An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes. It is well established in the tax law that an assessment is entitled to a legal presumption of correctness—a presumption that can help the Government prove its case against a taxpayer in court."); *Conway v. United States,* 326 F.3d 1268, 1278 (Fed.Cir.) ("The ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong.") (quoting *Transamerica Corp. v. United States,* 902 F.2d 1540, 1543 (Fed.Cir.1990)), *reh'g denied* (Fed.Cir.2003); *Lima Surgical Assocs., Inc. v. United States,* 944 F.2d 885, 888 (Fed.Cir.1991) ("[D]eterminations of the Commissioner of Internal Revenue are presumptively correct.").

■ The taxpayer not only has the burden of rebutting the presumption of correctness, but also of establishing entitlement to the specific amount of the deduction claimed. *See United States v. Janis,* 428 U.S. 433, 440–441, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover.") (citing *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293, *modified,* 284 U.S. 599, 52 S.Ct. 264, 76 L.Ed. 514 (1932)); *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935) ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid."); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933) ("The Commissioner of Internal Revenue['s] ... ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong.") (citing *Wickwire v. Reinecke,* 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184 (1927)); *Charron v. United States,* 200 F.3d 785, 792 (Fed.Cir.1999) ("Since the [plaintiffs] were seeking refunds of taxes they had paid, they have the burden of proving they are entitled to the amount sought."); *see also Danville Plywood Corp. v. United States,* 899 F.2d 3, 7–8 (Fed.Cir.1990); *Barenholtz v. United States,* 784 F.2d 375, 381 (Fed.Cir.1986); *Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 654–55, 410 F.2d 1233, 1244–45 (1969).

■ To rebut the presumption of the Commissioner's correctness, "the taxpayer

must come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir. 1998), *reh'g denied,* en banc *suggestion declined* (Fed.Cir.1999). Stated otherwise, to overcome the presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–152, 510 F.2d 1365, 1369 (1975); *Arrington v. United States,* 34 Fed.Cl. 144, 147 (1995), *aff'd,* 108 F.3d 1393, 1997 WL 101091 (Fed.Cir.1997) (table). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. Thus, a plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. *See Transamerica Corp. v. United States,* 902 F.2d at 1543; *Danville Plywood Corp. v. United States,* 899 F.2d at 7–8; *Arrington v. United States,* 34 Fed.Cl. at 147. Even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. *See Transamerica Corp. v. United States,* 902 F.2d at 1543; *Danville Plywood Corp. v. United States,* 899 F.2d at 8.

The case currently before the court concerns a LILO transaction entered into on December 15, 1997. As noted above, although LILO transactions often include certain general, common characteristics, each LILO transaction is developed and formed differently, based on specific relationships, the chronology, the financial arrangements, the nature of the property involved, and any number of other variables. In a LILO transaction, a United States taxpayer generally enters into a lease for property from a tax exempt entity and then leases it back to that entity for its use. The tax exempt entity has a shorter sublease term than the lease of the United States taxpayer. At expiration of the sublease, the original owner has an option to buy back the remainder of the United States taxpayer's lease. Additional terms often vary depending on the nature of the transaction.

In this case, plaintiff has claimed deductions "in rental expense allocated to 1997 for the acquisition of CED's Lease Interest in the RoCa3 Facility," pursuant to 26 U.S.C. § 162(a)(3), applying 26 U.S.C. § 467, "in interest expense allocated to 1997 … attributable to the nonrecourse debt incurred to pay part of the cost of CED's Lease Interest in the RoCa3 Facility," pursuant to 26 U.S.C. § 163(a), and for "transaction costs allocated to 1997," pursuant to 26 U.S.C. § 162(a), related to the RoCa3, LILO Transaction. The inquiry as to the validity of the deductions claimed by the plaintiff, therefore, starts with whether the Transaction and reporting were carried out in accordance with the Internal Revenue Code, including in this case, 26 U.S.C. §§ 162(a), 162(a)(3), 163(a), and 467. *See Coltec Indus., Inc. v. United States,* 454 F.3d 1340, 1347 (Fed.Cir.), *reh'g denied* (Fed.Cir.2006), *cert. denied,* 549 U.S. 1206, 127 S.Ct. 1261, 167 L.Ed.2d 76 (2007). In addition, two related doctrines, the doctrines of "substance over form" and "economic substance," are relevant to resolving the validity of the plaintiff's claimed deductions. *See Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). As discussed below, for the RoCa3 Transaction to be eligible for the deductions, the form of the Transaction must mirror its substance, and the Transaction must possess an economic purpose other than to generate tax deductions. *See, e.g., Dow Chemical Co. v. United States,* 250 F.Supp.2d 748, 799 (E.D.Mich.), *modified,* 278 F.Supp.2d 844 (E.D.Mich.2003), *rev'd* [on factual grounds, economic substance test maintained], 435 F.3d 594, 605 (6th Cir.), *reh'g and reh'g en banc denied* (6th Cir.2006), *cert. denied,* 549 U.S. 1205, 127 S.Ct. 1251, 167 L.Ed.2d 74 (2007).

■■■ The United States Supreme Court has articulated its position on the substance over form guidelines applicable in tax cases, as follows:

In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," *Commissioner of Internal Revenue v. Tower,* 327 U.S. 280, 291, 66 S.Ct. 532,

538, 90 L.Ed. 670 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering v. Lazarus & Co.*, 308 U.S., [252] at 255, 60 S.Ct., [209] at 210 [, 84 L.Ed. 226 (1939)]. *See also Commissioner of Internal Revenue v. P.G. Lake, Inc.*, 356 U.S. 260, 266–267, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 286, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

*Frank Lyon Co. v. United States*, 435 U.S. at 573, 98 S.Ct. 1291. Litigants also favor citing the colorful language in *Gregory v. Helvering*, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935), of refusing to "exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Id.* The substance over form doctrine requires the court to determine the "true nature" of the transaction to ensure that tax consequences are based upon a transaction's actual substance and not mere labels. *Rogers v. United States*, 281 F.3d 1108, 1113–1118 (10th Cir.2002); *see also Boulware v. United States*, 552 U.S. 421, 128 S.Ct. 1168, 1175–76, 170 L.Ed.2d 34 (2008); *Frank Lyon Co. v. United States*, 435 U.S. at 573, 98 S.Ct. 1291; *Coltec Indus., Inc. v. United States*, 454 F.3d at 1352.

■ If the transaction creates actual ownership in a leasehold interest, such that the taxpayer "retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts." *Frank Lyon Co. v. United States*, 435 U.S. at 584, 98 S.Ct. 1291; *see also Coltec Indus., Inc. v. United States*, 454 F.3d at 1351–52; *AWG Leasing Trust v. United States*, 592 F.Supp.2d 953, 976 (N.D.Ohio 2008) ("In assessing whether the form of the transaction accurately captures the substance, the court should consider the totality of the circumstances under which the transaction arose."). In other words, when the form of the transaction comports with its substance, the form will be respected for tax purposes, however, when the form of the transaction is nothing more than "'the simple expedient of drawing up papers,' ... when the objective economic realities are to the contrary," the substance of the transaction controls. *Frank Lyon Co. v. United States*, 435 U.S. at 573, 98 S.Ct. 1291 (quoting *Comm'r v. Tower*, 327 U.S at 291, 66 S.Ct. 532). The United States Supreme Court in *Frank Lyon* also mandated "combing all the facts" in a leasing transaction. As previously indicated:

> There is no single criterion that shows the essence of a commercial deal negotiated between businessmen with differing interests. All of the aspects of the arrangement must be examined to form a judgment as to whether the parties [sic] intent was to negotiate for the use of property or for the transfer of ownership.

> In fact, since most transactions exhibit a variety of circumstances which point in opposite directions, the cases have been decided on the basis of all of the facts and circumstances there presented.

*Transamerica Corp. v. United States*, 15 Cl. Ct. 420, 436 (1988) (quoting *Kansas City So. Ry. Co. v. Comm'r*, 76 T.C. 1067, 1094, 1981 WL 11259 (1981)), *aff'd*, 902 F.2d 1540 (Fed. Cir.1990).

■ The court in *H.J. Heinz Co. v. United States*, 76 Fed.Cl. 570 (2007), *appeal dismissed*, 331 Fed.Appx. 727 (Fed.Cir.2009), further explained the proper approach as one in which the "taxpayer must prove that its transaction was both purposeful [had a business purpose] and substantive—if proof in either regard is lacking, the transaction is a sham." *Id.* at 584. In other words, the taxpayer must show that "'the transaction had any practical economic effects other than the creation of income tax losses.'" *Id.* (quoting *Keener v. United States*, 76 Fed.Cl. 455, 467 (2007) (quoting *Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir.), *cert. denied*, 488

U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988))).

■ Regarding the issue of economic substance, in *Frank Lyon Co. v. United States*, the United States Supreme Court held that a transaction will be respected "where ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. at 583–84, 98 S.Ct. 1291. The United States Court of Appeals for the Federal Circuit followed this guidance in *Coltec Industries, Inc. v. United States*, 454 F.3d at 1355, when it articulated the general principles of the economic substance doctrine as the relevant test to be used in this Circuit. The economic substance doctrine permits transactions to take advantage of tax benefits so long as those transactions also have a non-tax business purpose. *See ACM P'ship v. Comm'r*, 157 F.3d 231, 248 n. 31 (3d Cir.1998) ("[W]e do not intend to suggest that a transaction which has actual, objective effects on a taxpayer's non-tax affairs must be disregarded merely because it was motivated by tax considerations."), *cert. denied*, 526 U.S. 1017, 119 S.Ct. 1251, 143 L.Ed.2d 348 (1999); *Gilman v. Comm'r*, 933 F.2d 143, 147–48 (2d Cir.1991) (Utilizing the business purpose/economic effect analysis based on objective standards, and stating that " '[a] transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions.' " (quoting *Jacobson v. Comm'r*, 915 F.2d 832, 837 (2d Cir.1990) (quoting *DeMartino v. Comm'r*, 862 F.2d 400, 406 (2d Cir.1988))), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992)).

> In *Coltec*, the Federal Circuit wrote:
>
> First, although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, *Gregory [v. Helvering]*, 293 U.S. at 469, 55 S.Ct. 266 ... the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality.... The Supreme Court later explained that "[if]

... the *Gregory* case is viewed as a precedent for the disregard of a transfer of assets without a business purpose ... it gives support to a natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." *Higgins v. Smith*, 308 U.S. 473, 476[, 60 S.Ct. 355, 84 L.Ed. 406] ... (1940).

> · · ·
>
> While the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance.
>
> Second, when the taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance.
>
> · · ·
>
> Third, the economic substance of a transaction must be viewed objectively rather than subjectively.
>
> · · ·
>
> Fourth, the transaction to be analyzed is the one that gave rise to the alleged tax benefit.... [T]here is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate).

*Coltec Indus., Inc. v. United States*, 454 F.3d at 1355–57 (footnotes omitted).

The *Frank Lyon* Supreme Court case and the *Coltec* Federal Circuit case are binding on this court. The *Frank Lyon* and *Coltec* cases set out the general approach to reviewing economic substance which has prevailed for years. Neither case, however, provides formulaic prescriptions for determining which elements necessarily will result in a finding of economic substance. Due to the fact specific nature of each taxpayer's position and of each individual transaction at

issue, this is the appropriate approach. The somewhat more detailed statutory and regulatory guidance referred to by the parties in their briefings, discussed more fully below, was enacted and promulgated after the signing of the RoCa3 Transaction. In addition, a number of courts, faced with LILO and non-LILO economic substance cases, have offered a range of guidance, albeit without complete agreement, resulting in a list of possible criteria to be used, but also offer no simple measurement criteria. This court, therefore, has examined existing case law beyond binding precedent for guidance, and conducted a lengthy trial, with the introduction of extensive documentary evidence into the record, to evaluate the true nature of the RoCa3 Transaction.[21]

In *Jade Trading, LLC v. United States*, 80 Fed.Cl. 11 (2007), *recons. denied*, 81 Fed.Cl. 173 (2008), *appeal reinstated*, 329 Fed.Appx. 263 (Fed.Cir.2009), while discussing the element of subjective intent as part of the economic substance test articulated in *Coltec,* the court stated,

> In the context of assessing objective economic substance, *Coltec* has relegated this type of evidence [subjective intent] to a back seat recognizing the taxpayer's "subjective motivation may be pertinent to the existence of a tax avoidance purpose." [*Coltec Indus., Inc. v. United States,*] 454 F.3d at 1356. Rather, the lack of economic reality of the transaction itself is the primary consideration as this is sufficient to disregard the transaction.

*Id.* at 48 n. 69.

 This court agrees that determining the economic substance of a transaction includes an "*objective* determination of whether a *reasonable* possibility of profit from *the transaction* existed.'" *Coltec Indus., Inc. v. United States*, 454 F.3d at 1356 (quoting *Black & Decker Corp. v. United States*, 436 F.3d 431, 441–42 (4th Cir.2006)) (emphasis in original). The *Coltec* court also quoted *Rothschild v. United States*, 186 Ct. Cl. 709, 407 F.2d 404 (1969), for the proposition that an important criteria for determining the authenticity of a transaction for tax purposes is whether the transaction has realistic financial benefit or whether there was " 'a possibility' " or " 'opportunity of profit to the taxpayer separate and apart from the tax deduction.'" *Coltec Indus., Inc. v. United States*, 454 F.3d at 1356 n. 16 (quoting *Rothschild v. United States*, 186 Ct.Cl. 709, 407 F.2d at 411, 414, 417). The court in *AWG Leasing Trust, Inc.* noted that "[t]he taxpayer generally must only show a reasonably expected, minimal pre-tax profit in order to prove that a transaction has economic substance and is not required to show that its transaction will yield a higher pre-tax return than all other possible investment opportunities." *AWG Leasing Trust, Inc. v. United States*, 592 F.Supp.2d at 980.

 Therefore, to prove that a business transaction possesses "economic reality," such that the transaction should not be disregarded for tax purposes, the plaintiff must show that the transaction is imbued with a business purpose beyond the beneficial tax treatment. A reasonable opportunity for pretax profit generally will be considered significant, although not always sufficient by itself to determine economic substance. *See, e.g., Johnson v. United States*, 11 Cl.Ct. 17, 25, 28 (1986) (A case in which the parties agreed that a "mere 'modicum' of profit will satisfy the 'economic substance' test;" and

---

21. The court recognizes that many different, sometimes slight, sometimes more divergent, articulations of the economic substance test have been used by courts. *See, e.g., Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89 (4th Cir. 1985) (The United States Court of Appeals for the Fourth Circuit agreed with the United States Tax Court in applying a "two-prong" test that, "[t]o treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, *and* that the transaction has no economic substance because no reasonable possibility of a profit exists."). *Id.* at 91

(emphasis added). The United States Court of Appeals for the Federal Circuit, however, specifically rejected this formulation and explained, in a footnote in the *Coltec* case, "[w]e think that the rule adopted by the Fourth Circuit ... that a transaction will be disregarded only if it both lacks economic substance *and* is motivated solely by tax avoidance—is not consistent with the Supreme Court's pronouncements in cases such as *Frank Lyon." Coltec Indus., Inc. v. United States*, 454 F.3d at 1355 n. 14 (emphasis added); *see also* discussions in *Stobie Creek Invs., LLC v. United States*, 82 Fed.Cl. 636, 697 (2008); *H.J. Heinz Co. v. United States*, 76 Fed.Cl. at 584.

the court used the test of "a reasonable chance of making, a reasonable profit apart from tax considerations."); *Rice's Toyota World Inc. v. Comm'r*, 752 F.2d at 94 (Utilizing "an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefit," as a test in the economic substance inquiry.); *Transcapital Leasing Assocs. 1990–II L.P. v. United States*, 97 A.F.T.R.2d 2006–1916, 1946 (W.D.Tex.2006) (Stating that, "[t]he economic substance prong of the sham transaction doctrine 'requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from the tax benefits.'" (quoting *Rice's Toyota World v. Comm'r*, 752 F.2d at 94)), aff'd, 246 Fed. Appx. 266 (5th Cir.2007); *Levy v. Comm'r*, 91 T.C. 838, 860, 1988 WL 114910 (1988) (Considering one of the key elements to determining whether there is economic substance, i.e., the benefits and burdens of ownership, is "the potential for realizing a profit or loss on the sale or re-lease of the equipment."); *Torres v. Comm'r*, 88 T.C. 702, 718, 1987 WL 39958 (1987) (Stating, "[b]ased on this standard, a finding of lack of economic substance is inappropriate if either a business purpose or a reasonable possibility of profit apart from expected tax benefits is found to have been present."); *Gefen v. Comm'r*, 87 T.C. 1471, 1490, 1986 WL 22070 (1986) (Stating, "[a] transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits."); *Packard v. Comm'r*, 85 T.C. 397, 417, 1985 WL 15389 (1985) (Stating that, "if an objective analysis of the transaction indicates that a reasonable possibility of profit existed apart from tax benefits, the transaction will not be classified as a sham."); *Rubin v. Comm'r*, T.C. Memo 1989–484, 58 T.C.M. (CCH) 25, 31–32 (1989) (Stating that the issue of whether an activity is engaged in for profit is one of fact to be resolved on the basis of all the surrounding circumstances.); *Moser v. Comm'r*, T.C. Memo 1989–142, 56 T.C.M. (CCH) 1604, 1623–24 (1989) (Stating, "[o]ur inquiry into business purpose and economic substance is inherently factual.... The focus of this inquiry, however, is to perform an OBJECTIVE analysis of the transactions to determine whether a realistic opportunity for economic profit existed exclusive of any anticipated tax benefit.... Our focus is on the realistic potential for profit at the time petitioners entered into the transactions.... We analyze the transactions as a prudent investor, but with the recognition that we cannot insist upon unreasonable demands for certainty.") (emphasis in original), aff'd, 914 F.2d 1040 (8th Cir.1990).

- **The Plaintiff has Acquired the Benefits and Burdens of a Leasehold Interest in the RoCa3 Facility**

■ A basic issue to be resolved is whether the taxpayer claiming the transaction related deductions qualifies as a true owner of a leasehold interest in the property, such that it possesses the benefits and burdens of ownership and, therefore, satisfies the substance over form test. "This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances." *Grodt & McKay Realty, Inc. v. Comm'r*, 77 T.C. 1221, 1237, 1981 WL 11305 (1981) (citations omitted).

■ The defendant takes the position that the RoCa3 Transaction was entered into solely for the tax benefits and that the plaintiff "did not, in substance, acquire a present leasehold interest in the RoCa3 Facility ... did not incur genuine indebtedness in connection with the deal ... and the Transaction should be disregarded under the economic substance doctrine." The plaintiff responds that it projected a pretax profit of at least $61 million, along with other significant benefits and possible burdens from the RoCa3 Transaction. The plaintiff asserts that the Transaction was a true lease transaction, which possesses economic substance.

In *H.J. Heinz Co. v. United States*, the court articulated factors, any or all of which, depending on the circumstances, may be considered relevant in a particular transaction to assist in determining whether a purported owner claiming tax deductions possesses meaningful burdens and benefits of ownership:

(i) whether the purchaser bears the risk of loss and opportunity for gain; (ii) which party receives the right to any current income from the property; (iii) whether legal title has passed; and (iv) whether an equity interest was acquired in the property.

*H.J. Heinz Co. v. United States,* 76 Fed.Cl. at 582 (footnote with citations omitted). Although the *Heinz* case deals specifically with stock ownership, the court offered its opinion that its conclusions also might apply to leasing or loan transactions. *Id.* at 582; *see also Frank Lyon Co. v. United States,* 435 U.S. at 579, 98 S.Ct. 1291 (discussing Revenue Procedure 75–21 and the criteria used by the IRS to issue Advance Rulings on ownership in leveraged leases). Revenue Procedure 75–28, 1975–1 C.B. 752 (Jan. 1, 1975), generally sets forth a checklist for information requested in order to obtain an Advance Ruling regarding whether a transaction is a true lease for federal income tax calculations. The guidelines, however, under Revenue Procedure 75–21, specifically state that, "[t]hese guidelines do not define, as a matter of law, whether a transaction is or is not a lease for Federal income tax purposes.... If these guidelines are not satisfied, the Service nevertheless will consider ruling in appropriate cases on the basis of all the facts and circumstances." Rev. Proc. 75–21, 1975–1 C.B. 715, 1975 IRB LEXIS 1316, at \*2–3 (Jan.1975).

The United States Tax Court also has detailed some of the factors used to determine whether a taxpayer possesses an ownership interest for tax purposes:

In previous cases involving the purchase and leaseback of computer equipment, this Court has found the following factors essentially neutral in determining whether a taxpayer is the owner of property: (1) the existence of a net lease; (2) the absence of significant positive cash flow; and (3) rent geared to interest and mortgage amortization.[22] *Levy v. Commissioner,* [91 T.C. 838, 1988 WL 114910] *supra; Larsen v.*

*Commissioner,* [89 T.C. 1229, 1267, 1987 WL 257438 (1987)]; *Estate of Thomas v. Leven,* [84 T.C. 412, 433–36, 1985 WL 15324 (1985)].

Factors of particular relevance in determining whether a taxpayer is the owner of property are: (1) the taxpayer's equity interest in the property as a percentage of the purchase price; (2) the existence of a useful life of the property in excess of the leaseback term; (3) renewal rental at the end of the leaseback term set at fair market rent;[23] (4) whether the projected residual value of the equipment plus the cash flow generated by the rental of the equipment allows the investors to recoup at least their initial cash investment; (5) the expectation of a "turnaround" point which would result in the investors' realizing income in excess of deductions in the later years; (6) net tax benefits during the leaseback term less than their initial cash investment; and (7) the potential for realizing a profit or loss on the sale or re-lease of the equipment.

*Rubin v. Comm'r,* T.C. Memo 1989–484, 58 T.C.M (CCH) 25, 34 (1989); *see also* the list of factors detailed in *Grodt & McKay Realty v. Comm'r,* 77 T.C. at 1237–38. "[N]one of these factors is necessarily controlling; the incidence of ownership, rather, depends upon all the facts and circumstances" of the case under consideration. *H.J. Heinz Co. v. United States,* 76 Fed.Cl. at 582 (citing *Int'l Paper Co. v. United States,* 33 Fed.Cl. 384, 393–94 (1995) and *Baird v. Comm'r,* 68 T.C. 115, 124, 1977 WL 3656 (1977)).

Addressing a sale-leaseback, the United States Supreme Court in *Frank Lyon Co. v. United States* held:

In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not

---

**22.** In *Levy,* item 3 of the essentially neutral factors was stated as, "the fact that the rental income stream during the initial lease term is tailored to or matches interest and debt payments that are due." *Levy v. Comm'r,* 91 T.C. at 860.

**23.** In *Levy,* item 3 of the factors of particular relevance was stated as, "lease renewal or purchase options at the end of the lease term based on fair market value of the equipment at that time." *Levy v. Comm'r,* 91 T.C. at 860.

shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. It suffices to say that, as here, a sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions.

*Frank Lyon Co. v. United States,* 435 U.S. at 583–84, 98 S.Ct. 1291 (footnotes omitted); *see also Coleman v. Comm'r,* 16 F.3d 821, 827 (7th Cir.1994).

Among the burdens and benefits that the plaintiff must possess in order to be considered a true owner of a leasehold interest in the RoCa3 Facility, are that the plaintiff must bear a risk of loss of its investment in the Facility and have created an opportunity to gain a profit as a result of the plaintiff's investment in the Facility. Understanding the plaintiff's true interest in the RoCa3 Facility is, in part, dependent upon the nature of what is likely to occur following the expiration of the Sublease Basic Term of 20.1 years. As stated above, pursuant to the Lease Agreement, the RoCa3 Transaction involved CEL Trust's lease of an undivided 47.47% interest in EZH's RoCa3 Facility for a Lease Term of 43.2 years, beginning on December 15, 1997 (which constituted 80% of the Facility's estimated remaining useful life of 54 years at the closing), and terminating on February 24, 2041. Under the Sublease Agreement, an agreement running simultaneously with a portion of the Lease Agreement, CEL Trust subleased back to EZH the same undivided 47.47% interest in the RoCa3 Facility, for a Sublease Basic Term of 20.1 years, beginning on December 15, 1997 and ending on January 1, 2018. Upon the termination of the Sublease Basic Term, EZH has the right of first refusal, under the Sublease Purchase Option, to purchase the remainder of CEL Trust's undivided interest pursuant to the Lease Agreement. If EZH does not exercise its rights under the Sublease Pur-

chase Option, CEL Trust can exercise either the Sublease Renewal Option or the Retention Option. Under the Sublease Renewal Option, CEL Trust could require EZH to extend the Sublease Term, and a Sublease would remain in effect from January 2, 2018 through June 15, 2034. On June 15, 2034, the undivided 47.47% interest reverts to CEL Trust for the remainder of the Lease Term, from June 15, 2034 through February 24, 2041, referred to as the Shirt–Tail Period. If, at the end of the Sublease Basic Term, EZH does not choose to exercise the Sublease Purchase Option, and CEL Trust does not choose to exercise the Sublease Renewal Option, CEL Trust will exercise the Retention Option and will take possession and control of the undivided 47.47% interest in the RoCa3 Facility for the remainder of the Lease Term, referred to as the Retention Option Period, from January 2, 2018 through February 24, 2041.

Key to understanding the benefits and burdens of ownership issue, as it relates to the RoCa3 Transaction, is whether the Sublease Purchase Option necessarily will be exercised by EZH. The defendant maintains that if EZH were to exercise the Sublease Purchase Option, the residual value of the RoCa3 Facility to the plaintiff following the Sublease Basic Term, as well as the plaintiff's continued risk as the owner/operator of the EZH Facility, would be eliminated. The plaintiff responds that even if the Sublease Purchase Option is exercised by EZH, the plaintiff would stand to gain a profit and incur risks as a result of entering into the Transaction. The parties, in their expert reports, testimony and submissions to the court concentrated mostly on the Sublease Purchase Option and the Sublease Renewal Option, and give less attention to the Retention Option. There was, however, some agreement that if EZH does not, or is not certain to, exercise the Sublease Purchase Option, the plaintiff would come much closer to, or, in fact, would meet the burdens and benefits test for ownership, including several of the defendant's experts, David W. LaRue, Samuel Ray and Paul Bent, who indicated that the plaintiff will bear the benefits and burdens of ownership if EZH does not elect

the Sublease Purchase Option, with the most risk associated with the Retention Option Period.

For example, even in the expert report submitted by one of the defendant's experts, Dr. LaRue, who was qualified as an expert in accounting and finance, he confirmed that both positive and negative risk would begin in January 2018, if the Sublease Purchase Option is not exercised, including risks associated with residual value, foreign currency conversion, the state of the electricity market in The Netherlands, possible management fees, and operations. Dr. LaRue also indicated that he had not reviewed documents during his expert review of the Transaction which gave any indication of any estimates of net present value analyses of pretax cash flows in United States dollars the plaintiff expected to receive if either of the options other than the Sublease Purchase Option was exercised. At trial Dr. LaRue responded to questions as follows:

A. To the extent that the fixed purchase option [the Sublease Purchase Option] was not pre-ordained, then this statement does not take into account the possible shirt-tail revenues that might have been earned from—during the shirt-tail period.

Q. And also the retention period?

A. And also the retention period.

Q. So, in other words, if the purchase option is not exercised, there would be cash flows that might occur that are not pre-ordained, secured, and defeased in this transaction?

A. In the retention period?

Q. In the retention period or shirt-tail.

A. In the shirt-tail period, yes. In the retention period, yes.

Q. And your conclusion when—in rendering your conclusion in this bullet point, you ignored those scenarios?

A. I ignored those scenarios for the reasons that I stated earlier.

Q. Okay. So let's go to the next bullet point. "These positive and negative cash flows, many of them circular, were entirely unrelated to the potential economic profits and losses that might be realized from the successful or unsuccessful operation of the facility." The question is the same. This is only—this conclusion and this bullet point that I just read only takes into account your scenario 1 and scenario 2; is that correct?

A. That's correct.

Q. Does not take into account possibility of an early termination?

A. It does not.

Q. And the cash flows that would result from that?

A. It does not.

Q. It does not take into account the cash flows, positive or negative, that might result from the retention option?

A. That's correct. Again, I didn't think the retention option was a viable option.

Q. It does not take into account the positive and negative cash flows that might occur with respect to the shirt-tail?

A. That's correct.

Q. In fact, with regard to the retention option and the shirt-tail, the cash flows would be far from entirely unrelated to the potential economic profits and losses that might be realized from the successful or unsuccessful operation of the facility, in fact, they would be entirely dependent on that, wouldn't they?

A. Yes.

Q. Here you state, "EZH did not relinquish to CELI [CEL] any of the benefits (rewards) or burdens (risks) of ownership of the undivided leasehold interest in the facility." My question is going to be the same. This conclusion only was related to your analysis of your scenarios 1 and 2; is that correct?

A. Not actually. At the time that—at the time EZH and Con Ed entered into this transaction, EZH did not relinquish any of the benefits and rewards, burdens, or risks of ownership of an undivided leasehold interest in the facility. EZH had the option of reacquiring that back in 2018. They would make that decision in 2018. And in 2018, in the event that EZH decided not to exercise the fixed purchase option, then for the first time would—then for the first time would Con Ed have the benefits and

burdens of ownership, and that was a decision exercisable at EZH's sole discretion.

· · ·

A. I am saying that at the time they entered into this transaction, there was no relinquishment of benefits and rewards. That decision wasn't made for—or would not be made for another 20 years. It was EZH's decision as to whether or not to provide Con Ed with an opportunity to benefit from the retention option, and whatever they might earn under the retention option or whatever they might earn during the shirt-tail period.

Again, during his testimony, defendant's expert Dr. LaRue clearly indicated that the plaintiff would bear burdens and benefits of ownership if the Retention Option is exercised:

Q. All right. And then would Con Edison have the benefits and burdens of ownership, at least insofar as its leasehold interest is concerned under that scenario [that the Retention Option is exercised]?

A. At that point, if EZH made a decision to convey the benefits and burdens of the ownership of the factory,[24] of the undivided interest to Con Ed, at that point and only at that point, 20 years hence, would Con Ed begin to benefit from the operation and the ownership of the facility—of an interest in the facility.

Q. And in coming to the conclusions in your report, you did not take any of those benefits or burdens into account in rendering the conclusion you have in this paragraph?

A. Well, as I have stated so often, I did not consider the retention option and, as with Cornerstone and the representations made in those interrogatories that we have referred to earlier, I assumed that the shirt-tail period revenues were zero. Even if they weren't zero, discounting them back to present value, those amounts would be very small.

Q. You didn't take them into account?

A. I didn't take them into account. I have said that several times.

Finally, Dr. LaRue admitted that, in 1997, it would be "pure speculation" to predict certain of the key decision-driving factors as they would exist 20 years later, which would have to be reviewed by EZH as it considered whether or not to exercise the Sublease Purchase Option.

Another of the defendant's witness, Samuel Ray, who described himself at the trial as essentially a management consultant, was qualified as an expert in large ticket equipment lease transactions and the equipment leasing industry. In his expert report, Mr. Ray concluded: "It is my opinion that it is reasonable that EZH will exercise the Sublease Purchase Option at the end of the Sublease Base Term, but not for economic reasons." At another point in his testimony, Mr. Ray also indicated, "I think it is likely that EZH will exercise that option [the Sublease Purchase Option]." In response to a dialogue with the plaintiff's counsel, Mr. Ray, however, also conceded that if EZH decided in 2018 it did not want the asset, the Sublease Purchase Option would not necessarily have to be exercised, and that there is nothing in the documents to indicate that a decision of whether or not to exercise the Sublease Purchase Option had been made at the time of the Transaction. The following dialogue with Mr. Ray occurred:

Q. So things could change down the road?

A. Sure.

Q. Over a 20–year period?

A. That's right.

Q. And who will make the decision?

A. EZH.

Q. And who at EZH will make those decisions?

A. I think the top officials of EZH.

Q. Do you think those would be the same people there in 1997?

A. For their sake, I hope not.

Q. We don't have any idea, do we?

**24.** Although Dr. LaRue referred to this as a "factory," the RoCa3 Facility was not a factory, but an "integrated facility" that generated electricity and carbon dioxide for the use of its municipal owners.

A. We don't. And I think when it comes up, I would think that they would look and see what they agreed to in 1997 and then what their options were in 2018.

Continuing, Mr. Ray stated:

Q. And in this transaction ... you can't tell even sitting here today ten years into the deal whether this purchase option could be exercised or not, right?

A. That's correct.

Q. If it is not, Consolidated Edison will have its own options to either continue the lease for some period of time or—

A. That's right.

Q. —or seek a residual value by selling the output.

A. That's right.

Q. Run the risk of whether they could sell it at a profit or not?

A. That's right.

Q. Perhaps sell it at a loss?

A. That's right too.

Q. And even if they elect the renewal term at the end of the renewal term, they will have those same risks and opportunities?

A. That's correct.

Q. And those risks and opportunities are to generate profit or loss?

A. That's right.

Q. It is likely those profit and losses will be generated in foreign currencies, right?

A. Very likely.

Q. And that's something, that's one of the risks Con Ed is going to have? A. That's a risk, yeah.

. . .

Q. Whether they analyzed it or not here, your opinion is that they actually had those risks in this transaction?

A. They had the risk and they had the opportunity, if EZH didn't exercise its purchase.

Q. We don't know if EZH is going to exercise or not?

A. We don't know for certain.

. . .

Q. And the option is actually above fair market value?

A. It is.

Q. They would actually have to pay more than fair market value to exercise the purchase option, EZH would?

A. They would pay more than the fair market value as estimated in the appraisal, yes.

Q. All right. Which would tend to indicate that they might not want to do that? If the appraisal was correct, they will be paying more than fair market value?

A. It would depend on whether the, whether in their analysis at the time the asset was worth more to them at the purchase option, I mean, an asset in place is worth more than an asset on the dock in these cases.

Q. That would be a determination they would make in the year 2018?

A. That's right.

Q. Based on economic values at the time?

A. That's right.

Mr. Ray further testified, as to the risks and opportunities available to the plaintiff in the RoCa3 Transaction:

Q. But you think that with regard to— there are issues that go beyond EZH's performance that should be analyzed?

A. Absolutely.

Q. And if you analyze them here, you would think there is material risk?

A. They are. Material risk, material opportunity.

. . .

A. In this transaction.

Q. Okay.

A. Assuming they don't exercise the sublessee purchase option.

Q. Okay. So in your expert opinion as a leasing person, a leasing expert, is that there are material risks, material opportunities if the purchase option is not exercised and those are material risks and opportunities to Consolidated Edison?

A. Yes.

Mr. Ray also stated:

Q. What other risks have you analyzed yourself?

A. I have thought, and I didn't go and take pen and paper to it and do research but the operations risks are not as low to me as Con Ed 61 indicated there were for them. There is a lot of things that can happen over a 20–year period. There can be fluctuations in the price of electricity. There can be fluctuations in the price of fuel. There can be reorganizations of electrical distribution systems in The Netherlands over the next 20 years, if you are looking at a transaction like this in Europe, what might happen there in terms of power need going up, power need not going up. I didn't see any of that in their analysis, but if I had been looking at this transaction, I would have been concerned about that and I wouldn't have written it off as a level of risk.

Q. In other words, operations risk you think is actually higher than the documentation you see that Con Ed considered it to be?

A. I would be concerned that it might be.

Q. And that's something actually would impart greater economic substance to the transaction in your view; is that correct?

A. I don't know that it creates economic substance. I think it creates risk.

Finally, Mr. Ray concluded that EZH's decision to exercise the Sublease Purchase Option would be an "economic decision as to whether or not the price is worth what you are getting for it."

In his report, another of the defendant's expert witnesses, Paul Bent, qualified as "an expert in equipment lease transactions, including the structuring, arranging and negotiation of such transactions," discussed the out years of the Transaction, and indicated:

Q. And that includes $18 million for a certain number of years and it follows off and then there is zeros from 2035 on. Does that mean that you have included no possible revenues from sales of electricity in your numbers in this case from 2034 on?

A. I have not. These are all schedules directly from the transaction.

Q. So if there were revenues or profits derived during that period of time, that would increase our free cash at the end of the day?

A. Just as if there are losses on the sale of energy, those would show up as decreases in the free cash.

Q. Let's take it one at a time. If there are extra revenues, our free cash could go from 141 million to something higher than that, depending on the actual—

A. Well, I would be careful how I said that. The free cash in the deal would not change. The deal numbers are what I have shown here. If you are asking can Con Ed increase its overall return on this deal by selling energy at some point in the future, yes, they could. We just discussed that at length.

Q. And their overall—maybe not free cash—but the overall amount of profit they could put in their pocket could go up by whatever sales of electricity, if they sold at a profit?

A. Just as if they went and invested in some other investment, they could put more cash in their pocket.

Q. And if they sold electricity at a loss, they would actually eat into this amount of profit they have in the transaction, and they might have less?

A. Again, as if they invested in some other investment and they lost money, they would lose money. But that wouldn't change the numbers that are derived from this transaction.

Q. It wouldn't change the numbers that derive from the schedule?

A. From the schedules, that's right.

Q. The schedules in the operative documents. But it would change numbers they have from this particular investment in this facility, because they would be deriving more profits or perhaps losses in the future from this facility? They are not scheduled?

A. Well, that's an interesting question actually when you put it that way, because, while it is true that their right to sell

energy from the plant derives from this transaction, I am not sure this transaction is a sine qua non to going to The Netherlands and selling energy from the plant.

The defendant also offered the expert testimony of Professor of Accounting and Finance, Dr. Jacob Thomas. He was qualified as an expert in "the field of economics, with a specialization in accounting and financial economics." He was asked by the government to evaluate "the profitability that Con Ed would get from the transaction with special consideration to the special tax benefits that were generated within the transaction." Professor Thomas concluded that he believed the plaintiff's motivation for the RoCa3 Transaction was special tax benefits and that the participants expected the Sublease Purchase Option to be exercised, in which case, he believed that "the transaction becomes very circular." He, however, described his analysis as follows: "the whole analysis I have done is sort of a very high level analysis, without getting into the details that much." He also indicated that:

Q. Now, before I ask any other questions here, you would agree that, when you prepared your reports, you had not read very carefully or extensively the agreements that were entered into pursuant to the EZH transaction, correct?

A. Yes. I had not read them very extensively. I was sort of scanning them looking for certain kinds of arrangements that I would say are in the economics literature expected when there's joint ownership or joint ventures.

Q. Okay. But you had not—you had not read any of the agreements carefully cover to cover, correct?

A. I had not.

A significant portion of Professor Thomas' testimony was quite general, despite his attempts, based on a general review of the Transaction, to offer specific conclusions regarding Con Ed's motivation for entering the RoCa3 Transaction and how the parties to the transaction would behave in the future. Although there is a role for parties to educate courts on background regarding complex issues not intuitively obvious to someone outside of the expertise under review, ulti-mately the final decision of the court on a particular transaction challenged in the litigation must be made with specific reference to the actual facts of the transaction before the court. Moreover, Professor Thomas admitted on cross-examination that he had never been involved in a commercial leasing transaction and that he had never taught a course dedicated to leasing transactions. Although Professor Thomas described himself as one who spends considerable time "researching different topics," he admitted that he had done only limited research on leasing transactions, asking to refer to his own biography to check on whether, in addition to one white paper, he had produced any other work in the leasing area.

Professor Thomas also was a consistent and experienced expert for the government in other LILO and SILO cases. He was previously retained by the government in the *BB & T* case, *BB & T Corp. v. United States,* No. 1:04–941, 2007 WL 37798 (M.D.N.C. Jan. 4, 2007), *aff'd,* 523 F.3d 461 (4th Cir.2008), a LILO case; the *Fifth Third* case, *Fifth Third Bancorp v. United States,* No. 05–350 (S.D.Ohio Apr. 18, 2008) (jury verdict), another LILO case; and the Altria case, *Altria Group, Inc. v. United States,* No. 06–9430 (S.D.N.Y. July 9, 2009) (jury verdict), a SILO case, all of which are discussed more fully below. Unlike in the case before this court, in the *Fifth Third* and *BB & T* cases, Professor Thomas indicated he had done a detailed analysis, "based upon the actual numbers and valuations in those cases," running "hundreds of scenarios" of what might prevail on the purchase option date. In the *BB & T* case, he indicated he had done a "very detailed calculation" of what might occur on the purchase option date during his original and rebuttal calculations. Professor Thomas admitted, however, that he had not performed the same kind of analysis on the RoCa3 Transaction. As stated by Professor Thomas during his testimony:

Q. So to be clear, neither the numbers or the dates contained in appendix B are based upon the facts of the EZH transaction, right? The numbers used or the dates you've used in appendix B are not

based upon the facts in the EZH transaction, correct?

A. They are not.

Q. And that's because, as you say here—let's look at the sentence. The simulation is not intended to replicate the actual transaction. Correct?

A. Yes.

As to specific details of the plaintiff's claimed deductions and the RoCa3 Transaction, including how the deferred rent was deducted, it also became apparent during cross-examination that Professor Thomas may have used information and models, particularly from the *BB & T* case, to do a superficial analysis of the Con Ed Transaction, and that he used his "intuition," and not specific "knowledge" acquired reviewing plaintiff's case, to reach some of his conclusions. He admitted that, in reviewing the documents sent to him by the Department of Justice, on behalf of the defendant in the *Con Ed* case, it partly "was a random process," and that he "may have missed documents that were relevant to the conclusions that [he] reached about noneconomic reasons that [he] thought the purchase option would be exercised."

Professor Thomas also admitted at trial that several of his assumptions and conclusions regarding the inevitability of EZH choosing the Sublease Purchase Option were not viable. He had concluded in his report that, because EZH was a municipally owned utility, it would not wish to lose control of a utility asset. However, in actuality, in 1999, EZH shareholders entered into a stock purchase agreement with PreussenElektra AG, a for-profit entity, and in 2000, after a merger, EZH was owned by a subsidiary of E.ON AG, a large, German utility company. To arrive at his conclusion that the Sublease Purchase Option would be exercised, Professor Thomas also appears to have misapplied Dutch regulatory requirements applicable to licensed producers of electricity.

Although offering repetitive experts is a common occurrence, and such experts can offer competent and valuable testimony, such offerings are most helpful when based on the specific facts involved in the transaction at issue. Professor Thomas failed to conduct in-depth studies of the RoCa3 Transaction and gave almost automatic and generalized conclusions on the flaws of LILO and SILO transactions for tax purposes. For the most part, his testimony failed to address the unique characteristics of the RoCa3 Transaction. This court, therefore, gives Professor Thomas' opinions less weight than the opinions of other experts offered by both sides.

The plaintiff advanced credible exhibits and credible expert testimony at trial to support its position that a decision by EZH to exercise the Sublease Purchase Option is not the inevitable outcome, that no such decision is pre-ordained, and that plaintiff bore the burdens and benefits of ownership for its part in the RoCa3 Transaction. For example, the record in this case contains a document signed by the Finance Director of EZH that states: "There is no known factor to EZH which creates a material inducement for EZH to exercise the Purchase Option, or disregards the provision of the Sublease an [sic] related Participation Agreement." The Appraisal Report prepared by Deloitte, commissioned as part of CED's due diligence efforts prior to entering the RoCa3 Transaction, concludes that a decision by EZH to exercise the Sublease Purchase Option was not a necessary, or even likely outcome, given the parameters of the Transaction. The basis for Deloitte's conclusion was: (a) the Sublease Purchase Option Price is expected to exceed the projected fair market value of CED's lease interest at the end of the Sublease, (b) the cost to EZH of exercising the Sublease Purchase Option would exceed the benefits EZH would receive if it did exercise that option, and (c) there were no other factors that "create [a] material inducement" for EZH to exercise the Sublease Purchase Option.

Based on a careful appraisal of the RoCa3 Facility at the time the parties entered into the RoCa3 Transaction, and considering the other operative events and dates during the life of the Transaction, the Deloitte Report concluded, among other findings, that:

Any amount of Sublease Basic Rent is no greater than our expectation of fair market rentals for the Undivided Interest at the

time such amount of Sublease Basic Rent would be payable, and any amount of Sublease Renewal Rent (assuming present market conditions and interest rates obtained at the time) is no greater (taking into account fluctuations thereof as provided in the Operative Documents) than our expectation of 90 percent of the fair market rentals for the Undivided Interest at the time such amount of Sublease Renewal Rent would be payable, in each case taking into account in determining fair market rentals all obligations of the Sublessee under the Operative Documents and the effects of inflation or deflation;

. . .

Neither the physical attributes of the Facility, the applicable return provisions, the terms and conditions of any Sublease Renewal Term, the cost savings that the Sublessee could realize by purchasing the Sublessor's Lease Interest rather than other power production or transmission assets not then operated by the Sublessee nor any other identifiable factor which came to our attention in the course of our appraisal after due inquiry, will create a material inducement to the Sublessee or cause the Sublessee to exercise the Sublease Purchase Option. Neither the physical attributes of the Facility, the cost of arranging a new sublease with a party unrelated to the Sublessee, nor any other identifiable factor which came to our attention in the course of our appraisal after due inquiry, will create a material inducement to the Sublessor to exercise the Sublease Renewal Option;

Based on the comparative costs of the reasonably anticipated alternatives expected to be available to the Sublessee on the Sublease Basic Termination Date, the Sublessee is not expected to be under any economic compulsion to exercise the Sublease Purchase Option;

On the Sublease Basic Termination Date and on the Sublease Renewal Termination Date, if any, the use of the Sublessor's Lease Interest by the Sublessor or some person unrelated to the Sublessee, is expected to be commercially feasible based on technical knowledge and expertise that would be applied by prudent business persons on the basis of present knowledge and generally accepted operating standards;

. . .

On the Lease Termination Date, the use of the Facility by the Lessor, EZH or some person unrelated to the Trustee and the Investor, will be commercially feasible based on the standards that would be applied by prudent business persons on the basis of present knowledge and generally accepted operating standards;

. . .

On the Sublease Basic Termination Date, the Sublessor's Lease Interest is expected to be able to be placed with a party unrelated to the Sublessee, EZH, the Investor or the Trustee with a rating at least equal to the Qualified Bank Minimum Rating pursuant to a new sublease that provides for rent payable in arrears equal to the estimated fair market rents for the Facility of 14.9 percent of the original fair market value of the Facility, taking into account the terms of the Control Documents.

In arriving at its conclusions, Deloitte analyzed the alternative scenarios of EZH exercising the Sublease Purchase Option, or of EZH not doing so. Deloitte concluded that if EZH did not exercise the Sublease Purchase Option, Con Ed would not select the Sublease Renewal Option. As part of this analysis, Deloitte concluded:

Based on the projected value of the rights under the Lease at the Sublease Basic Termination Date, the net Sublease Purchase Option Price is greater than the anticipated fair market value of the Sublessor's Lease Interest as of the Sublease Basic Termination Date. Accordingly, the Sublessee should not, on this basis, have any incentive to exercise the Sublease Purchase Option.

. . .

When the Sublessee examines its alternatives on the Sublease Basic Termination Date, we believe that the Sublessee would

compare the financial costs of each alternative and select the least costly path. Since the Sublessor has the option and the right to cause the Sublessee to renew the Sublease for the Sublease Renewal Term, the Sublessee, in assessing whether to exercise the Sublease Purchase Option, will assess the possibility and potential costs of the Sublessor exercising this put [the Sublease Renewal Option] and the other costs associated with not exercising the Sublease Purchase Option.

. . .

In order to determine whether the cost of not exercising the Sublease Purchase Option compels the Sublessee to exercise the Sublease Purchase Option, we calculated the cost of not exercising the Sublease Purchase Option to the Sublessee.

If the Sublease Purchase Option is not exercised, the Sublessor can cause the Sublessee to renew the Sublease for the Sublease Renewal Term. During such a term, the Sublessee would be required to pay the Sublease Renewal Rents presented in Exhibit XXII.

If the Sublease Purchase Option is exercised, the Sublessee will have the use of the Facility for the 6.7 year period beginning on the Sublease Renewal Termination Date and ending on the Lease Termination Date. If the Sublease Purchase Option is not exercised, the Sublessee may not be able to use the Facility for this period since the Facility will be leased to the Sublessor. Therefore, foregoing the use of the Facility over this period represents a cost to the Sublessee of not exercising the Sublease Purchase Option.

Finally, if the Sublessee does not exercise the Sublease Purchase Option, it will be required to pay for credit support for the equity termination amounts for the remainder of the Lease Term. Based on the equity termination amounts and the estimated costs as provided to us of obtaining a Letter of Credit which satisfies the credit criteria sufficient to meet the credit support requirements under the Operative Documents, we calculated the present value of the fees which the Sublessee would be required to pay for the credit support over such a term. These payments were discounted back to the Sublease Basic Termination Date using the company's cost of borrowing for debt with similar terms and conditions.

. . .

Based on the analysis set forth above, the present value of the costs of the Sublease Purchase Option, net, exceeds the present value of the costs of not exercising the Sublease Purchase Option as of the Sublease Basic Termination Date. Therefore, based on the comparative costs of the reasonably anticipated alternatives expected to be available to EZH at the Sublease Basic Termination Date, EZH will not be under any economic compulsion to exercise the Sublease Purchase Option.

. . .

We conducted an inquiry of the Sublessee and such other persons as we deemed relevant to determine whether some other factor might compel the Sublessee to exercise the Sublease Purchase Option. As a result of this analysis, neither the physical attributes of the Facility, the applicable return provisions or terms and conditions of any Sublease Renewal Term, the cost savings that the Sublessee could realize by purchasing the Facility rather than other power generating or distribution facilities not then operated by the Sublessee nor any other identifiable factor known to us after due inquiry, will create a material inducement to the Sublessee to exercise the Sublease Purchase Option.

The Deloitte Report also analyzed the options available to CEL Trust if EZH did not exercise the Sublease Purchase Option, including electing the Retention Option and using the Facility for its own account, electing the Sublease Renewal Option, or locating another sublessee. Deloitte projected that the Dutch electricity demand probably would continue to grow and that decentralized capacity will continue to be encouraged in The Netherlands. Moreover, according to Deloitte, projections for the impact of European Community policy are likely to lead to inter-

nationalization of the electricity industry, with the result that a market-based industry, with fewer rules restricting competition, will provide business opportunities for those engaged in the electricity industry. In addition, the Deloitte Report concluded that the EZH RoCa3 Facility is well-positioned to provide heat and carbon dioxide to the Dutch greenhouse industry.

The Deloitte Report addressed the likelihood of CEL Trust exercising the Sublease Renewal Option, if EZH does not exercise the Sublease Purchase Option, as follows:

> we conclude that the Sublease Renewal Rent (assuming present market conditions and interest rates obtained at the time) are no greater than 90 percent of the expected fair market rentals for the Facility at the time it would be payable, taking into account the effects of inflation or deflation. Thus, the Sublessor will be less likely to select this alternative [the Renewal Option] since the Sublease Renewal Rent is expected to be less than fair market rentals over the same time.

Regarding the potential for attracting a new sublessee if EZH does not exercise the Sublease Purchase Option, the Deloitte Report concluded:

> We believe that it is possible to arrange for a new sublessee because of the nature of the Facility, the anticipated electricity industry economics and the impact of new sublease rents in relation to Facility cash flows which we discuss below.

The defendant attempted to undermine the validity of the Deloitte Report and Richard Ellsworth, who had managed and directed the preparation of that Report, and who testified at trial. According to the defendant, "Deloitte concluded, as it did in all of the hundreds of appraisals it did in connection with LILOs, that economically, EZH's best option was not to exercise the Sublease Purchase Option." (citations omitted). The difference, however, in the validity of the Deloitte conclusions, as opposed, for example, to the opinions offered by the defendant's expert, Professor Thomas, is that the Deloitte Report offered in this case was based on a very specific review of the details of the RoCa3 Transaction.

Based on the projected value of the rights under the Lease at the Sublease Basic Termination Date, the net Sublease Purchase Option Price is greater than the anticipated fair market value of the Sublessor's Lease Interest as of the Sublease Basic Termination Date. Accordingly, the *Sublessee should not, on this basis, have any incentive to exercise the Sublease Purchase Option.* (emphasis added).

The Deloitte Report, therefore, projected that EZH would be under no compulsion and would have no incentive to exercise the Sublease Purchase Option at the end of the Sublease Basic Term. Furthermore, the Deloitte Report also concluded that EZH will ultimately make the decision at the end of the Sublease Basic Term as to how to proceed, given the then current economic, statutory and regulatory environment and the current state of the Facility.

Plaintiff's expert witness, consultant John P. Kelly, was qualified as an expert in "valuations, appraisals and appraisal reviews of utility properties." Mr. Kelly was asked to conduct an independent appraisal review of the Deloitte, pre-Transaction appraisal and the conclusions reached therein. He also was asked to study and offer "an analysis of whether EZH will be economically compelled to exercise the sublease purchase option, based on information available as of the date of the Deloitte appraisal." Based on his review of the appraisal, which he found to be in accordance with the Uniform Standards of Professional Appraisal Practice, Mr. Kelly concluded that:

> The material used to create the D & T [Deloitte & Touche] Appraisal was complete;

> The data used in the D & T Appraisal was adequate and relevant;

> The methods and techniques used in the D & T Appraisal were appropriate; The analyses, opinions, and conclusions in the D & T Appraisal were appropriate and reasonable; and

> The analyses performed and conclusions drawn by D & T regarding economic compulsion, as it relates to the Sublease Pur-

chase Option were appropriate and reasonable.

. . .

[B]ased on my re-performance of the D & T analysis as it related to the Sublease Purchase Option, in my opinion EZH will not be economically compelled to exercise the Sublease Purchase Option.

In explaining his analysis of whether EZH would be economically compelled to exercise the Sublease Purchase Option, Mr. Kelly stated that "economic compulsion" means:

if the benefits to be achieved by exercising the option would be far greater than the cost, that there would be—it would be compulsion, we would have no choice but to exercise the option.

Mr. Kelly explained how he arrived at the numbers he did for each of the Options available at the end of the Sublease Basic Term, and independently confirmed the Deloitte Report conclusion. Although he did state, during cross-examination, that there were "several instances where [he] could not replicate [Deloitte] numbers exactly," he confirmed at trial that the Deloitte appraisal was "complete," the "data used . . . was adequate and relevant," and the methods and techniques used were "appropriate." For example, Mr. Kelly "couldn't quite replicate" the depreciation rates Deloitte used in their tax calculations. He also indicated that there is a "slight difference" in the maintenance expense between his calculations and the Deloitte calculations, explained, in part, by the fact that Deloitte did not include the replacement of the combustion turbine component at the Facility, or another major maintenance expenditure under the distributed control system projected in the year 2037. He concluded, however, that the general impact of Deloitte's failure to include that item would be that the residual value of Con Ed's lease interest in 2018 "would have gone down a little." Regarding a difference in the calculation of fuel expense, he indicated, "[t]hat's one exception that could be explainable." Mr. Kelly also discussed Deloitte's use of the market approach in valuing the RoCa3 Facility, but indicated that the Deloitte Report did not rely much on the market approach and

"really gave no weight to it." Mr. Kelly also indicated that he might not have used the market approach, so he agreed with the decision not to give it any weight.

Mr. Kelly, however, fully explored, explained and independently verified the methodology and appraisal conclusions of the Deloitte Report. Independently, Mr. Kelly concluded that there was no economic compulsion for EZH to absolutely exercise the Sublease Purchase Option. According to Mr. Kelly's expert report:

the costs to EZH of exercising the Sublease Purchase Option are greater than the benefits of doing so. Therefore, in my opinion, as of December 15, 1997, EZH cannot be considered to be economically compelled to exercise the Sublease Purchase Option in 2018.

Mr. Kelly's report also indicated:

the costs to EZH of exercising the Sublease Purchase Option are not found to be significantly below the benefits, thus indicating no economic compulsion [to exercise the Sublease Purchase Option].

Mr. Kelly was not reluctant to criticize the Deloitte Report when he though it appropriate to do so, reinforcing the independence of Mr. Kelly's conclusions. Mr. Kelly, however, ended the body of his report confirming the overall Deloitte conclusions, as follows:

in terms of economic compulsion on the part of EZH, it is important to note that the test of economic compulsion does not rely on whether or not the exercise price is below the value received without regard to the size of the difference between the two. Economic compulsion rests on whether an option price will be significantly below the fair market value of the acquisition that was expected at the time of the initial transaction. Thus, in my opinion, it is not a matter of whether or not the expected costs of exercising the Sublease Renewal Option are less than the expected benefits, but rather the magnitude of any excess benefits over the costs. In my opinion this is a mischaracterization on the part of D & T in regards to its analysis of economic compulsion, but not one that affects its conclusions.

Also, as part of its due diligence prior to entering the RoCa3 Transaction, the plaintiff reviewed an engineering Report prepared by Duke Engineering, titled "EZH–RoCa CHP Station Unit No. 3 Due Diligence Engineering Report." The Deloitte Report, discussed above, also included consideration of the Duke Engineering Report. The Duke Engineering Report on the RoCa3 Facility included the following conclusions:

the station design and components to be of high quality using state-of-the-art proven technology.... Both the estimated remaining useful life (at least 55 years) [25] and predicted availability over that useful life (87.3%) were judged to be above average. The predicted useful life and availability take into account a list of major components that will need to be repaired or replaced over the life of the facility ... and it is assumed that such repairs and replacements will be completed as required. We also concluded that the plant complies with current environmental regulations; the fuel supply is adequate for gas under the current purchasing agreements; and the maintenance philosophy, practices, and facilities are good.

. . .

Furthermore, based on past performance of other EZH units, it can be expected that EZH will operate and maintain ROC3 [sic] in a prudent and conservative manner, and if it does, the result will be a reliable, efficient plant that meets its projected design life.

The defendant, however, attempts to discredit the Duke Engineering, due diligence Report, asserting that Duke Engineering's conclusion that the plant had a useful life of 55 years at the time of its appraisal, prior to the transaction closing, was based on the assumption that the plant would operate at a "base-load" level, although Capstar Partners, EZH's financial advisor in the RoCa3 Transaction, had projected that the Facility would operate at a "mid-load" level. The defendant asserts that this changed assumption, had it

been made, would have indicated that there would be an "increase in the wear and tear on the facility, and all things being equal, diminish the useful life of the facility."

In fact, the Duke Engineering Report's load level assumption stated that the operation of the RoCa3 Facility would be at " 'base-load' manner *whenever possible.*" (emphasis added). Luis C. Gonzalez, a Duke Engineering engineer, who headed the Duke Engineering due diligence effort, testified as to the difference between load levels:

A. A base loaded plant is one that is designed to operate essentially continuously at full load throughout the year, 24 hours a day, seven days a week, until there is an outage, a typical maintenance outage once a year, whenever the utility typically schedules an outage, but it is a plant designed to run continuously.

Q. How does a base load plant compare to an intermediate or a peaking load plant?

A. Well, a peaking plant is a plant that is designed to come on usually a few hours a day during, for example, a hot afternoon in Washington, when there's a peak power surge and there's a requirement to supplement the base load, so it is designed to come on and then operate a few hours, go off again, maybe come on every day, and then be taken offline every day.

A mid load or—so there's no exact definition, but a mid load plant would be somewhere in-between, that is, a plant that generally runs not full-time, all the time, but also not every day, might come on and run for a whole week at a time, maybe at night, you might cut back on the output from 100 percent to 50 percent, but stay online over the overnight hours. So it is a slight difference between the three types of products.

Q. And you indicated it was Duke Engineering's assumption that the RoCa3—or understanding that the RoCa3 would operate as a base load facility?

A. That is correct.

---

**25.** The remaining useful life of the RoCa3 Facility at the time of the Transaction in December 1997 was 54 years.

The plaintiff correctly points out that the Capstar document referencing that the plant would operate at the "mid-load" level was a document created prior to the filing of the final documents, whereas the final Duke Engineering document and other documents pertinent to ·finalizing the Transaction, contain references which indicate that the Facility would be operated at a base-load level. Moreover, Mr. Gonzalez testified on redirect examination, as to the difference between a base-load facility and a middle-load or mid-load facility:

Q. If RoCa3 had been operated as a middle load facility, as opposed to a base load facility, would that have necessarily changed the 55–year useful life?

A. Not necessarily. We might have, depending on the—if we knew the regime that it was being operated under, recommended slightly higher or more frequent maintenance intervals, but the conclusion easily could have been the same.

The defendant also asserts that on the date of the closing, there was a "flurry of communication" between Duke Engineering and Cornerstone regarding language to be included in Duke Engineering's Final Report with respect to the Facility's useful life. Duke's Engineering's decision not to include some proposed language regarding useful life, proper maintenance, and replacement of parts, was a judgment that Duke Engineering made in finalizing its Report. Mr. Gonzalez testified at trial that Duke Engineering also would have been comfortable with the proposed statements in its Final Report. Duke Engineering's decision not to include the proposed language in the Final Report does not indicate that the plaintiff improperly disregarded relevant information about the quality of the Facility. Indeed, Duke Engineering concluded in its executive summary that: "Certain major components can not be expected to last for 55 years and will need to be replaced and/or repaired (Exhibit 1A). These repairs and replacements have been taken into account in the projection of availability."

Also, as part of plaintiff's due diligence efforts, Tauw Milieu, a company which performs due diligence reviews for financial clients, multinational industries and real estate companies, was engaged first by EZH and then also by CED, to complete environmental due diligence on the RoCa3 Facility prior to the Transaction closing. The Tauw team conducted on-site inspections, held interviews and reviewed environmental regulations in The Netherlands and documents they received from EZH. The final Report titled "EZH—RoCa 3 Power Station: Due Diligence Environmental, Safety and Health Report," dated January 14, 1998, was submitted in draft form to Cornerstone, for use by plaintiff, prior to the December 15, 1997 closing date of the Transaction.

As Mr. Hans Nieuwenhuis, a representative of Tauw, testified at trial:

Environmental due diligence is the investigation into the environmental status of a certain facility. And it is very often related to transactions. And that means that the prospective buyer wants to be informed about environmental risks associated with the asset he or she wants to acquire, so it is often related to transactions. . . . And it takes into account, for instance, soil and ground water, air emissions, noise, odor, wastewater, storage of hazardous substances. . . .

The Tauw environmental due diligence Report of the RoCa3 Facility, including its gas turbine, heat recovery steam generator, carbon dioxide boiler, steam turbine, two generators, a cooling water station, a cooling water channel and a primary distribution network, concluded:

Based upon our investigation of the Facility's permits, contracts, liability issues, and site assessment, our conclusion is that the Facility's overall environmental condition is very good. Based upon the historical research, review of documents supplied by EZH and the on-site visual inspection of the property, no direct evidence was found of significant contamination problems affecting or having affected the site.

Provided that proper operating, maintenance, and upgrade procedures, and all appropriate regulatory requirements are followed, the Facility does not appear to present any significant environmental concerns resulting from on-going operations.

Further, the Report concluded that "EZH is in possession of all the required permits for the RoCa3 Facility, with the exception of the EMA [Environmental Management Act] permit for the pump building. . . ." As to the environmental site assessment, "[n]o major non-compliances were encountered," although certain minor non-compliances were encountered (minor non-compliances defined as "requiring administrative actions . . . or minor investments."). Tauw concluded that "[t]he Facility can be described as a state of the art power station. The Facility employs best available technology to minimize environmental impact, is well managed and is in good condition. Due to the above qualification, Tauw is of the opinion that the Facility doesn't present any significant environmental concern." The Report further found, with respect to the environmental site assessment, that "[n]o major future issues were encountered," although certain minor non-compliance or future issues were encountered. Tauw also found in its Report that it was unlikely that any administrative, civil or criminal liability would result from the operation of the RoCa3 Facility. As to the health and safety assessment, Tauw stated that "[n]o major non-compliances were found," and listed minor non-compliances, concluding that, "costs to be made by the RoCa3 for Health and Safety are mainly costs of personnel." The Report stated that "EZH shows a positive attitude towards matters of health and safety. A lot of attention is paid to the safety and working conditions of all employees."

Attempting to discredit the environmental due diligence Report prepared by Tauw, the defendant asked Mr. Nieuwenhuis, as a representative of Tauw, why no one from Tauw spoke to anyone from the plaintiff until after all of its due diligence trips had been performed. In the same sentence, defendant conceded that other due diligence contributors, such as Deloitte and Duke Energy, would be "commonly" retained before an investor was identified. The defendant does not assert any further problems with Tauw's credible, environmental due diligence Report.

In fact, EZH contacted Tauw about conducting the environmental due diligence in September 1997, the same month in which the plaintiff submitted its initial proposal to EZH. Phillip S. Mintun, of Capstar Partners, EZH's financial advisor on the Transaction, testified that:

A. [T]here was some, you know, up front due diligence that we wanted to get moving, so that, you know, once we took the transaction to market, that the work that Tauw would ultimately do for the investors would have advanced to a certain level.

Q. In your experience, was it unusual to engage some of these consultants prior to identifying the—

A. No, that's standard practice in any, you know, leasing or partnership energy transaction certainly.

Q. And I think you may have touched on this yesterday, but just in case you didn't, why is this done? Why do you engage some of these consultants so early in the process?

A. It is really a timing issue. Well, I guess, timing and also to make sure that, you know, there are—if there are any unusual things that aren't apparent, that these consultants bring to the table, that we understand them and can, you know, can explore them and understand them, so that we can present them best when we bring the transaction to the market.

Q. Are these consultants ultimately engaged by the investor?

A. They are.

Q. In your experience, has one of the consultants that you engaged as lessee advisor, has the investor ever selected a different advisor later on?

A. There have been circumstances when, for example, an investor will engage an additional engineer, for example, with whom they have an existing relationship to sort of review the work that's being done by these consultants. That's not unusual. Obviously, when we look at engaging consultants, we want to make sure that at the end of the day, they have a reputation and work experience that investors will find acceptable, since they ultimately will be engaged by the investors.

Plaintiff also presented the expert report and testimony of John J. Reed, the chairman, President and Chief Executive Officer of a management consulting and advisory firm specializing in the energy industry, and a consultant to buyers and sellers of major energy assets. Mr. Reed testified that he had been involved with more than 25 power plant sales, and involved extensively in utility mergers and acquisitions. At trial, he was qualified as an expert for the plaintiff in "the purchase, sale, and valuation of power plants and in the economic and financial factors relating to such transactions." His report and opinion relate particularly to the economic reasons for the decisions following the expiration of the Sublease Basic Term. He concluded that a decision by EZH on whether or not to exercise the Sublease Purchase Option would rest on the fair market value of the plaintiff's remaining Lease Interest in January 2018, as compared to the Sublease Purchase Price. According to Mr. Reed, because of certain factors, valuations of the Lease Interest in the Facility might vary markedly between 1997 and 2018, and "it would have been nearly impossible to determine with virtual certainty on December 15, 1997, whether EZH would be economically compelled to exercise the Sublease Purchase Option." Among the factors affecting revenues and costs, for example, could be the demand for energy, the cost and market prices of fuel, ancillary services, heat, carbon dioxide, natural gas, equipment and parts and labor. Among the factors affecting market competitiveness of the RoCa3 Facility would be the relative efficiency of the plant and plant outages. Factors affecting the financing requirements and cost of capital of buying CEL Trust's remaining Lease Interest, would include credit standing, required return on equity, and forecasted inflation.

Mr. Reed concluded that it was foreseeable that there would be relevant changes between 1997 and 2018, for example, in discount rates, inflation, market changes, and technological evolution. Moreover, he also concluded that there also would be changes in the Dutch utility industry, some of which were already underway at the time of the 1997 Transaction, with attendant impacts on the utility generating assets. Therefore, Mr.

Reed concluded that, "it would have been impossible based on any realistic assessment of the Lease Interest's future value, as performed in late 1997, to conclude that exercising the Sublease Purchase Option would be virtually certain." He also stated, "you cannot tell with 98 or 99 percent certainty that they will exercise the option."

In addition to concluding that the exercise of the Sublease Purchase Option by EZH cannot be deemed as certain, Mr. Reed concluded that there also is a possibility that CEL Trust would not exercise the Sublease Renewal Option, which would result in the plaintiff operating the Facility or entering a new sublease, with a new sublessee, at market rates. In any event, if EZH does not exercise the Sublease Purchase Option, Mr. Reed concluded that for the Shirt–Tail Period, following the Sublease Renewal Term, Con Ed would be burdened with "very real potential risks" and with "benefits." Mr. Reed also indicated at trial that the presence of defeasance funds does not affect his conclusion that the exercise of the Sublease Purchase Option, "is not reasonably certain," although in his expert report he used slightly different words to indicate it was not "virtually" certain. With respect to the Defeasance Accounts, Mr. Reed stated:

The existence of a defeasance account has a similar effect on all three scenarios, that is, the scenario in which the purchase option is elected, the scenario in which the sublease renewal option is elected, or the scenario in which the retention option is elected.

Because these defeasance account funds are available similarly in all three scenarios for purposes of EZH, they do not have an impact in differentiating the likelihood of any one of those three scenarios occurring. My point is that the defeasance accounts are not earmarked for a single purpose.

They are in fact available under all three scenarios for the economic use of EZH and, therefore, don't enter into the equation with regard to one option over the other option being selected.

Another of plaintiff's experts, Dr. David M. Ellis, a former finance professor and consultant in the field of economics, was qualified as an expert in the areas of "finance, analysis, and returns of complex financial transactions, including leases, and the analysis and valuation of securities." He testified on the economics of leveraged leasing and the role of taxes in such transactions. Dr. Ellis testified that, generally, based on his experience and on learned treatises he had reviewed, investment decisions are made on an after-tax basis and that the government's experts did not follow this approach in their analyses. In his expert report, Dr. Ellis concluded, "[i]t is customary and appropriate to use after-tax returns when making investment decisions," in order to figure out the maximum "total real return after taxes."

In his expert report, Dr. Ellis addressed possible risks to the plaintiff in the event of premature termination prior to the end of the Sublease Basic Term.

> Other events that can trigger termination of the Transaction and the application of the amounts in the Sublease Deposit and IJssel Deposit include EZH breaking lease covenants, casualty events, defaults, or Con Edison N.Y. acquiring a competitor to EZH. However, if the Transaction terminates prior to the Sublease Basic Term, then the amount in the Sublease Deposit and the IJssel Deposit may not be sufficient for the Sublessee to meet its obligations, and the Sublessor will be exposed to risk of loss. This can be seen by comparing the sum of the Sublease Deposit and the IJssel Deposit with: either the Sublease Termination Values, the Sublease Special Termination Values, or the Sublease Special Termination Values.

Dr. Ellis also noted in his rebuttal that since the IJssel Deposits are all invested in Treasury STRIPS:

> as zero coupon instruments they will *only* be worth their face value (the amount needed to make the necessary obligations) at maturity—on *any* date prior to maturity they will be worth less than face value and

therefore be insufficient to make the required payments. (emphasis in original). He also concluded:

> Note that in every one of the termination cases and in every year there is a shortfall. In other words, both the Sublessee and the Sublessor are exposed to risk: the Sublessee from having to come up with large amounts of foreign currency and the Sublessor from the risk that early termination due to Sublessee default leaves insufficient funds available to meet the Sublessee's obligations to the Sublessor.

Responding to the defendant's expert's comments, that the defeasance provisions, by way of the Sublease Deposit and the IJssel Deposit, "virtually eliminat[e] any risk to Con Ed of recovering its equity investment in the Facility and in the Transaction," Dr. Ellis, in his rebuttal report, rejected that concept and indicated that the risk was eliminated,

> if and only if the Sublease Purchase or Sublease Renewal Option is exercised and the Transaction runs smoothly from start to finish with no interruption or problem. If neither the Sublease Purchase Option nor the Sublease Renewal Option is exercised, Con Edison N.Y. will be exposed to variations in cash flows due to market forces in rents and due to residual value risk.

Dr. Ellis also concluded that, although the defeasance accounts can be a benefit to the sublessor,

> [e]ven the loan defeasance account is not entirely riskless, as Messrs. Bent, LaRue, Ray and Thomas would have us believe. The amounts in the [Sublease Deposit] account are not invested in zero coupon Treasuries, as is the case with the IJssel Deposit: rather, they are placed in an interest bearing account at ABN AMRO Therefore, there is still credit risk present, namely the credit risk of ABN AMRO. Recent events have highlighted that the nature of the risk is very real: last week a large German bank, Landesbank Sachsen Girozentrale, was placed in receivership by the German authorities. The bank has participated in many cross-border transactions in a variety of roles, including as

deposit provider; it is also a provider of letters of credit. Many of those transactions may now be in jeopardy as a result of the failure of Sachsen.

Finally, there is still credit risk associated with EZH, a municipal utility operating in the southern part of the Netherlands. . . . Electric Utilities are not exempt from default risk: in the nearly ten years since the start of the Transaction, defaults by such companies have occurred every year.

Further, regarding the risks and uncertainties for plaintiff, Dr. Ellis indicated that:

A. While a lot of the cash flows and so on in the lease are predetermined, there is considerable uncertainty as to what some of the cash flows and returns are going to be. In particular, at the end of the lease, there is considerable uncertainty as to what the residual value of the asset is going to be at the time that it is returned to the equity investor.

Q. How can that affect return?

A. That is crucial. That's the final, if you will, the final item in the calculation. You cannot calculate the return until you know what the residual value is. You can come up with an expected residual value at the time you enter into the transaction, but you don't know for certain what that is going to be. And until you get all the way to the end of the lease and see what the realized residual value is.

After reviewing the benefits to the plaintiff, Dr. Ellis offered the following regarding some of the risks inherent in the RoCa3 Transaction:

A. Well, it [an equity investor] certainly faces payment risk from the sublessee, the uncertainty that all the payments will be made in a timely fashion. It also is potentially exposed to interest rate risk, it is certainly exposed to residual value risk as we mentioned earlier, as I discussed earlier, the uncertainty about what the residual value would be at the end of the lease. And it is exposed to what can best be described as risk of the asset itself, that during the life of the lease, it may be subject to obsolescence as new technology comes on and renders what you thought was a state of the art piece of equipment

second rate. There is also the risk, as we mentioned earlier, about the insurance, it is possible that insurance may not always be available, and there are multiple risks associated with the asset itself.

Q. Taking the last one, what would be an asset risk that an investor would face?

A. Risk of loss, fire, flood, act of war, technological obsolescence, loss of insurance.

Consistent with other witnesses offered by both the plaintiff and the defendant, Dr. Ellis testified as to the demonstrable risks associated with the Shirt–Tail Period, after the Sublease Renewal Term, and similarly with the Retention Option Period. Dr. Ellis offered the following thoughts if Con Ed were to operate the RoCa3 Facility beginning in 2018 under the Retention Option, or in 2034, under the Sublease Renewal Option. He addressed the potential for both possible loss and profitability:

Q. And could you please give us some sense of any risk that Con Ed Development would face from 2018 through 2041 if the retention option is exercised?

A. The risk of being a power generator, it will have the risks of uncertain cost of the natural gas input to generate the electricity, uncertainty over the cost at which it will be able to sell the electricity, ongoing uncertainty as to—the time the transaction was done, it would have no idea what would be involved at that point as far as keeping the, by then, a well-used asset in good operational maintenance, whether there might have been additional regulatory impositions as far as environmental or whatever. So ongoing costs associated with operating and maintaining the asset.

. . .

Q. Could you explain how that [the RoCa3 Plant generating a loss] might occur, give us some examples?

A. Certainly. If there were costs associated with bringing the asset up to scratch, so that it would be fully efficient, if there were additional regulatory and environmental restrictions imposed that would incur additional costs to become compliant, if

there was a certain spike in the cost of natural gas, but regulators did not permit all of the costs associated with that to be passed on to consumers. There are numerous factors that could cause an electric utility not to be able to operate an asset efficiently and profitably.

Q. It sounds like a pretty grim picture. Does that mean Con Edison will never exercise the retention option?

A. No, it doesn't mean that at all.

Q. Why is that?

A. That has to be evaluated at the time in 2018, Con Ed will—we don't know what the circumstances are going to be at that time. Ten years ago, nobody foresaw the massive spike we have had in the cost of energy in the last two or three years. Ten years from now, it could go the other way. We don't know. Market conditions may be such that they can get very favorable financing terms, and they can—and everything works out smoothly and efficiently and they can operate the asset efficiently and profitably for the remaining years until 2041. But that is a decision that has to be evaluated, given the market conditions at the time in 2018.

With respect to the possibility that the plaintiff might exercise the Retention Option, contrary to the testimony of some of the defendant's experts, Dr. Ellis testified that he believed, given Con Ed's frequent involvement in capital markets to raise funds, Con Ed has access to a variety of possible financing sources and should be able to obtain adequate financing in order to exercise the Retention Option if it chooses to do so. Dr. Ellis also identified risks for Con Ed during the Sublease Basic Term:

Q. Could you please state what risk, if any, Con Ed Development has in the RoCa3 transaction during that sublease term?

A. It has a payment risk. It has—and all the associated risks with the asset that we discussed this morning.

Q. And what payment risk does Con Ed Development face?

A. The risk that if something were to happen and the transaction were to end early, then EZH might not be able to meet all of its obligations.

Q. And do the defeasance arrangements we have been discussing mitigate that payment risk?

A. They mitigate it, but they don't eliminate it.

Q. Are you familiar with the letter of credit in the RoCa3 transaction?

A. Yes, I am.

Q. And does the letter of credit mitigate that payment risk that Con Ed Development is exposed to?

A. It mitigates it, but does not eliminate it.

Q. Why is that?

A. Well, if something were to happen to lead to early termination, it is still an obligation of EZH. EZH still has to make that—make up that shortfall I described in Exhibit 3 earlier, whether it pays Con Ed directly or the letter of credit provider, it still is EZH's obligation. And it is not necessarily guaranteed that the letter of credit provider is going to be willing or able to provide the funds when it is asked to do so. It is not unknown for there to be disputes as to whether a letter of credit event has actually been triggered and obligations are owed from the letter of credit provider. In particular, it is not unknown for a letter of credit provider, if the event that triggered the early termination were default on the part of EZH, that the letter of credit provider might be, to say the least, reluctant to provide funds on behalf of an institution that was insolvent, and if it was unable, felt it was unable or unlikely to be able to obtain repayment from EZH.

In addition, as a witness for the plaintiff, University of Chicago Professor, Dr. Roman L. Weil, was qualified as an expert in "economics, specifically the subspecialties of accounting and related managerial decision making." Dr. Weil discussed accounting benefits available to the plaintiff through the RoCa3 Transaction:

a. The EZH Transaction meets the leveraged lease criteria set out in *FAS 13* [Statement of Financial Accounting Standards No. 13].

b. Con Ed has correctly accounted for the EZH Transaction as a leveraged lease.

c. The EZH Transaction increased Con Ed's net income. The accounting required for the EZH Transaction accelerated the recognition of that income in the early years and provided long-term financing with favorable balance sheet effects as compared to a direct financing lease.

d. Con Ed's management would have been reasonable in believing that the accelerated income recognition, netting of long-term financing against investment on the balance sheet, and any resulting income smoothing could effect upward movement, or at least forestall downward movement, of Con Ed's stock price.

Dr. Weil also concluded:

Con Ed's management had reason to believe that the EZH Transaction would provide accounting benefits from leverage lease accounting. The EZH Transaction increased Con Ed's income, provided long-term financing with favorable balance sheet effects, and allowed Con Ed to report income in periods when it otherwise would have shown lower income, or even losses. Con Ed was also reasonable in thinking that any resulting income smoothing could increase Con Ed's stock price, or at least avoid a decrease from more volatile reported income.

During his testimony, Dr. Weil repeated his conclusions, elaborating on his expert report, as follows:

Q. Yesterday I believe that when we left off, you had testified that the requirements of leveraged lease accounting as set forth in FAS 13 are viewed as producing two accounting benefits; is that correct?

A. Yes.

Q. Can you tell us now what those two accounting benefits are?

A. The first benefit and the one that I think that is more important in this case is that relative to other transactions with similar cash flows, it enables earlier recognition of income, some people call that

acceleration of income, front loading of income. But this particular transaction results in more dollars of income than you might think in the early periods. And you don't have a choice of where those dollars go. They come early. And that is advantageous under some business circumstances. The second accounting benefit has to do with the treatment of the nonrecourse debt in the leveraged lease, and that debt does not appear on the liability side of the balance sheet of the investor like Con Ed, which keeps the debt-equity ratio from increasing the way it would if there were some recourse debt there.

Although on cross-examination Dr. Weil was not directly offering an opinion on the plaintiff's business purpose for entering the RoCa3 Transaction, his conclusions, quoted above, and his testimony, nonetheless, are instructive to the court to explain one of the plaintiff's legitimate business reasons for entering the RoCa3 Transaction.

A.J. Goulding was qualified as an expert witness for the plaintiff in the area of regulatory economics associated with electricity markets. A portion of his testimony was a background discussion of the deregulation of the utility industry in the 1990s, and of companies "like Con Edison." He indicated, however, that he believed his comments could predict how Con Edison was likely to behave. Taken alone, without other witnesses, his testimony would not have been sufficient on this issue, in part because when discussing the options available to the parties at the end of the Sublease Basic Term, Mr. Goulding described limitations to his expert report, for example, "we [Mr. Goulding and his team] were not asked to do an in-depth review of the transaction." Mr. Goulding, however, analyzed the Deloitte Report and the specifics of the RoCa3 Transaction. He offered his understanding of the options available to EZH and the implications of selecting those Options. He also agreed that he and his team "did not" "rely upon any information as to actually what occurred in The Netherlands electricity market," but did "look at and see how accurate the expectations in 1997 were of what happened in The

Netherlands electricity market." According to Mr. Goulding, he did this because he:

> wanted to, first of all, gain an understanding of how reasonable it would have been to have these expectations in light of what actually occurred. Now, it's possible to have a reasonable expectation that doesn't come to fruition, but if you have that expectation and it does come to fruition, it would seem to enforce the fact that what you expect is what's reasonable.

Mr. Goulding described the widespread deregulation of the utilities industry in the United States during the 1990s and the decision by many United States utility companies at that time to invest in international utilities as a means of responding to the pressures of deregulation. He discussed four investment criteria considered by companies when "looking solely at the question of whether a country represents a[sic] investment destination that may be favorable," to include "a clear legal framework, clear rules associated with the power markets, a fair competitive environment, and the presence of creditworthy counterparties in some form of a price determination mechanism." He concluded that The Netherlands met all these investment criteria. Mr. Goulding also described the basic conclusions of his report, as follows:

> The first issue we looked at was related to international trends, and I came to an opinion on that issue, and that opinion was that international acquisitions of generation assets by large U.S. utilities were indeed common in 1997. The second issue that I examined was whether it was reasonable, from a regulatory and market perspective, for a company like Con Edison to invest in and/or operate a combined heat and power plant in The Netherlands in 1997. And I did indeed conclude that it was reasonable. I also concluded that the regulatory description in the Deloitte & Touche appraisal was consistent with then current information about the Dutch electricity regulatory framework.

In addition, Mr. Goulding projected what he considered reasonable expectations, with respect to the RoCa3 Transaction, in 2018. He addressed the issue considered by Deloitte of "whether, in 1997, it would have been reasonable to expect the [sic] EZH would not be under any regulatory or market compulsion to exercise the sublease purchase option," and testified as follows:

A. I concluded that EZH would not be under any regulatory or market compulsion to exercise its sublease purchase option if you were looking at this question in 1997.[26]

Q. And what was the basis for that conclusion?

A. Well, first of all, the basis was that EZH did not have and would not have any particular load obligations in 2018, and that even if it did have load obligations, that is an actual requirement to supply power to somebody, that it would have had a number of different alternatives as to how it could source that power.

Q. When you refer to load obligations, which I believe you just defined as an obligation to supply power, is that a contractual obligation or a regulatory obligation?

A. Well, it can be either. It can be an existing contract with a private party, or it can be a regulatory obligation, a condition of existence, if you will.

Q. In 1997, would it have been reasonable for Con Edison or a company like Con Edison to have believed that EZH would not have any regulatory load requirements as of 2018?

A. Yes.

Q. Why would that have been reasonable?

A. Well, first of all, it would have been known that, as of 1998, the system of regulation, the entire organization of the electricity sector in The Netherlands was going to change, and so that, in and of itself, would have been a reasonable, that

---

26. Elsewhere in his testimony, Mr. Goulding also stated: "I concluded that ... it would have been reasonable to expect that EZH would not be under any regulatory or market compulsion to exercise its sublease purchase option," and that,

"as of 1997, it would have been reasonable to expect that Con Edison could sell the output from RoCa3 for its own benefit or sublease part or all of its interest to a third party in 2018."

would have been a—it would have provided support for reasonable conclusion that there would be no particular regulatory or market reason for EZH to exercise an option to purchase RoCa3.

Q. Now, even assuming that EZH did have some load requirements, perhaps contractual load requirements, would it have been reasonable for a company like Con Edison to have believed that, in 2018, EZH would have had other options to meet those contractual load requirements?

A. Yes.

. . .

Q. [W]ould it have been reasonable for a company like Con Edison in 1997 to have believed that EZH would have required the RoCa3 facility specifically to meet any load requirements that it might have?

A. [I]t would not have been reasonable to assume that it [EZH] needed RoCa3 specifically.

Mr. Goulding also noted that, in 1997, EZH was owned by municipalities and that:

municipalities . . . operate under budgets. They also have a need to allocate funds appropriately, and often, many municipalities actually look to a municipal utility to fund other activities of the government, so they're very concerned actually about profitability at their municipal utility.

As noted above, due to weaknesses in the preparation of Mr. Goulding's report, taken alone, his conclusions would not carry the day for the plaintiff. However, Mr. Reed, one of plaintiff's other experts, also concluded that, due to the expected deregulation of the Dutch market, the value of the RoCa3 Facility would be subject to wide swings, making predictions about the exercise of the Sublease Purchase Option entirely speculative. The plaintiff maintains that the municipal owners of the RoCa3 Facility would not be forced into the Sublease Purchase Option because in a deregulated market, electricity is more fungible and can be obtained from a number of sources on the open market, such that EZH and/or the municipalities might have the opportunity to replace lost electricity production at a reasonable cost. In addition, the municipal owners of the RoCa3 Fa-

cility already disposed of their interest in the Facility in 1999 when a German company purchased all the shares of EZH, which also changes the dynamics and adds uncertainty as to whether the Sublease Purchase Option is pre-ordained.

Defendant's own expert, Samuel Ray, an expert in large ticket equipment lease transactions and the equipment leasing industry, admitted that:

A. I believe—and I have to tell the Court and everyone else that these cash flows are very hard to follow. And I have looked at them repeatedly over the time I have been looking at this. And I have—and I am not sure that I can explain them with any level of accuracy or confidence.

This testimony helps explain in this case why the defendant's assertion that the plaintiff could not have reasonably expected to gain a profit from the RoCa3 Transaction as a whole, and that the plaintiff was not exposed to the benefits and burdens of ownership of a leasehold interest in the Facility during the possible option periods of the Transaction, is too simple a conclusion.

Certainty as to the future, prior to the close of the Transaction, is not required. Business transactions have unpredictability inherent in their structure. Both internal and external forces can operate to change results. What is required for a transaction to demonstrate economic substance is that there be a reasonable, fact based, business foundation for the transaction developers to project benefits from the transaction, and to anticipate that risks inherent in the project also could result in burdens to the party entering the transaction for the leasehold ownership.

The RoCa3 Transaction as a whole contains various uncertainties and speculations that may vary the amount of profit the plaintiff expects to make on the Transaction. Plaintiff projected a minimum profit of approximately $61 million. There were, for example, opportunities for additional profit, as well as a lack of certainty as to the amount of money available and necessary to pay the $831,525,734.00 Final Basic Rent Payment on February 24, 2041, under the

Sublease Renewal Option and Retention Option. Defendant's expert, Paul Bent, qualified in "equipment leased transactions ... [i]ncluding structuring, arranging, and negotiation of such transactions," stated:

Q. Do you know if these various deposits that can be set up by the trust to provide funding for that $381 [$831] million in 2041, are you familiar generally with those deposits and how they work?

A. Which number? You said 381—831?

Q. 831.

A. The final basic rent payment?

Q. Yes.

. . .

Q. Do you have an understanding as to whether those deposits could be replaced at Con Ed's election with a letter of credit?

A. I think there is such a provision, yes.

Q. And so let's say one of these deposits has been invested in securities that become valuable because of a decline in interest rates generally. Take that hypothetical. Would it be possible for Con Ed then to just take those securities out of the deal and take them for itself and replace it with a letter of credit?

A. There are some provisions for replacement collateral, yes.

Q. In putting the letter of credit?

A. I believe that's the case, yes.

Q. So, again, with my hypothetical, if there are deposits that have been put in place and to fund this $831 million payment in 2041, and those deposits, those funds have been placed in securities which have become more valuable, Con Ed could simply take the value out of the transaction and replace it with a letter of credit?

A. I believe they could, yes.

Q. So the benefit of those securities remains Con Ed's to enjoy, whenever it chooses to?

A. Within the framework of the requirements of the documents, yes.

Q. And do these deposits, are they guaranteed to grow to an amount sufficient to pay exactly 300—I'm sorry, exactly $831 million?

A. I doubt that they are guaranteed. The documents call for them to place some of these deposits in interest-bearing accounts at double A banks.

Q. And do we know today, ten years after this deal is closed, what the interest rate will be on those deposits?

A. I think the interest rates are specified in the pricing runs, but that would not be a guarantee that those interest rates could be achieved. And so the answer is no, I don't think there is a guarantee of that.

Q. So the pricing run made assumptions about those interest rates, but nobody knows what those rates will be until the time comes?

A. That's right. The pricing runs made assumptions about not only assumptions about what they would be, but what they needed to be to achieve the numbers that are required at the end of the deal.

Q. So for instance, if interest rates, you know, way out there in 2037 or something like that were higher, it is possible that there could be more money in those deposits than is needed to pay the $831 million lease rent payment?

A. That's possible, yes.

Q. And that higher funds then would go back to Con Ed then, wouldn't they?

A. I think they would, yes.

Q. And it is possible that based on interest rates out there at that point in time, the funds in those deposits might be lower than the amount necessary to pay the $831 million lease payment? That's correct?

A. I guess that's correct, yes.

Q. And if they were lower, that would be a risk Con Ed would have in the transaction because they would still owe the cash payment of $831 million under the lease?

A. Well, theoretically, I guess that's right. . . .

After examining the information available in 1997, based on the record and the testimony of the witnesses, plaintiff had a legitimate business purpose including to achieve a profit and to gain multiple other benefits from its investment in the RoCa3 Transaction, aside from tax benefits. The plaintiff established

at trial that it expected an acceptable profit yield from the RoCa3 Transaction under any of the scenarios that could have taken place at the end of the Sublease Basic Term in 2018.

Moreover, in many ways, and through many witnesses and exhibits, although witness prognosticators tried to hypothesize, what became clear is that in 1997 there was no certainty as to which of the out-year options would be exercised by EZH or the plaintiff, with its increased opportunities for both benefits and burdens to plaintiff after 2018. Even the defendant's own expert, Mr. Ray, confessed the absence of certainty, indicating that, over a 20 year period, "things could change down the road." Mr. Ray's testimony bears repeating at this point:

Q. And in this transaction . . . you can't tell even sitting here today ten years into the deal whether this purchase option could be exercised or not, right?

A. That's correct.

Q. If it is not, Consolidated Edison will have its own options to either continue the lease for some period of time or—

A. That's right.

Q. —or seek a residual value by selling the output?

A. That's right.

Q. Run the risk of whether they could sell it at a profit or not?

A. That's right.

Q. Perhaps sell it at a loss?

A. That's right too.

Q. And even if they elect the renewal term at the end of the renewal term, they will have those same risks and opportunities?

A. That's correct.

Q. And those risks and opportunities are to generate profit or loss?

A. That's right.

Q. It is likely those profit and losses will be generated in foreign currencies, right?

A. Very likely.

Q. And that's something, that's one of the risks Con Ed is going to have?

A. That's a risk, yeah.

. . .

Q. [T]hey may not in your view have analyzed the operational risk sufficiently but it was actually there—

A. It is there.

Q. Whether they analyzed it or not here, your opinion is that they actually had those risks in this transaction?

A. They had the risk and they had the opportunity, if EZH didn't exercise its purchase.

Q. We don't know if EZH is going to exercise or not?

A. We don't know for certain.

Q. We don't—

A. We don't know.

Q. And the option is actually above fair market value?

A. It is.

Q. They would actually have to pay more than fair market value to exercise the purchase option, EZH would?

A. They would pay more than the fair market value as estimated in the appraisal, yes.

Q. All right. Which would tend to indicate that they might not want to do that? If the appraisal was correct, they will be paying more than fair market value?

A. It would depend on whether . . . in their analysis at the time the asset was worth more to them at the purchase option, I mean, an asset in place is worth more than an asset on the dock in these cases.

Q. That would be a determination they would make in the year 2018?

A. That's right.

Q. Based on economic values at the time?

A. That's right.

Mr. Ray also discussed the likelihood of different top management at EZH when the Sublease Purchase Option would have to be exercised from when the Transaction was consummated in 1997. The new management would have to review their options in the context of existing conditions in 2018, including the risks inherent in foreign currency conversion, Dutch regulatory status, as

294

well as market conditions and RoCa3 Facility mechanics.

The defendant's argument that plaintiff does not have the benefits and burdens of ownership hinges on its assertion that the Sublease Purchase Option is certain to be exercised and, further, that the plaintiff's risk is minimized by the Sublease Renewal Option, which would require EZH to continue to lease the property from CEL Trust for "a period of time sufficient to assure that the taxpayer could fully recover its equity investment from a secure source." However, after hearing the testimony of the witnesses at trial, assessing their credibility and examining in detail the documents introduced into evidence, including the expert reports, the court concludes that in the RoCa3 Transaction, the Sublease Purchase Option is not certain to be exercised. If EZH does exercise the Sublease Purchase Option, it can pay the Sublease Purchase Option Price from the funds it holds in the Sublease Deposit and the IJssel Deposit. However, the Sublease Purchase Option Price is set at $215 million, which is projected to be greater than the fair market value price of the Facility on the Sublease Purchase Option Date in 2018. The fair market value of the leasehold residual value as of the Basic Sublease Termination Date, January 2, 2018, was projected as $205.5 million. Plaintiff's expert, John Kelly, also determined that EZH's cost of exercising the Sublease Purchase Option would exceed the benefits of such Option. This is because the Defeasance Accounts, which were established by EZH for EZH's benefit, remain the property of EZH throughout the RoCa3 Transaction and EZH is entitled to draw on them if it chooses not to exercise the Sublease Purchase Option. Furthermore, if EZH does not exercise the Sublease Purchase Option and CEL Trust chooses to exercise the Retention Option, the Sublease Deposit Pledge and Repledge Agreement will be terminated and EZH will be able to withdraw over $123 million from the Sublease Deposit for its use. Robert Holzman, of

Cornerstone, confirmed that, "in this type of lease transaction, as many leveraged lease transactions, you cannot have a bargain purchase option[,]" which would create an inducement to exercise the Sublease Purchase Option. To that end, in assessing the RoCa3 Transaction, Cornerstone's ABC Software[27] pricing file ensured there would be no "economic compulsion" to exercise the Sublease Purchase Option, by including a constraint requiring the Sublease Purchase Option Price to exceed the projected fair market value at the time the option could be exercised. As a result, the Sublease Purchase Option is not guaranteed to be exercised and, therefore, contrary to some other LILO cases, discussed below, the plaintiff's investment was placed at risk, at least in the form of residual value risk and, additional, premature termination or default risk.

Moreover, in addition to the risks discussed above, the plaintiff faces risks in the event of a Premature Termination of the Lease or Sublease, as described in the Transaction documents, and as discussed by plaintiff's witness, Dr. Ellis. Under the Operative Documents, the Sublease to EZH may be terminated before the Sublease Term expires, by way of a number of Premature Termination events listed in the Sublease Agreement, including: (a) a Burdensome Buyout Event (e.g., a development that makes it illegal for EZH to continue as a sublessee or make payments; EZH becomes liable for additional taxes which could be avoided by purchasing CEL Trust's interest; or Dutch reorganization of the energy industry); (b) a Voluntary Termination for Economic Obsolescence (e.g., a development that causes the RoCa3 Facility to become technologically obsolete or surplus to EZH's needs); (c) an Early Purchase Option (e.g., a decision by EZH to end the lease because the plaintiff acquired, merged with or consolidated with a competitor in the Benelux); (d) a Sublease Facility Event of Loss (e.g., a termination arising from unforeseen losses, which renders the facility unfit for use); or (e) Subles-

27. The ABC Software pricing file was a program developed by Warren & Selbert and used by Cornerstone to determine the optimal pricing of the RoCa3 Transaction for both parties. The individual running the program enters various

inputs, constraints and targets set by the parties in order to calculate appropriate rent schedules and other necessary amounts by optimizing the cash flows around the inputs and constraints.

see Events of Default (e.g., failure of EZH to provide proper warranties; events of EZH bankruptcy, dissolution, or liquidation; EZH failure to maintain insurance; failure to maintain letters of credit or to protect HBU's security interest in the Facility).[28]

The plaintiff will be entitled to certain additional cash flows if a Premature Termination Event occurs. Moreover, under certain Premature Termination Events, EZH may lose its rights to the RoCa3 Facility. Also, given that the trial testimony and exhibits lead the court to conclude that there is no certainty that EZH will exercise the Sublease Purchase Option, plaintiff's potential loss of the opportunity to earn additional profit in the Shirt–Tail Period or the Retention Option Period could be triggered by a Premature Termination Event. For example, in the event of a Voluntary Termination for Economic Obsolescence, EZH must attempt to sell CEL Trust's Lease Interest to a third party Appropriate Purchaser for cash, the net proceeds of which must be delivered to CEL Trust. Additionally, under a Voluntary Termination for Economic Obsolescence, EZH also must pay to CEL Trust, in cash, the excess, if any, of the Sublease Termination Value over such net cash proceeds. Alternately, CEL Trust may elect to take possession of the Lease Interest for the remainder of the Lease Term, conditioned upon a requirement that CEL Trust make security arrangements for the payment of Lease Basic Rent and pay HBU sufficient funds to repay the aggregate unpaid principal amount of the Loan Certificates, together with all accrued interest thereon.

On the occurrence of a Sublease Early Purchase Option Event, EZH may purchase CEL Trust's Lease Interest, and must pay CEL Trust an amount equal to the greater of the Sublease Termination Value on that date or the Fair Market Sales Value of CEL Trust's Lease Interest. Defendant's expert, Mr. Bent, testified that that the remedy is structured such that the payment would be the higher of fair market sales value and sublease termination value, because:

A. [I]n a typical lease or sale leaseback, the equity investor is the owner of the asset and, as such, is entitled to the full value of that asset. And if the termination value has been specified to include an amount that is not adequate to represent the full value of the asset, it wants to get that full value. So if the full value is higher than the termination value, it would get that value rather than the termination value.

Q. And is that principle at play equally in a lease-leaseback?

A. Yes.

If a Sublease Facility Event of Loss occurs, EZH will be required to purchase CEL Trust's Lease Interest for the Sublease Termination Value. If the Sublease Facility Event of Loss is caused by the seizure or condemnation of the Facility by any governmental authority for the shorter of the balance of the Sublease Term or more than two years, unless waived by the Trustee and HBU, EZH is required to purchase CEL Trust's Lease Interest for an amount equal to the greater of the Sublease Termination Value or Fair Market Sales Value. In the event of a Sublease Facility Partial Event of Loss, EZH will be deemed to have assumed CEL Trust's obligations under the Lease, equal to the Partial Loss Percentage of such obligations, and EZH will be required to pay the Sublease Termination Value multiplied by the Partial Loss Percentage to CEL Trust. Moreover, if the Facility Value after the Sublease Facility Partial Event of Loss is less than 50% of the Facility's Value as of the Closing Date, EZH must restore the output capacity and/or efficiency of the Facility to the level that would cause the reduction in the Facility Value resulting from such Sublease Facility Partial Event of Loss, not to exceed such percentage, or a Sublease Facility Event of Loss will be deemed to have occurred.

Should a Sublessee Event of Default occur, CEL Trust has the option to: (a) require EZH to assume CEL Trust's obligations under the Lease and pay to CEL Trust the

---

**28.** Additional lessor and lessee Events of Default also are set forth in the Lease Agreement with

remedies attached.

higher of Fair Market Sales Value or the Sublease Termination Value; (b) require EZH to pay liquidated damages in payment of the amount of Sublease Termination Value that exceeds either (i) the Fair Market Rental over the Life of the Lease or (ii) Fair Market Sales Value of CEL Trust's Lease Interest; (c) require EZH to return the undivided interest to CEL Trust, in accordance with of the Sublease Agreement; (d) sell CEL Trust's Lease Interest, along with any property pledged to secure EZH's obligations under the Sublease, with the requirement that CEL Trust account to EZH with respect to the sale of certain collateral identified therein; (e) subject to the Operating Agreement and, without terminating the Sublease Agreement, use, operate, or sublease the undivided interest to others, with no duty to account to EZH for the proceeds therefrom, but with the rent owed by EZH being reduced by any amount received by CEL Trust from subleasing the undivided interest; (f) require EZH to assume CEL Trust's obligations under the Lease and possibly require EZH to pay the Equity Portion of the Sublease Termination Value and any unpaid Sublease Rent; or (g) any other right or remedy available under law.

Robert Holzman, Cornerstone's representative, testified that the Termination Value, which is secured by the Letter of Credit, and is for more than 100% of the anticipated shortfall, preserves the investor's net income return. He also identified a possible credit risk for Con Ed as an investor in the deal:

We talked about risks that the sublessee doesn't maintain the asset or take care of it. Those are really asset risks, ultimately, because, to the extent the asset isn't cared for and maintained in a good condition, the asset that Con Edison expects to receive back and recognize a residual on, or may have to take back during the term of the asset if there's a default, could be in jeopardy. And that value of it might deteriorate relative to what it's expected to be.

Furthermore, Mr. Holzman discussed the consequences of a Sublessee Event of Default as follows:

A. Section 15 sets forth the remedies that Con Edison can exercise in the event of a sublease event of default by EZH.

Q. What is meant by remedies?

A. It's the actions that Con Edison can take to protect itself when there's an event of default.

Q. Could you give us an example of one of those remedies?

A. I'll paraphrase it obviously, but this allows the investor, Con Edison, to ask EZH to pay the higher of fair market sales value and sublease termination value in the event there is an event of default.

. . .

A. Con Edison, can ask EZH to return the asset, the undivided interest, to Con Edison pursuant to Section 5, which is the returned condition section we talked about for Con Edison's use.

Q. Why is it important to have this particular remedy in the sublease agreement?

A. Well, it may make more sense at any given point in time, particularly with Con Edison being a utility and familiar with how to operate utilities, to ask for this asset to be returned to it, as opposed to just asking for the higher of the sublease termination value or fair market sales value. Because Con Edison might believe that, in this circumstance, it can achieve a higher value by taking the asset back.

The plaintiff maintains that its risk was not fully eliminated by the Letter of Credit protection, citing to Mr. Holzman's testimony, that the issuer of a Letter of Credit might fail to honor the Letter of Credit, and to Dr. Ellis's testimony, that the issuer might prove financially incapable of paying at the time the letter is drawn upon. Mr. Holzman testified:

Q. Did that provision of a letter of credit eliminate the credit risk, in your view?

A. No, it did not.

Q. Why is that?

A. Well, there's always the risk that an LC [Letter of Credit] provider doesn't pay when Con Edison, for instance, were to go make a drawing on it. It also could be the case that the letter of credit amount might not be sufficient to cover the balance of

that exposure were market interest rates to change and impact the value of the IJssel deposit.

Mr. Holzman also testified, on cross-examination, as follows:

Q. Okay. I noticed on your direct yesterday, you didn't mention the effect of termination on Con Ed. Is there a risk of non-payment for Con Ed?

A. Yes.

. . .

Q. Okay. And then if there is a termination value, Con Ed preserves its net economic return, and if EZH doesn't have enough money to pay them, the letter of credit comes in, correct?

A. They can make a drawing, pursuant to a drawing event under the letter of credit of the LC bank.

Q. So the risk is the AA bank or better will not honor the letter of credit? Is that the risk you are discussing?

A. There is more risks than that, unfortunately. AA banks have gone bankrupt, too.

Q. So if the AA bank goes bankrupt or doesn't honor the letter of credit, those are the risks you are talking about?

A. I think those are the primary risks.

Q. Are you aware that—isn't it true the banks can be replaced if their credit rating drops?

A. They can be. Not very quickly, but they can be.

The plaintiff contends that it has acquired significant benefits and burdens, including, "the possibility of profiting, or of incurring a loss, from the property's residual value." While residual value is not necessarily the most important element of ownership of an interest in property, it has been determined the most significant element in certain transactions. For example, the United States Court of Appeals for the Seventh Circuit stated: "The facts of *this* case appear to make the residual value issue the foremost consideration." *Coleman v. Comm'r*, 16 F.3d at 827 (emphasis in original).

The defendant agrees that, "[t]he pertinent inquiry for determining whether CED acquired a current leasehold interest in the Facility is whether CED—as the putative owner of that interest—possesses an equity investment in the RoCa3 Facility that can be lost if the residual value of its interest in the RoCa3 Facility at the end of the sublease to EZH is insufficient to recoup that investment." The defendant, citing *Swift Dodge v. Commissioner*, 692 F.2d 651, 652–54 (9th Cir.1982) and *Estate of Thomas v. Commissioner*, 84 T.C. at 434, asserts that, "[t]he most important characteristic of a true lease is whether the lessor remains exposed to market value risk (including residual value risk) from the inception through the termination of the term of the lease." The defendant contends that, because of the structure of the agreement, the plaintiff is assured to recover its investment no matter whether the value of the Facility fluctuates over the life of the Transaction. The defendant also maintains that the potential residual value afforded to the plaintiff during the Shirt–Tail Period is insufficient to validate the Transaction. Therefore, according to the defendant, the benefits and burdens of ownership of the lease have not passed from EZH to the plaintiff. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. at 581, 98 S.Ct. 1291; *Estate of Thomas v. Comm'r*, 84 T.C. at 435; *Swift Dodge v. Comm'r*, 692 F.2d at 653–54.

The record, however, supports the potential for a realistic residual value remaining after the Sublease Basic Term, if EZH does not exercise the Sublease Purchase Option. Thus, the plaintiff has a true possibility of obtaining a significant profit. *See Estate of Thomas v. Comm'r*, 84 T.C. at 433. The Retention Option, which has a longer residual value period, is projected to be more lucrative to the plaintiff than the Sublease Renewal Option. However, even if CEL Trust were to elect the Sublease Renewal Option, the residual value during the Shirt–Tail Period, which is approximately 15.5% of the term of the Lease Interest, would exceed the percentage accepted previously by the United States Supreme Court for residual interest risk. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. at 566, 98 S.Ct. 1291 (upholding a residual value of over 13%); *see also*

*Torres v. Comm'r*, 88 T.C. at 716–17 (upholding a residual value of over 11% of the original life of the lease); *Mukerji v. Comm'r*, 87 T.C. 926, 931, 951–55, 1986 WL 22046 (1986) (of over 12% residual value); *Estate of Thomas v. Comm'r*, 84 T.C. at 428–29 (of approximately 14% residual value). Because the plaintiff has demonstrated to the satisfaction of the court that the exercise of the Sublease Purchase Option is not guaranteed, the residual value in the RoCa3 Facility to the plaintiff is at risk and subject to the potential for both gains and losses.

The defendant also argues that "[t]he fact that CED will not possess the Facility during the Sublease Basic Term, and cannot possess the [F]acility after that term expires if EZH exercises its purchase option, demonstrates that CED acquired nothing more than a conditional right to acquire an interest in the Facility at some point in the future." According to the defendant, "EZH's continued and unabated use of the RoCa3 Facility at no cost to itself, deprive[s] CED of the benefits and burdens of the leasehold interest it claims to possess." In other words, defendant asserts that ownership and use of the RoCa3 Facility were not separated, because they both remained with EZH and, therefore, that a true lease does not exist. As evidence, the defendant argues that "many of the maintenance requirements contained in the Operative Documents are essentially the same as those undertaken and performed by EZH prior to entering into the RoCa3 LILO Transaction." Moreover, "EZH was required to maintain insurance of the type and amount it already maintained on its other facilities." The defendant states: "the RoCa3 Facility is owned by EZH, will continue to be owned by EZH (or its successor), when the sublease ends, and can be used and possessed by EZH for as long as EZH chooses simply by giving CED its money back."

In *Frank Lyon Co. v. United States*, Worthen, the original owner of the property in the SILO transaction at issue, retained the continued and unabated use of the facility that was the basis for the litigation in that case, but the court found that the Frank Lyon Company was the true owner for tax purposes. *Frank Lyon Co. v. United States,* 435 U.S. at 566, 583–84, 98 S.Ct. 1291; *see also Torres v. Comm'r,* 88 T.C. at 721 ("a lessor is normally not vested with the right of possession during the term of the lease."). Similarly, whether EZH retained the "continued and unabated use" of the Facility does not lead to an automatic result in this court's analysis that the plaintiff lacked ownership of a leasehold interest in the facility.

The plaintiff's residual interest was projected into the future, as has been the case in other leveraged leasing transactions, including the one in *Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550. That the plaintiff did not have immediate physical possession of the Facility is typical in leveraged leases, and does not result in a conclusion that the plaintiff did not have sufficient ownership of a leasehold interest in the Facility. The plaintiff also was exposed to a risk regarding the future residual value of the RoCa3 Facility with both risks and benefits at stake. The plaintiff argues that the Operative Documents require CEL Trust to bear its pro rata share of the expenses of operating the RoCa3 Facility during the Retention Option or the Shirt–Tail Period, and that, if EZH does not elect the Sublease Purchase Option, the plaintiff's investment is exposed to the risk of loss if the RoCa3 Facility operates at a loss. Because the Sublease Purchase Option is not certain to be exercised at the end of the Sublease Basic Term in 2018, the plaintiff's investment remains subject to market risk and currency fluctuation. Furthermore, after the Sublease Basic Term or Sublease Renewal Period ends, under the Retention Option and the Sublease Renewal Option, respectively, the plaintiff is entitled to exploit its 47.47% share of the output from the RoCa3 Facility. *See Frank Lyon Co. v. United States,* 435 U.S. at 587, 98 S.Ct. 1291 (in which the majority did not agree with the dissenting opinion's position that the SILO Transaction did not create a "present" interest in the property).

The Internal Revenue Code at section 163(a) provides that taxpayers may take "as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a) (2006). The plaintiff has

claimed a deduction on its 1997 taxes related to the RoCa3 Transaction, pursuant to 26 U.S.C. § 163(a), attributable to the nonrecourse debt incurred on the HBU loan to pay a portion of the Initial Rent payment on CEL Trust's Lease Interest in the RoCa3 Facility. The plaintiff bears the burden of showing that the interest expense deductions claimed on its 1997 tax return fall within the scope of section 163(a). *See Halle v. Comm'r*, 83 F.3d 649, 652 (4th Cir.1996). In *Halle*, the United States Court of Appeals for the Fourth Circuit offered a helpful explanation of how to understand the term "interest," with respect to a loan, under 26 U.S.C. § 163(a):

> Explaining that "interest" is to be given its "usual, ordinary and everyday meaning," *Old Colony R.R. v. Commissioner*, 284 U.S. 552, 561, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932), the Supreme Court has defined the term as "compensation for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940) (interpreting predecessor to § 163(a)); *see also Old Colony R.R.*, 284 U.S. at 560, 52 S.Ct. at 213–14 (same).

*Id.*

 However, pursuant to 26 U.S.C. § 163(a), " 'although indebtedness is an obligation, an obligation is not necessarily an "indebtedness" for tax purposes,' " and, therefore, interest expense deductions are only permitted for interest payments on loans that create true indebtedness. *Id.* at 653 (quoting *Deputy v. du Pont*, 308 U.S. at 497, 60 S.Ct. 363). In *Nelson v. Commissioner of Internal Revenue*, the Tax Court indicated that:

> Interest payments are only deductible if: (1) There is a bona fide indebtedness; (2) the indebtedness is that of the taxpayer; (3) the interest is paid or accrued on the indebtedness; and (4) the payment or accrual is made within the taxpayer's taxable year. *See* 6 MERTENS, LAW OF FEDERAL INCOME TAXATION, sec. 26.01, at 1 (1974 rev.).

*Nelson v. Comm'r*, No. 21028–91, T.C. Memo 1993–419, 66 T.C.M. (CCH) 691, 1993 WL 347412, at *4 (Sept. 13, 1993).

The concept of interest appropriate for a tax deduction was further defined in *Bridges v. Commissioner of Internal Revenue*, which presupposes that a statutory allowance of interest deductions must be based on a transaction that is not a sham. *Bridges v. Comm'r*, 39 T.C. 1064, 1963 WL 1605, *aff'd*, 325 F.2d 180 (4th Cir.1963). The *Bridges* court further elaborated:

> This means that the term 'interest' as used in the statute has a commercial connotation, that is, regardless of the purpose for which the money is borrowed or the use to which it is put, and regardless of any tax consequences resulting therefrom, the amounts paid as interest must have commercial reality, there must be some valid commercial reason for paying interest, the borrower must in fact receive something in the transaction itself which would warrant the payment of interest. To be deductible the amounts paid must, in fact, constitute interest—that is, compensation for the use or forbearance of money, *Deputy v. du Pont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940)—paid with respect to genuine indebtedness.

*Id.* at 1075, 1963 WL 1605.

Similarly, the United States Court of Appeals for the Second Circuit, in *Goldstein v. Commissioner of Internal Revenue*, disallowed a claimed deduction, which "can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Comm'r*, 364 F.2d 734, 740 (2d Cir.1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967). The *Goldstein* court wrote:

> In order to fully implement this Congressional policy of encouraging purposive activity to be financed through borrowing, Section 163(a) should be construed to permit the deductibility of interest when a taxpayer has borrowed funds and incurred an obligation to pay interest in order to engage in what with reason can be termed purposive activity, even though he decided to borrow in order to gain an interest deduction rather than to finance the activity in some other way. In other words, the interest deduction should be permitted whenever it can be said that the taxpayer's

desire to secure an interest deduction in [sic] only one of mixed motives that prompts the taxpayer to borrow funds; or, put a third way, the deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction. After all, we are frequently told that a taxpayer has the right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by any means the law permits. *E.g., Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

*Id.* at 741 (footnote omitted).

The defendant argues that the RoCa3 Transaction was a "circular financing arrangement, which ensured payment of the respective obligations, and by which Con Ed's 'debt' is paid by EZH's 'rent' and money never leaves the control of the lender's affiliates." Defendant further argues that EZH continued to use and receive profits from the RoCa3 Facility and still was responsible for costs and capital investments. To clarify its position with respect to the circular nature of the financing arrangement, the defendant asserts in its reply brief, "it is not solely that EZH's rent payments are scheduled to satisfy the HBU loan scheduled payments until the HBU Loan is satisfied, on which the United States' [sic] maintains the financing arrangement is circular. It is that, in addition, the Debt Defeasance Account [the Sublease Deposit] fully defeases the rental payments and payments on the HBU loan and the source of the funds in the Debt Defeasance Account is the original HBU loan itself." Therefore, the defendant argues that the plaintiff "had neither the benefits nor the burdens of the leasehold interest it claims." The plaintiff, however, maintains that such "features are typical of sale-leasebacks and leveraged leases."

■ Leases which impose rental payments that exactly match the debt service owed by the lessor do not automatically prevent a lessee from acquiring a true leasehold interest in property. *See, e.g., Levy v. Comm'r,* 91 T.C. at 860 ("[N]eutral factors are: ... (2) the absence of significant positive net cash flow during the lease term ... (3) the fact that the rental income stream during the initial lease term is tailored to or matches interest and debt payments that are due."); *Larsen v. Comm'r,* 89 T.C. at 1267 ("In *Estate of Thomas,* we found the following factors to be essentially neutral in making the determination of whether a taxpayer is the owner of property: (1) the existence of a net lease, [*Estate of Thomas v. Comm'r,*] 84 T.C. at 433; (2) the absence of significant positive net cash flow during the leaseback term or rent geared to interest and mortgage amortization, [*Estate of Thomas v. Comm'r,*] 84 T.C. at 434; and (3) the use of nonrecourse liability. [*Estate of Thomas v. Comm'r,*] 84 T.C. at 436."); *Estate of Thomas v. Comm'r,* 84 T.C. at 436 ("Rent during an initial lease term geared to the cost of interest and mortgage amortization is not, in and of itself, much more than a neutral commercial reality."); *Hilton v. Comm'r,* 74 T.C. 305, 348, 1980 WL 4523 (1980) ("[W]e do not deem the existence of a net lease, nonrecourse mortgage or rent during the initial lease term geared to the cost of interest and mortgage amortization to be, in and of themselves, much more than neutral commercial realities."), *aff'd,* 671 F.2d 316 (9th Cir.), *cert. denied,* 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 168 (1982).

Comparing the structure of the transaction in *Thomas v. Commissioner,* dealing with a lease-leaseback of computer equipment, to that in *Frank Lyon Co. v. United States,* dealing with a sale-leaseback of a building and the underlying ground lease, both of which bestowed upon the taxpayers a true ownership status in the interest at issue, the United States Tax Court wrote in *Thomas:*

With regard to respondent's 'financing arrangement' theory, we see little to distinguish this case from *Frank Lyon Co. v. United States, supra,* where the Supreme Court upheld the form of a transaction structured very similarly to the one before us but in some respects not as strongly indicative of a lease transaction. For example in this case the lessor's initial equity ($1.2 million) represented approximately 13 percent of the equipment's total cost ($9,070,234) whereas in *Frank Lyon* it represented about 6 percent. The potential lease term in *Frank Lyon* aggregated 65

years, which probably was close to the useful life of the building; here the lease terms were only 8 years, and the computers were expected to have useful lives of at least 3 years beyond lease termination. In *Frank Lyon* the renewal rental was fixed at approximately one-half the initial term, whereas here renewal rental was at fair market rent.

*Estate of Thomas v. Comm'r*, 84 T.C. at 436 (citing *Frank Lyon Co. v. United States*, 435 U.S. at 585, 98 S.Ct. 1291).

The RoCa3 Transaction also demonstrates the attributes of a true lease transaction, even exceeding what the United States Supreme Court found to be acceptable in *Frank Lyon*, and what the United States Tax Court found to be acceptable in *Thomas*. Using similar calculations, according to the plaintiff, it contributed an equity investment equal to over 26% of the value of the equipment, the Lease Term of the Facility was 43.2 years, less than the useful life of the Facility, which was projected to be 54 years as of 1997 when the Transaction closed, and the renewal rent was fixed at approximately 90% of the projected fair market value of the Facility.

The defendant attempts further to explain its theory of circular financing with respect to the HBU Loan as follows:

> The funds used to make the loan, which began (and ended) in an account at HBU's parent, ABN AMRO, 1) were "loaned" by HBU to CED on a nonrecourse basis; 2) CED "paid" the funds to EZH as part of the Advance Head Lease Payment; 3) EZH "paid" the funds to ABN AMRO as consideration for ABN AMRO's assumption of its contractual obligations under the Debt Defeasance; and finally 4) ABN AMRO "paid" the funds to HBU to satisfy both EZH's rent obligations under the lease and CED's obligation under the loan agreement. Thus, the funds never left the ABN AMRO corporate umbrella; CED never received loan proceeds and never made loan payments of principal or interest. No portion of this purported borrowing was ever invested in the RoCa3 Facility, or put to any other purposeful use by either CED or EZH.

In response, plaintiff asserts that the nonrecourse loan from HBU should be respected as *bona fide* debt for purposes of tax deductions and the interest deductions allowed. First, plaintiff explains it is entitled to the deductions, because nonrecourse debt is common in leveraged lease transactions. Also, because the amount of the HBU loan is expected to maintain a value less than the value of the undivided interest throughout the life of the lease, the plaintiff argues that it can be expected to maintain an equity interest in the undivided interest of the Facility. Therefore, the plaintiff can satisfy any requirement that the nonrecourse debt have a value less than the equity Lease Interest in the Facility, such that the HBU loan shall be regarded as true debt. The plaintiff maintains that it made an investment of more than $39 million in the Facility, that it expects to make at least a $61 million pretax profit on the Transaction as a whole, and that it will maintain an equity interest in the Facility beyond the amount of the HBU Loan throughout the life of the Lease Term. Therefore, the plaintiff argues that in order to protect its investment and expected profit from the Facility, it must continue to honor the terms of the HBU Loan and that its indebtedness to HBU is genuine, in that there will be a financial incentive to pay off the nonrecourse debt, so long as the value of the lessor's property exceeds the amount of the nonrecourse debt.

Prior to the 1999 promulgation of 26 C.F.R. § 1.467 (codified at Apr. 1, 2000), limiting tax benefits available in leveraged lease transactions, and the 2004 enactment of 26 U.S.C. § 470, regarding tax deduction claimed in LILO transactions, the statutory/regulatory framework did not wholesale disallow the deductions claimed, as evidenced by the fact that many large, well-established corporations engaged in similar transactions, expecting to take advantage of available tax deductions. Deductions taken with respect to such transactions were permissible on a case by case basis, in conformance with the doctrines of substance over form and economic substance. As is discussed in other sections of this opinion, LILO transactions have been reviewed by the IRS and a number of federal courts, with differing results,

based on the facts of the individual transactions at issue in the specific cases. Even in those cases that have disallowed the claimed LILO based deductions, courts, while suggesting a number of determinative factors for evaluating whether or not the LILO transaction deductions should be recognized as valid by the IRS, also have acknowledged that not all such deductions should be disallowed. As discussed above, *Frank Lyon Co. v. United States,* 435 U.S. at 573, 98 S.Ct. 1291, and *Coltec Industries, Inc. v. United States,* 454 F.3d at 1355–57, set out the basic, albeit general, ground rules to test transactions under the doctrines of substance over form and economic substance.

The specific use of nonrecourse debt has been found to be essentially a neutral factor in evaluating the true substance of a transaction, beyond just the form. In *Estate of Thomas v. Commissioner,* the Tax Court wrote:

> Respondent argues that the fact that the notes are nonrecourse evidences a lack of true substance, but, contrary to respondent's contentions, we have stated repeatedly that we do not believe that the nonrecourse nature of notes is necessarily more than a "neutral factor," since nonrecourse liabilities are commonly used in modern transactions. *See Dunlap v. Commissioner, supra* [74 T.C. 1377] at 1435; *Hilton v. Commissioner, supra* at 363.

*Thomas v. Comm'r,* 84 T.C. at 436–37; *see also Larsen v. Comm'r,* 89 T.C. at 1268. Plaintiff's expert, Dr. David Ellis, testified regarding nonrecourse debt, as follows:

Q. You also mentioned that a leveraged lease has debt that's nonrecourse. Do you recall that?

A. Yes.

Q. And why is that typical in a leveraged lease?

A. It is required under FAS 13 in order for the lease to receive favorable, the favorable accounting treatment of a leveraged lease.

Q. Is there security for that loan?

A. Yes, there is. It is provided by the equity investor granting first mortgage rights on the asset to the lender.

Q. Are those characteristics present in this RoCa3 transaction?

A. Yes, they are.

Q. You also mentioned use of a trust in leveraged leasing?

A. Yes.

Q. Why does—why are the investments made through a trust?

A. To have one central party through whom all the payments and so on are channeled, but also it is another factor that can help the equity investor—it is putting it, if you will—help it so that the debt is nonrecourse, so that there is another party in between.

Similarly, defendant's expert, Paul Bent, described leverage leases and nonrecourse debt, as well as the RoCa3 financing structure, by stating:

A. Well, in a leveraged lease, as opposed to having simply a lessor and a lessee, there is a third party who is a lender who loans money on a nonrecourse basis to the lessor, which represents most often the majority portion of the cost of acquiring the asset.

Q. And that's all very typical in leveraged leases, right? A. Yes.

. . .

Q. In fact, one of the definitions of a leveraged lease is that the debt be nonrecourse, right?

A. That's right.

Q. And have you ever worked on transactions where the lender has put up, say, like 85 or so percent of the funds for the investment?

A. I have. That number is quite variable, but I have done deals where the lessor has—or, sorry, the lender has advanced as much as 85 percent.

Q. Would you say that around 80 percent financing on a nonrecourse loan is pretty common in the industry?

A. Well, the rule of thumb is roughly 80 percent, yes, although it varies quite a bit, but that's the number that people typically think of.

Q. By rule of thumb, I mean, that's very common, or what do you mean by that?

A. Yes. I think in the industry when people think about how to structure a leveraged lease, they most often think of 20 percent equity, 80 percent debt, although that number varies a great deal from transaction to transaction.

Q. No, in the [RoCa3] transaction, HBU financed 67 percent of the initial rent payment; does that sound about right to you, that calculation?

A. That's about right. They advanced 80 percent out of—80 million out of 120 million, yes.

Q. That's about two-thirds?

A. Right.

Q. And is that well within the range that's typical for leveraged leases?

A. Yes.

Q. And, in fact, Con Ed put up more equity here than your rule of thumb would indicate?

A. They did. They put up more equity than I have seen in many other leveraged leases, yes.

Q. Now let's focus on the cash flows for a minute. We talked about the fact that potentially the rent payments here are very close to the debt service payments under the nonrecourse loan. Do you recall that?

A. Well, the sublease rent payments are exactly equal to the debt service payments, yes.

Q. Isn't it typical in these transactions that the schedule of rentals due from the lessee throughout the term of a lease are calculated so that the periodic rent payments are exactly equal to, in time to coincide exactly with the schedule of debt service payments due from the lessor to the lender under the loan?

A. No, not throughout the term, no. Otherwise, the equity would never make any money.

Q. What do you mean by throughout the term?

A. Well, I am just using your words. You said is it typical throughout the term for the rent payments to equal the debt payments and the answer is no, because then there would be nothing left for the equity.

Q. Isn't it typical that the amount that would be left to the equity throughout the term of the lease might be a fairly small number, that most of the cash flow would go to the lender?

A. Well, virtually all of the rent—typically all of the rent goes to the lender until the rent—until the debt is retired, but then the equity begins to make its money, yes.

Q. So, for instance, in this transaction [RoCa3], if you take the combined basic term of the sublease and renewal term of the sublease, if the renewal were exercised, most of the cash flow goes to the lender up until the debt is retired, and at that point, the remaining sublease rents can go to the equity investor; is that right?

A. That's right. The way this deal is structured, there is a substantial step-up in rent during the renewal of the sublease, so during the sublease basic term, the rent is fixed at a certain amount. And that is exactly equal to the debt service during that time. At the time the sublease is renewed, if it is renewed, the renewal rent is significantly higher than the basic rent during the basic term and the debt service steps up at the same time. So it is still exactly equal.

Q. Okay. And the purpose of having the cash flows coming in from rents being paid out to the lender is to avoid the lessor or here, Con Edison, having to come out of pocket to make debt service payments to the lender throughout the term of the lease?

A. Well, that's one purpose.

Q. And isn't it true that the rental payments are often calculated precisely often to the penny, to match the debt service payments due from the, here from Con Ed?

A. Yes, that's quite common.

Q. And once the rental payment stream is assigned to the lender, no further cash debt service payments are made by the lessor or, here, Con Ed, to the lender?

A. Yes, that's typical. The debt—the rent is assigned to the lender and the rent, in a deal where the rent actually comes from the sublessee or the lessee, they make the rent payment typically to the trustee. The trustee pays it directly to the lender and sometimes they assign it to the lender and leave the trustee out of the loop.

Q. So sometimes the lessee, here EZH, makes payments directly to the lender?

A. Yes, sometimes they do.

Q. And that's in satisfaction of the rent obligations?

A. That's right. That satisfies the rent obligation, which equals the debt service payment.

Q. And that then also satisfies the debt service obligations?

A. Right. It is equivalent to the lessor paying it—it is equivalent to the lessee paying the lessor and the lessor paying the lender.

Q. And those payment mechanics are common in leveraged leases?

A. Yes.

The *Statement of Financial Accounting Standards No. 13* (FAS 13), "Accounting for Leases," published by the Financial Accounting Standards Board (FASB), November 1976, in the section on "Accounting and Reports for Leveraged Leases," qualifies a leveraged lease for accounting purposes under FAS 13 (which the plaintiff intended to utilize), if it meets "all of the following characteristics:"

a. Except for the exclusion of leveraged leases from the definition of a direct financing lease as set forth in paragraph 6(b)(ii), it otherwise meets that definition. . . .

b. It involves at least three parties: a lessee, a long-term creditor, and a lessor (commonly called the equity participant).

c. The financing provided by the long-term creditor is nonrecourse as to the general credit of the lessor (although the creditor may have recourse to the specific property leased and the unremitted rentals relating to it). The amount of the financ-

ing is sufficient to provide the lessor with substantial leverage in the transaction.

d. The lessor's net investment, as defined in paragraph 43, declines during the early years once the investment has been completed and rises during the later years of the lease before its final elimination. Such decreases and increases in the net investment balance may occur more than once.

*Statement of Financial Accounting Standards No. 13* (Financial Accounting Standards Board) (Nov.1976), ¶ 42(a-d).

In the case of the RoCa3 Transaction, CEL Trust took out the HBU Loan and incurred the nonrecourse debt on the Loan. CEL Trust then used the Loan funds to acquire a lease interest in the RoCa3 Facility, with the addition of its own funds. Plaintiff's equity investment, in addition to the nonrecourse debt, was above average, according to defendant's witnesses. Plaintiff also had a projected potential for profit in the RoCa3 Transaction, exclusive of tax benefits, which was due, in part, to its ability to use the Loan funds to finance its Lease of the Facility. Given that the Lease was for a term of 43.2 years, and the Sublease Purchase Option was not certain to be exercised by EZH, especially given the economic and regulatory, future uncertainty, both domestically and abroad, the plaintiff had the benefit of potential profit and burdens of possible lost monies, associated with the ownership of a lease interest. The purpose of the Defeasance Accounts (the Sublease Deposit and the IJssel Deposit), created by EZH, was to provide security for the Sublease Basic Rent and Sublease Renewal Rent payments it was or would be required to pay to CEL Trust. The accounts reduce the credit risk to the parties, however, they do not remove EZH's obligation to make the rental payments to CEL Trust.

The potential for greater cash flow beyond that which will be derived under the Sublease Purchase Option comes from a combination of the Sublease Basic Rent, Sublease Renewal Rent, and Sublessee Loan Payments, in addition to potential greater profits from the operation of the Facility during the Shirt–Tail Period from 2034 to 2041 or from the parties to be divided during the Reten-

tion Option Period from 2018 to 2041. The plaintiff also argues that it is unknown whether the IJssel Deposit and the Sublease Deposit will be sufficient to meet EZH's obligations after 2018 and that, in any event, EZH is not obligated to use the IJssel Deposit to meet such obligations. According to plaintiff, if the Sublease Renewal Option is selected, the Sublease Deposit and the IJssel Deposit will both remain in place and continue to secure part of EZH's future payments. Plaintiff notes that the Sublease Deposit will secure a portion of EZH's payment obligations, through 2027, at which point it will be exhausted, and that in 2017 and 2018, the STRIPS, which make up the IJssel Deposit, will have matured to a total of $99,199,000.00, the proceeds of which will be reinvested by Credit Suisse First Boston. Plaintiff asserts that there is, nevertheless, no way to know whether the funds will be sufficient to cover EZH's rental payment obligations, from 2027 through 2034, as well as EZH's Sublessee Loan repayment obligations, because the plaintiff cannot predict the interest rate it will be able to obtain when the Treasury STRIPS have matured and the proceeds have been reinvested by Credit Suisse First Boston. Under the Retention Option, plaintiff has an even greater opportunity to make a profit, which would derive from CEL Trust's operation of the Facility, and which is unrelated to the proceeds from the IJssel Deposit STRIPS.

According to the plaintiff, "Con Edison also demonstrated that, for purposes of financial accounting, the funds in the defeasance deposits continue to belong to EZH. FAS 76 (in effect in 1997) and its successor FAS 125 provide that these funds belong to EZH, since these funds are intended to be used to pay EZH's obligations." The defendant's expert, Mr. Bent, agreed and testified that he had "no doubt" that the transaction documents created "enforceable obligations,"

including obligations that EZH pay sublease rent, which are satisfied by payments that come out of various Defeasance Accounts and that, therefore, a transfer of wealth occurs between CEL Trust and EZH. Defendant's expert, Mr. Ray, agreed that the funds in the Sublease Deposit belong to EZH. EZH did not use the Facility "rent free," as the defendant asserts, but rather, was required to pay Sublease rent out of funds it held in the Sublease Deposit, and was primarily liable for the payment of this rent, since the Sublease was written as a "hell or high water lease." [29] Because EZH retained primary liability on the Sublease rent owed to CEL Trust, and because EZH used the funds in the Sublease Deposit to satisfy its Sublease rental obligations, these funds are treated as EZH's funds for both accounting and tax purposes. EZH had a real obligation to pay Sublease Rent to CEL Trust, and the funds from those payments came from an account owned by EZH, which diminished EZH's assets.[30]

The defendant argues that the "circular financing arrangement from a defeased account ensures that the sublease rent and HBU Loan are paid at no cost to either EZH or CED and virtually eliminates risk of loss on the Transaction (except tax risks)." Stated somewhat otherwise by the defendant:

> The United States does not argue that a defeasance account extinguishes liability of the owner. [R]ather, the United States' contents [sic] that the combination of the defeasance accounts and the letter of credit eliminates risk to CED that it would not receive its initial investment and expected return on the transaction. Without the risk, CED cannot be considered a current leasehold owner with benefits and burdens, whose equity investment is exposed to market conditions or credit.

The defendant's arguments regarding the impact of Defeasance Accounts do not ad-

---

29. Defendant's expert, Mr. Bent, testified that a "hell or high water lease" is a lease under which "the obligor, the sublessee in this case, is obligated to pay rent regardless of any other circumstances with no offsets, no contingencies, no other factors that would prevent it from paying rent."

30. Mr. Bent also testified, "... if your question is when EZH owes sublease rent under the sublease to the sublessor, Con Ed, and that rent is paid in cash from the debt defeasance account, and is credited as a payment of sublease rent, which is, in fact, paid to HBU to pay down the leveraged loan, my answer to your question would be, yes, that is correct."

dress the whole picture of the RoCa3 Transaction, as discussed throughout this opinion. Moreover, even the defendant, in its briefing to the court, seems to acknowledge the existence of some credit risk on the plaintiff's part. The defendant states:

the United States is not arguing that the use of defeasance accounts to mitigate some aspects of the risk a legitimate lessee may face from entering a transaction is improper, or that a lessee cannot have any credit protection against a default, it is use of these specific defeasance accounts, which fully defease EZH's obligations in this case and virtually eliminate credit risk that the United States challenges.

The Defeasance Accounts as part of the Transaction to reduce credit risk, in and of themselves, do not defeat true lease status. In fact, the defendant, in its brief, concedes that the existence of Defeasance Accounts in a LILO transaction is not automatically disqualifying for an interest deduction. The Transaction must be viewed in its entirety. The Transaction, as it was put into place by the parties, consisted of three possible scenarios, none of which was certain to occur after the initial lease term: the Sublease Purchase Option, exercised by EZH, or the Sublease Renewal Option or Retention Option, either of which could be exercised by the plaintiff. Contrary to the defendant's assertion that "it [plaintiff] knew that EZH would exercise the Sublease Purchase Option and the transaction would end without ever reaching those claimed residual periods," there was no guarantee to that effect in December 1997, when the Transaction was consummated. Moreover, although the risk of failure with the available defeasance mechanisms is minimized, given their relatively conservative nature, the volatility of worldwide economic conditions, including among lending institutions, even well-rated banks, means that the risk is not totally eliminated. In the event that the Defeasance Accounts do fail, the distinct possibility exists that EZH or its successor-owner might not be able to make payments from its own funds, given the unpredictability of the utility industry, the volatile cost of natural resources and the unpredictable actions of governments, including the responses of energy and regulatory bodies.[31]

Under the Retention Option, EZH returns its Sublease Interest to CEL Trust on January 2, 2018. At that point, CEL Trust would be able to take possession of the Facility and have it operated at its own expense, or find another operator, receiving a proportional 47.47% share of output from the Facility, while also paying a proportional share of expenses, for a potential profit opportunity. Although some of those reviewing the RoCa3 Transaction may not have focused pre-transaction energies on the Retention Option Period, the Deloitte Report commissioned by the plaintiff did suggest that the Retention Option was a likely option. Moreover, the Transaction documents all address the possible eventuality of a Retention Option Period, including a structure to define the relationships if the Retention Option is triggered. There also is risk for plaintiff that, if EZH does not exercise the Sublease Purchase Option, CEL Trust remains obligated to pay the $831,525,734.00 Final Basic Rent Payment, although certain types of offsetting accounts could be created to cover the obligation, if those accounts are able to generate sufficient funds, including sufficient interest rates, from the date funded until February 24, 2041.

Considering the RoCa3 Transaction as a whole, including the terms of the Transaction documents and the facts and surrounding circumstances testified to at trial, at the time of the Transaction, there was no certainty that the Sublease Purchase Option would be exercised. Exercise of any of the available Options had the potential for both benefits and burdens for plaintiff as a party holding a leasehold ownership interest in the RoCa3 Facility. Depending on which Option was exercised, and how and when, the RoCa3 Transaction offered benefits by way of profit potential in varying amounts, as well as other potential business benefits, including the opportunity to gain technical and regulatory

---

**31.** As noted earlier, although not apparently contemplated at the time of the Transaction, the Joint Stipulations of Facts submitted by the parties indicates that 100% ownership of EZH has been acquired by a German company through acquisition and merger.

expertise, establish a presence in a Western European market, and improve environmental knowledge and sensitivity. The financing arrangement is only part of the whole picture. There also existed risks, including risks to plaintiff from the RoCa3 Transaction, for example, in the event of a default on the part of EZH, fluctuations in currency, fluctuations in the cost of energy, domestic and Dutch regulatory risks, and risks associated with the functioning and maintenance of the Facility. Not surprisingly, plaintiff attempted to minimize its risks, financial and otherwise, while also trying to achieve multiple goals, albeit in an uncertain business environment.

 Having determined that the RoCa3 Transaction has substance by way of a lease in which the plaintiff had the benefits and burdens of a leasehold interest as a result of the RoCa3 Transaction, the court proceeds to examine the economic substance of the Transaction. If a transaction was shaped by motives other than, or even in addition to, tax avoidance, the court need not necessarily disregard the transaction for tax purposes, so long as the tax avoidance motives were legally permissible. *Gregory v. Helvering,* 293 U.S. at 469, 55 S.Ct. 266 (Noting that taxpayers have the legal right to decrease or avoid taxes by legally permissible means); *see also Frank Lyon Co. v. United States,* 435 U.S. at 584, 98 S.Ct. 1291 (Noting that a transaction must not be "shaped solely by tax-avoidance features"); *Jade Trading, LLC v. United States,* 80 Fed. Cl. at 48 ("The objective economic substance test requires that a taxpayer prove that a transaction had a 'realistic financial benefit' beyond tax avoidance." (quoting *Coltec Indus., Inc. v. United States,* 454 F.3d at 1356 n. 16) (quoting *Rothschild v. United States,* 407 F.2d at 411) (citing *ACM P'ship v. Comm'r,* 157 F.3d at 251)). "More precisely, the economic substance inquiry requires an objective determination of whether a reasonable possibility of profit from the transaction existed, exclusive of tax benefits." *Jade Trading v. United States,* 80 Fed.Cl. at 48 (citing *Coltec Indus., Inc. v. United States,* 454 F.3d at 1356); *see also Black & Decker Corp. v. United States,* 436 F.3d at 441 ("[O]ur inquiry is directed to the same ques-

tion: whether the transaction contained economic substance aside from the tax consequences." (quoting *Hines v. United States,* 912 F.2d 736, 739 (4th Cir.1990)); *Rice's Toyota World, Inc. v. Comm'r,* 752 F.2d at 91) (Finding as part of the test of a sham transaction, "that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction").

During the trial, representatives from Con Ed, including Eugene McGrath, Kevin Burke, Mary Jane McCartney, Charles Muoio and Brian DePlautt, all testified as to the intent of the plaintiff in entering the RoCa3 Transaction. Among the non-tax reasons discussed as Con Ed's considerations for entering into the Transaction were: the ability to pursue new opportunities and alternatives in a deregulated market; the expectation of making a pretax profit through the RoCa3 Transaction; plaintiff's entry into Western European energy markets; the potential for benefits from the output of the RoCa3 Facility due to the life of the plant beyond the Sublease Basic Term; technical benefits to Con Ed of operating a state of the art plant in its own field of expertise; the ability to further develop and share Con Ed's own cutting edge technology; and environmental benefits, including gaining expertise, while involved with a world-class, environmentally friendly plant and improving plaintiff's environmental public image.

A fundamental goal, given its public ownership, was for Con Ed to engage in projects that would generate a profit for the company. Mary Jane McCartney served as the Chairman of the Board of the development company GDI/CED from 1997 through 1999, and continued for some period of time on the Board following her chairmanship. She offered a description of CED's project screening process to determine whether a project would satisfy CED's need to "[g]enerate opportunities that will meet or exceed our targeted return on investment." Ms. McCartney explained that CED identified investments in its "core competency so that we could use what we knew in making those investments.... And our competency was running energy infrastructure, running distribution systems, running power plants,

running control rooms, running information systems that had to do with the utility business." Ms. McCartney explained that the plaintiff hoped to gain additional experience in infrastructure projects and also to improve Con Ed's environmental image. According to Ms. McCartney, the company viewed the potential market as beyond New York City and Westchester, as broadly as the "whole world."

Regarding its profit expectation, Ms. McCartney testified that GDI/CED was interested in:

> making investments, some somewhat riskier than running a utility in the United States. So we certainly wanted our earnings to be at least as good and probably better than what we were earning on our U.S. infrastructure.

Kevin Burke, at the time of the trial, Chairman, Chief Executive Officer and President of CEI, and a Con Ed employee for over 34 years, was the Vice President of Corporate Planning for Con Ed from 1993–1998, and during the time of the RoCa3 Transaction. Mr. Burke was involved with planning Con Ed's response to deregulation and the creation of the development company. Mr. Burke testified that the business activities of the development company were primarily focused on energy infrastructure facilities, either power plants or utility distribution systems in various parts of the world, in direct or indirect ownership, including investment in funds and leases. Regarding the investments involving leases the development company contemplated or entered following deregulation, Mr. Burke stated:

> A. [T]he ones [leases] that I described, which included the power plant or in the other case it was a gas distribution system were directly related to our core competencies. We have been operating power plants for over a hundred years. And gas distribution systems from the 1820s on. So that was a long time, too.
>
> Q. With regard to all of the investments you have described, Mr. Burke, could you please elaborate on whether those investments were related or unrelated to each other?

> A. Well, they were all related to each other in the context of we're trying to grow CED to help grow the earnings of the company. I had mentioned yesterday that with the divestiture, or pending divestiture at this time, of our power plants, the earnings, the ability to earn money on those assets would go away, and the earnings would go down and companies were always looking for ways to grow their earnings, too.

Eugene McGrath, Chairman and Chief Executive Officer of CEI and CEO at the time of the RoCa3 Transaction, testified that Con Ed sought to "[g]enerate opportunities that will meet or exceed our targeted return on investment." He continued:

> A. Well, we wanted to get a return on our investment.
>
> . . .
>
> A. We wanted to generate opportunities or create opportunities that would meet some targeted return on investment.

Mr. McGrath testified that "earnings were important in any project we went into," including in the pre-Transaction analysis of the RoCa3 Transaction. Mr. McGrath also indicated:

> A. That we—before we entered this, as I read this, that we wanted to make sure we had the expertise and familiar [sic] with the technology to provide whatever the business product or service was.

Moreover, recounting the events of a shareholders meeting, Mr. McGrath read from the transcript of the meeting into the record:

> A. Well, first off, we are going to stay very close to what we know. We are not going to get into businesses of what we don't know. . . . As part of restructure, two of the businesses we know very well, customer service and energy supply, are being turned over to the unregulated competitive marketplace. So for us to stay in that business, which we know very well and we have been in for over 100 years, we need to setup subsidiaries that will compete in the unregulated competitive marketplace for those business. And they'll be the primary areas that the holding company will

setup subsidiaries in the holding company. So we need to do that to stay in the kind of businesses that we are in that are no longer a part of the regulated business, and that will be the bulk of—initially at least—what we get into.

Q. You used the phrase: We are going to stay very close to what we know.

A. Yes.

Q. What were you trying to convey by that?

A. I'm trying to convey that we are not going to use this opportunity to go out and do—go into all brave new worlds that we had no real expertise in. So they could understand that we—what we were doing with their investment. We were going to stay very close to what we knew, what we had been doing for 100 years. We weren't going to go out and run airlines or something.

Q. What was that expertise you had?

A. The expertise of designing, building, operating all aspects of energy from its supply to its end use.

Mr. McGrath also testified on the Leasing White Paper memorandum addressed to him from Mary Jane McCartney, titled "Additional Investment in Consolidated Edison Development, Inc.," which indicated: "CED's strategy will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings."

Thus, from the testimony of the leadership of the plaintiff, as supported by documents in the record of top management meetings discussing the RoCa3 Transaction, there existed a profit motivation, and a conservative approach on the part of management to make investments in the company's field of expertise and in relatively safe environments.

Another goal management hoped to achieve with the Transaction was front-loaded income and near term earnings. Joan Freilich served as Comptroller and CFO of Con Ed, as a Board member of both CEI and Con Ed, Vice Chairman of CEI, and as a Board member of the development company (GDI/CED) from its inception until 1998.

She testified how Con Ed sought to fill the projected gap in company earnings after deregulation. She stated that Con Ed formed a number of subsidiaries, including GDI/CED, to attain these goals. Leasing was one of the means considered and utilized to help grow the business after deregulation, because:

A. Leasing provided a way of acquiring assets that would—that were more likely to close, although we did work on several leases that did not close, but they were—although it would take some months to conclude a major lease, it was generally less time. And also then the leases would provide income and, in particular, the leases that we entered into would provide front-loaded earnings and very predictable earnings.

Ms. Freilich, discussing an exhibit in the record, which she testified was created "to be used to present a proposed business plan for Gramercy Development," explained that "front loaded income profile" means:

A. It means the earnings on the lease are relatively higher in the early years of that project, so in a relatively short term, the company is able to recognize earnings.

Q. What if any advantage did such front loaded earnings have to Con Edison and CED?

A. Because we were divesting our generating plants, and as I mentioned, that meant giving up about 20 percent of our earning assets. The front loaded earnings were a way of stabilizing the earnings picture or helping to stabilize the earnings picture for the company in the shorter term and making up for some of that earnings gap.

Ms. Freilich also explained the use of leveraged lease accounting as follows:

A. What the financial accounting standard board specifies, it is a way of allocating the cash flows from the investment to the investment and to income, so it specifies how the—a portion of the cash flows would be applied to the company's investments where the company is recovering its investment initially, and also to net income. And net income is recognized only in the

years in which the investment is positive. This is why the investment starts at a high level, income is higher and as the investment initially is written down, the income declines as well.

In addition, Ms. Freilich described the interrelationship of the front-loaded earnings available from the Transaction and the tax benefits of the Transaction, as follows:

Q. And is it correct you testified on direct that front-loaded earnings is one of the main reasons that Con Ed entered into this transaction?

A. Yes.

Q. And isn't it true that this transaction would not have had the front-loaded earnings without the tax benefits?

A. That's correct.

Q. Okay. And have you heard the term hurdle rate?

A. Yes.

Q. And what does that mean?

A. Generally for a specific project, a hurdle rate is the minimum return that makes the project acceptable.

Q. Okay. And is it true that the EZH transaction would not have met the hurdle rate without the tax savings?

A. The EZH transaction would not have met the hurdle rate without the pattern of tax—taxes, the timing of the tax savings and payments.

Ms. Freilich, however, also added:

Q. Perhaps you can follow that up. Is the tax benefit in the transaction, is it a permanent tax benefit over the course of the transaction?

A. No. The tax benefit in this transaction is timing. The company pays the same taxes on its income that it would if the income—it pays at the statutory rate on the income, which is about 35 percent. But the deductions for the lease investment are accelerated, similar to accelerated depreciation, where, in order to encourage investment, the government provides for accelerated depreciation, better cash flows in the early years of the project. But later on, those amounts are paid back, in effect, and paid to the government.

Similar to the explanations of many of the other Con Ed witnesses for the plaintiff, pursuing alternative forms of profit-making in a newly deregulated market was a significant goal of the company. Ms. McCartney explained that leasing was attractive because:

A. There were several reasons. Leasing provided front end or near term or very soon after you closed the deal earnings, which we very much needed. We were expecting to lose money for the first couple of years. They provided a rate of return that exceeded our rate of return in the regulated company.

Brian DePlautt, from 1997 to 2003, Vice President and, later, CFO of the development company, testified that his role was "to find opportunities for the company to create earnings and returns in the deregulated environment." He indicated that the development company was directed by Con Ed management to primarily pursue opportunities within its energy related "core competencies." He was responsible for the RoCa3 Transaction, under the supervision of Charles Muoio. During questioning at trial, Mr. DePlautt addressed the development company's consideration of the advantages and disadvantages of leasing transactions, and the use of leveraged lease accounting principles. Among the advantages discussed, were the following:

Q. The first line under advantages says, near term closings. Can you explain what that means?

A. That meant we would be able to close the deals pretty quickly.

Q. Approximately how long?

A. [I]nside a year, maybe inside six months.

Q. All right. And then the next line says, immediate earnings. What does that mean?

A. That meant that these transactions generated earnings pretty much right off the bat, once you closed them.

Q. The next line says, front loaded earnings profile. Would you please explain that?

A. That meant that the earnings were— they had a utility-style earnings profile,

you would start on a high basis with constant rate of return, so you start right away and the earnings are higher as the basis—before the basis declines.

Q. All right. The next line says, vehicle to provide early year earnings "cover" for unregulated startups. Would you explain what that meant?

A. That meant that while the—that meant that these—investing in these structures would provide the opportunity to generate earnings here on these transactions, while the other transactions, typically IPP developments, which earn cash during the development phase, don't make any money during construction, and then eventually start eking out a little bit of earnings in the early years, got up to speed.

Q. The final line says, "efficient reduction of Holdco [holding company] tax obligations." Can you explain what that means?

A. That meant that these structures had the opportunity to use—to offset—to generate in some instances tax losses, which would reduce the obligations of the parent corp. on a consolidated basis.

The tax advantages that the plaintiff could derive from the RoCa3 Transaction are undisputed by either party. However, understanding that a transaction would produce tax benefits, in addition to non-tax benefits, is not dispositive regarding the validity of the economic substance of the Transaction. Under the relevant statutes, regulations and precedent at the time of the RoCa3 Transaction, deductions emanating from a LILO transaction were not automatically excluded. The relevant business motives and the risks and benefits of the particular transaction at issue must be examined to determine the validity of the deductions. With respect to the RoCa3 Transaction, tax benefits were only one of the multiple motivations which contributed to the plaintiff's decision to enter the RoCa3 Transaction. Mr. McGrath testified:

A. Well, every transaction has—pretty much every transaction has taxes associated with it. So we wanted to be sure we dealt with that appropriately. We were, I think at that time, we were the largest taxpayer in the State of New York, so we knew, you know, taxes were important. . . .

In an attempt to undermine Mr. McGrath's testimony and the plaintiff's position, the defendant drew attention to a report of a statement by Con Ed management included in the minutes of a joint meeting of the Board of Trustees and the Finance and Budget and Contracts Committees of Consolidated Edison Company of New York, on October 28, 1997: "Several utilities have engaged in these cross-border leases as a strategy to reduce tax payments[.]" Although that assertion, as part of a briefing, may have occurred, it was a general comment, which was not a major part of the discussion, and does not demonstrate that the plaintiff's sole motive in the RoCa3 Transaction was to gain tax advantages. Mr. McGrath could not even recall any discussion on point. Moreover, to engage in a lease transaction as a strategy, among other goals, also to reduce tax payments, does not cause this court necessarily to find the RoCa3 Transaction to be without economic substance. As discussed above, in order to pass the economic substance test, a taxpayer's subjective intent to enter into a transaction may be based, in part, upon tax benefits, if it also is based upon other business motives and the transaction has economic substance.

Among additional witnesses examined by defendant's counsel about Con Ed's motivations in entering the RoCa3 Transaction, Brian DePlautt was questioned on the issue of tax advantages of the Transaction. The defendant called Mr. DePlautt's attention to a Con Ed briefing memorandum, dated October 23, 1997, which included the following language:

The benefits CED would derive from the [RoCa3] transaction would include the following:

(A) Tax benefits from the deductions of allocated Head Lease Rent.

(B) Tax benefits from the interest deductions taken (derived from the interest paid on the non-recourse debt).

(C) Actual cash-on-cash return of investment and profit received at the end of the term on the Sublease Agreement.

Defendant's counsel then asked a series of questions related to the memorandum:

Q. Now I would like to go to page 07647. This is 11. It says, "the benefits CED would derive from the transaction would include the following." [Paragraph] A says, "tax benefits from the deductions of allocated head lease rent." Can you explain that?

A. It was meant to convey that the rent that was paid would be deductible.

Q. By—

A. Paid by the trust.

Q. All right. [Paragraph] B says, "tax benefits from the interest deductions taken (derived from the interest paid on the non-recourse debt.)" Can you just explain that?

A. That was also an indication, I was trying to explain where other elements of the deductions were coming from. So we have an expense called rent and we have an expense called interest and this was describing that.

Q. Okay. And [Paragraph] C says, "actual cash-on-cash return of investment and profit received at the end of the term of the sublease agreement." Again, can you explain what that means?

A. That was to show that, in addition to the tax benefits, we were getting cash, cash on the deal, cash from the transaction.

Q. And can you explain what you mean by cash on the transaction?

A. The receipt of monies.

Therefore, although Mr. DePlautt acknowledged possible tax benefits, even this memorandum and his testimony contemplated the ultimate profit motive in the Transaction. Although throughout the trial, defendant's attorneys vigorously cross-examined the plaintiff's corporate witnesses in an attempt to extract a concession that the plaintiff had entered the RoCa3 Transaction solely for the potential tax benefits, the defendant was unable to demonstrate that senior management were solely motivated by tax consequences. Not surprisingly, nowhere in the record is there a statement by Con Ed or the development company's senior management that their primary or only goal was tax avoidance. To the contrary, the testimony establishes that there were numerous additional business purposes for management to consider entering the RoCa3 Transaction. After hearing and reviewing the testimony of the Con Ed senior management witnesses, the court is persuaded that, although the benefits of the Transaction included possible tax advantages, tax avoidance was not the "sole subjective motivation" for engaging in the RoCa3 Transaction. *See Coltec Indus., Inc. v. United States,* 454 F.3d at 1355.

Con Ed management and development company employees engaged in a deliberate evaluation of the many benefits and risks of entering the RoCa3 Transaction, including the location and the attributes of projects in which the company and its subsidiaries should engage, leading ultimately to the RoCa3 Transaction. For example, the plaintiff considered the effects of deregulation on the industry, domestically and internationally, company earnings and profits, entry into foreign markets, further development of industry expertise, including management and equipment expertise, and environmental image and expertise. The plaintiff also evaluated and considered the potential tax benefits of the Transaction. Corporations and individuals engage in tax minimization each and every tax year, which does not automatically invalidate deductions claimed by a taxpayer, including this plaintiff. Moreover, the plaintiff sought and received advice from outside tax counsel, as well as a variety of other experts, prior to entering into the RoCa3 Transaction. Project briefing memoranda included detailed descriptions and analyses of benefits and risks. The deliberateness of Con Ed's due diligence involving engineering, accounting, financial investment, environmental and legal advice, as well as internal company analyses, and presentations to senior management, convince the court that the subjective intent of Con Ed's management was broader than just to take advantage of available tax deductions.

The court recognizes that, although of interest, pursuant to the *Coltec* test, "subjective views of [company] executives ... are insufficient to establish economic sub-

stance.... [E]conomic substance is measured from an objective, reasonable viewpoint, not by the subjective views of the taxpayer's corporate officers." *Coltec Indus., Inc. v. United States,* 454 F.3d at 1359. From the record, it appears that Con Ed corporate officers understood that many aspects of the RoCa3 Transaction, not just possible tax implications, needed to be carefully analyzed and reviewed before committing company resources to the Transaction. Moreover, company management understood the business opportunities, including direct monetary, profit opportunities, financial benefits, as well as the more indirect financial benefits, including two-way technology transfer, environmental image-building, corporate education, expansion of Con Ed's presence into new, stable markets, with future potential for more of the same, in a newly deregulated worldwide industry. Each of these aspects, and others, of the RoCa3 Transaction were of value to Con Ed. But for investment in the RoCa3 Transaction, similar acquisition of the technology transfer, environmental knowledge, improved image-building, and expansion into new markets, would have triggered costs for Con Ed, which the company otherwise would have had to pay, in order to achieve these same goals. The ability to derive these benefits from the RoCa3 Transaction added to the ultimate profits and benefits to be derived from the RoCa3 Transaction. These benefits, in addition to plaintiff's profit expectations, contribute to the economic substance of the Transaction.

Given the deregulation that had occurred in New York State and was occurring internationally, in a trans-global market, Con Ed, through CED, sought to create near term earnings to offset projected losses and to diversify its holdings, while developing a presence in energy markets around the world, including entry into Western Europe. The Netherlands, a stable country in which the investment and potential profit would be safe, with a predictable political and legal system, contributed to the attractiveness of the RoCa3 Transaction. In deciding to expand into international markets, the development company engaged in a domestic and international screening process, during which it reviewed possible investment opportunities. Ms. McCartney testified that leasing investment opportunities "gave us entry into countries that we had not yet done business in." Based on those investigations, the development company decided to enter the RoCa3 Transaction, in accordance with its overall business goals and purposes, in a manner responsible to its shareholders. Contingent upon obtaining sufficient information, including from the companies plaintiff hired to assist in the conduct of its due diligence investigations, the plaintiff identified the opportunity for the RoCa3 Facility to give Con Ed access to, and knowledge about, the Dutch energy market in a state of the art facility. CED also anticipated that its participation in the RoCa3 Transaction would allow it to gain the information needed to pursue future, additional transactions and investments in The Netherlands and in other Western European countries.

Mr. Muoio, who worked in the corporate planning group of Con Ed and eventually became the President and Chief Executive Officer of CED, testified at trial as to the level of risk the development company was willing to undertake:

A. Again, it is a function of the market. Western Europe was a lot slower, and still is in deregulating. So, again, it is a question of what the market is going to allow you to do. Certainly England had partially deregulated before, and there was some discussion about Ireland and Belgium possibly deregulating. So, it is, again, what the market allows you to do.

Q. Would you have considered investments besides leasing in The Netherlands?

A. In any Western European countries, yes, if the opportunity presented itself, we would take a hard look at it.

Q. And why is that?

A. We felt very comfortable, when you think about the risk/return profile, one of the things we concluded, even before I left Hydra–Co Enterprises, was that the market was so competitive, there really wasn't a country risk allowed. So you could invest in a combined cycle plant in New York or in Peru or in Western Europe, and there was no difference in what the market

allowed you as far as return, even though the currency and economy and regulatory risk could be vastly different. So we were always seeking countries that we were exceptionally comfortable with that were essentially predictable.

. . .

Q. Did you ever form any opinions about doing business in The Netherlands?

A. Yes. We actually had a process that we had to go through to look at risk premium for doing business in a particular country. And following our process, it was actually less risky than the U.S. We certainly didn't recommend a negative risk premium for The Netherlands, but it is certainly a country that you could be very comfortable with the political and regulatory and court system.

Former Chief Executive Officer of CEI Eugene McGrath similarly indicated that, through Con Ed's unregulated subsidiaries, "[b]asically we were trying to take our knowledge and expertise and go out and compete in this world. And to the extent we were successful, we would be able to grow those businesses."

Mr. McGrath defined his deliberate growth philosophy and how it differed from that of some other utilities during the early period of deregulation, when utilities were restructuring their businesses:

A. Because at the end of the day . . . I felt, personally, a responsibility . . . for the energy supply for New York, for New York City. And I wanted to be sure, at the end of the day, we didn't do anything in this restructuring that jeopardized that. I also, as chairman of the company, was interested in continuing to have the ability to grow our company.

So we watched carefully to . . . try to make sure that nothing prevented those two things.

Q. Were you familiar with the activities of other utilities were pursuing at this time?

A. Yes. Other utilities had gone pretty far afield. Sometime utilities, you know, bought horse farms in Argentina or air-lines or—. . . bought power plants—bought utility properties in Australia, Great Britain. So there was a whole—timberlands. There was a whole slew of activities going on.

Q. What, if any, lessons did you learn from your monitoring the activities of other utilities?

A. Stay close to your knitting.

Mr. McGrath described Con Ed's development activities in the United States, in states other than New York, as well as outside the United States, including in England, Guatemala, China, The Netherlands and Australia. Mr. McGrath detailed how "making this investment in Holland would help Con Edison in its strategies" for development and entry into the European electricity market:

A. Well, it was consistent with what I said at the shareholder meeting there, that we were staying close to what we knew. That we were expanding outside our service territory. One of the issues we had, you know, being—being in the same small service territory, small in geographic area, is we don't—didn't know how the rest of the world dealt with regulation and how governments interacted around the world. And they're different all over the world. So part of what we needed to know and what we learned, for example, in Australia was very interesting, and also in the United Kingdom. We learned how things are done differently in different areas. And China was different from everybody else. But we needed to learn that to, first off, to learn how to work in those various areas. And Europe we were looking at also. But, also, to learn what's good and what's bad about regulation and what we might learn from how others did it and see if we could influence changes, changes here.

Mr. McGrath also testified regarding screening criteria for the target market, including:

Q. The first item is political stability.

A. Yes.

Q. Can you comment on the relevance of that, please?

A. We were looking around the world, going to look around the world. And we

wanted to make sure that we were considering doing business only in those countries that we considered politically stable.

Q. Can you relate that, if at all, to the EZH investment made?

A. Well, Europe would be considered politically stable. The Netherlands, politically stable. As opposed to, at this point in time, there were rebellions in Africa and things like that where—areas we probably wouldn't want to be in.

As to the goal that investment transactions take place in "developed countries," with "stable economies" and "stable political environments," Mr. McGrath explained: "[w]e didn't want to add additional risk of the plant being taken over or burned down or disallowed or something." Unlike participants in many of the other LILO transactions taking place around the world during the same time period as the RoCa3 Transaction, Con Ed, through the development company, sought to partner with an established facility, in a stable country, in an industry in which it had extensive expertise and could gain additional expertise and business benefits.

Likewise, Kevin Burke testified that following deregulation, there was a competitive market and a lot of opportunities. He stated:

A. I think there were significant business growth opportunities. The demand for electricity in the world was continuing to grow. There were, you know, some countries that would have prevalence being able to fund the power plants that needed to be developed. And we were also looking at technical services because as the utilities around the world grew significantly, they came to Con Edison on occasion and were looking for advice on how to run densely populated, you know, electricity systems in densely populated urban areas, so there were a lot of opportunities. And a lot of the opportunities came out of the proceedings that were going on elsewhere in the world and the country, similar to the competitive opportunities proceeding.

He also commented:

A. Con Edison Development was trying to grow its business. If it grew its business successfully, then the earnings for Con Edison Development and CEI would grow. And one way of growing the earnings is to make investments, but also make investments that hopefully will lead you to other investments. And we were trying—that's part of what we were trying to do at this point in time, because at this point in time, CED was a new company that was trying to get its name out there.

Q. Okay. And hopefully, you just mentioned, hopefully leading to new projects, I believe you said that?

A. Leading to other projects, that's correct.

Q. So you believe that's a benefit of the EZH transaction.

A. I believe that was a benefit of the EZH transaction and other transactions, too.

Q. Okay. And do you know if Con Edison was looking for any potential opportunities in The Netherlands, other than lease transactions?

A. I don't know if we were looking for other transactions in The Netherlands, but we were looking for other transactions in other parts of the world and being active in the area would help develop those transactions.

With respect to the development company's reasons for pursuing international investments, Ms. McCartney testified that:

A. For many reasons, a lot of utilities were investing internationally. And, frankly, we had to—we would be asked by the financial analysts and the rating agencies, you know, what we were doing on the unregulated front. And there was an expectation, I think, that we invest internationally, as others had. And it was exciting to us. It was the way we wanted to replace our lost income from the plants.

Q. And could you explain why CED was interested in Europe, as you've mentioned previously?

A. Well, Europe was undergoing the kind of regulatory change that was happening in the United States. So there were going to be opportunities for power plants and

transmission lines and energy trading that had not existed before.

Ms. McCartney also stated:

A. And the energy markets in Europe were opening up. So output from this plant could conceivably be sold into a power pool the way we do in New England and New York and New Jersey and Maryland. So it was our entrée into the European energy market. It was the first project that we did in Europe.

Q. And how did CED learn about other countries from this project?

A. Well, we learned about the energy market in The Netherlands. That was our primary learning.

Similarly, Mr. DePlautt testified that his personal opinion regarding lease-leaseback transactions was that these transactions presented "a terrific opportunity to learn, to get into a country, learn about the country's energy market, get paid for doing it, earn money while you are doing it, and potentially participate in a terrific overseas investment market." He also testified that the development company sought to "concentrate on assets familiar to Con Edison," "[b]ecause there would be a potential business benefit from addressing assets that we were familiar with and had knowledge of. We wouldn't be able to bring—corporate wouldn't necessarily be able to bring, you know, any corporate competencies to or familiarity to assets that were not familiar to Con Ed, you know, airplanes."

Moreover, Charles Muoio indicated:

Over the time I spent in corporate planning, we continued my study and their study of what was going on domestically and internationally. And I had concluded and convinced other people within the group that the competitive advantage that we had as a utility going out into the unregulated market was in our understanding of infrastructure in large metropolitan areas, so we wanted to focus in on infrastructure projects, both domestically and internationally as a way of having a competitive advantage.

Yet an additional goal of the plaintiff through the Transaction was to share knowledge and gain expertise as a result of involvement with a state of the art electricity-generating plant, the RoCa3 Facility. Former Chairman McGrath also testified that in investing in leasing transactions, the development company was "focusing on small to medium-sized independent power and cogeneration projects." He described the RoCa3 Facility investment as one in "a state-of-the-art power plant." He testified:

A. Well, it was the latest state of the art in turbine technology and blade materials. It was a good example of environmentally friendly, efficient cogeneration use. And also the fact that they used and harvested the $CO_2$ from the combustion process. These were interesting—very interesting state-of-the-art kinds of things.

Mr. McGrath offered an "assessment of the EZH transaction," as follows:

A. Well, it was one of a group of projects that were part of the initial foray into the competitive world. It—it was good for us to be involved in the state-of-the-art plant. It was important to us that this plant work properly because, you know, if we're about, at this point in time, conveying our reputation as experts in this business to the world, we didn't want to be associated with something that didn't work right. It had the environmental aspect that had the efficient cogeneration aspects that was state of the art. It used equipment that we were familiar with and we wanted to continue to advance. When you buy, for example, a General Electric gas turbine, it comes with a certain set of blades that are made of a certain material, ceramic material or metal. But over time they improve those. We're dealing with very high temperatures, 2—to 3,000–degree temperatures. And any little change can improve efficiency. So we had a whole fleet of these back home, here, too. So it's a whole picture.

Mr. Muoio also indicated that some of the equipment in the RoCa3 Facility was equipment used in the Con Ed domestic system.

Similarly, Ms. McCartney testified that the development company looked for projects that would be "[c]onsistent with its mission of

gaining experience in infrastructure projects." She explained:

> A. Okay. We were just starting out. And we wanted to get to be an investor in international infrastructure projects. We had never really branched out, outside of the US. So we wanted to gain experience and be successful at that outside the US.

According to her testimony, one of the criteria for screening projects in the Gramercy Development 1997 Business Plan was to gain experience in infrastructure projects, "[a]ppropriate technology and/or expertise to provide the products and service." Ms. McCartney continued:

> A. We wanted to use, to the extent we were capable, state-of-the-art technology. So that in our technical services area, for example, we wanted to be able to share the things that Con Edison were doing that were fairly cutting edge.

Ms. McCartney went on to explain that the development company "decided to focus on a strategy of business as being related to core competencies," because:

> A. [T]his was a time when utilities all over the country were investing in a lot of different things, a lot of unregulated things as—as deregulation was coming about. And we saw some utilities investing in things outside their core competencies, like insurance companies or shopping centers, real estate. And we had guidance, really, from Gene McGrath that we wanted to stick to things that we knew. And that was the energy business.

The environmental benefits to be derived by Con Ed as a result of involvement with the RoCa3 plant were not in terms of direct decreases of environmental impacts domestically, such as emissions or discharges; rather, Con Ed indicated that it was seeking to improve its environmental image and to gain expertise to further its ability to conduct company business in a more environmentally friendly fashion. Mr. McGrath testified:

> A. Remember, we were in—I was in this process, and the company was in this process of improving our environmental performance and becoming a much stronger, better, environmentally friendly. And we had come a long way, did a lot of work

over the years and had made a lot of progress on this.

> And this [the RoCa3 project] was an example of an environmentally good project to be associated with.

Mr. McGrath further testified:

> A. Remember, we were attempting to achieve environmental excellence throughout the company. So this was more or less a mantra in the company, that we applied to—attempted to apply to all that we were doing.

Aside from the general goal of environmental consciousness, by way of explanation, Mr. McGrath testified that Con Ed was "under federal probation, the environmental program," which shareholders in the community were aware of, because:

> A. Following the Gramercy steam explosion in 1989, there was a release of asbestos, and there were several fatalities from the explosion. And that asbestos release became a major problem, major issue for the company and demonstrated that our program was not anywhere near where it needed to be. And the courts imposed a probation on—assigned a monitor and put our program on probation, which was lifted years later, after we had turned the program around and made it a good environmental program.

> Q. As chairman, how would you characterize your personal commitment to the environmental track record of Consolidated Edison under your tenure?

> A. Well, the explosion happened just the year before I became chairman. And it was very high on my agenda. It was—it was survival of the company to make sure we—because we couldn't operate in New York City without a good environmental program. We just wouldn't be allowed to operate. So it was a very important issue for the company.

Therefore, Mr. McGrath indicated the development company included environmental excellence as one of its screening criteria for new projects. The RoCa3 Transaction met that criteria. According to Mr. McGrath:

A. And it [the EZH Facility] also had a good environmental benefit for us. Remember this is a point where we're trying to improve our environmental performance in actuality and also our reputation to the public, our environmental program. And this was a good use of energy. Efficient. And it had a byproduct that was good. And it also was part of this expansion into the world. And it put us on the map, if you will, as a company that's interested in doing work around the world. So, you know, for a lot of good reasons.

Mr. McGrath described the benefits of a combined cycle cogeneration plant, such as the EZH Facility:

A. Well, implicit in a gas fired, combined cycle power plant is an environmental message. Because gas—gas is a pure fuel. A lot of coal was burned in Europe. So that's an environmental benefit. Combined cycle is very efficient. Thermal output is a very efficient output. So, yes, environmental is implicit in that.

As an aside, Mr. McGrath noted that the exhaust gases from the boiler were sent to hothouses where the RoCa3 Facility grew tulips.

Mr. Burke also testified, regarding the environmental benefits to Con Ed, as a result of investment in the RoCa3 Facility:

A. Well, if you think of a typical, you know, power plant, most of the electricity in the United States and a good bit in Europe is generated by, you know, burning coal in large boilers, you will wind up with significant air emissions. In this case, this project was burning natural gas in a combined cycle unit which has a higher efficiency, just from the nature of the combined cycle unit. And on top of that, you take the wasted heat and instead of either putting it in a local body of water or into the air, you wind up using that waste heat to heat a number of greenhouses. And on top of that, you take the carbon dioxide and use that carbon dioxide to enter the greenhouses, too, it helps whatever was growing in the greenhouses grow. So instead of increasing the air or water emissions, the design reduced that dramatically. And that was something that we

were concerned about. We would be interested in what's the environmental impact of a project because we have—we're called Consolidated Edison because we consolidated from a lot of different companies. And some companies had projects that they sold before they were even consolidated into the entity that became Con Edison that we're paying to clean up for. So the environmental impacts can be significant and also the reputation of the company. So you would rather be associated with a clean plant than associated with a dirty plant.

Mr. Burke further stated:

A. You know, also Con Ed also has been interested for a long time in doing what it can to help clean up the environment. We stopped burning coal shortly before I got to the company, so it was prior to 1973. And what this indicated was that this plant had a very clean environmental design and operation and should be able to operate very well and not have a significant impact on the environment.

According to Mr. Burke, among the beneficial aspects of the RoCa3 Facility, "[w]hat was a little atypical about it [the power plant] was that it also provided thermal energy, a little bit different but very similar to what we do with our steam system where we send steam out through pipes in the streets of Manhattan to buildings."

Similarly, Ms. McCartney discussed the goal of the development company to "[a]chieve environmental excellence,"

A. Con Edison was in the process of polishing its image with respect to the environment, because we had had an unfortunate experience a few years before, so that we wanted to make sure that our investments in other countries were consistent with what we were trying to do in the United States, which was achieve excellence in the environmental area.

Ms. McCartney asserted that, if an opportunity did not pass the environmental screening criteria, the development company would not have pursued that investment. Ms. McCartney also referred to a portion of the 1997 annual report of CED, distributed to

shareholders to emphasize multiple benefits, including environmental benefits, that were factors in the decision to enter the RoCa3 Transaction:

A. Based in Manhattan's Financial District, Con Edison Development aims to become a leading investor in energy infrastructure projects, including independent power, transmission and distribution systems. The company is poised to benefit from growth in the global market for energy systems and from the trends towards privatization and restructuring that are shaping regulated energy industries in other nations. Initially, Con Edison Development is focusing on small to medium sized independent power and cogeneration projects. In December 1997, Con Edison Development provided capital to a state-of-the-art power plant near Rotterdam in The Netherlands. This plant, recently constructed, uses a unique combined-cycle process to capture the carbon dioxide contained in the plant's exhaust gas. The carbon dioxide is then sold to local greenhouses where it is used to promote the growth of plants, including Holland's famous tulips. This and other design elements make the plant one of the most innovative and environmentally-friendly electric generation facilities in the world.

The subjective views and intent of Con Ed corporate management for entering into the RoCa3 Transaction, while relevant to establishing the non-tax business purpose of the plaintiff, are insufficient on their own to establish the validity of the RoCa3 Transaction for tax purposes. *Coltec Indus., Inc. v. United States,* 454 F.3d at 1359. The defendant argues that the RoCa3 Transaction lacked objective economic substance for federal income tax purposes and, therefore, that plaintiff's claimed deductions must be disallowed. The *Coltec* court's guidance on the objective nature of the test for determining economic substance of a transaction is worth repeating:

the economic substance of a transaction must be viewed objectively rather than subjectively. The Supreme Court cases and our predecessor court's cases have repeatedly looked to the objective economic reality of the transaction in applying the

economic substance doctrine. While the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose, all courts have looked to the objective reality of the transaction is [sic] assessing its economic substance. *See, e.g., Black & Decker [v. United States],* 436 F.3d at 441–42 (noting that economic substance inquiry requires an *"objective* determination of whether a *reasonable* possibility of profit from *the transaction* existed") (internal quotation marks omitted, first two emphases added); *Dow Chem. Co. [v. United States],* 435 F.3d at 599; *In re CM Holdings, Inc. [United States v.],* 301 F.3d [96,] 103 [ (3d Cir.2002) ] (stating that the objective economic substance inquiry is "whether the transaction affected the taxpayer's financial position in any way"); *United Parcel Serv. of Am., Inc. [v. Comm'r],* 254 F.3d [1014,] 1018 [ (11th Cir. 2001) ]; *Rice's Toyota World, Inc. v. Comm'r of Internal Revenue,* 752 F.2d 89, 94 (4th Cir.1985). *Coltec Indus., Inc. v. United States,* 454 F.3d at 1355–56 (emphasis in original; footnote omitted). The *Coltec* court quoted from *Rothschild v. United States,* 186 Ct.Cl. 709, 407 F.2d at 411–12, describing the "historic economic substance analysis," *Coltec Indus., Inc. v. United States,* 454 F.3d at 1356 n. 16, as whether the transaction has realistic financial benefit, and finding that in a transaction which had "neither a possibility nor an opportunity of profit to the taxpayer separate and apart from the tax deduction," the deduction of interest payments should be denied. *Rothschild v. United States,* 186 Ct.Cl. at 721, 724, 407 F.2d at 411, 412.

A significant consideration in determining economic substance is whether the transaction, at the time it was entered into, possessed a reasonable opportunity for economic profit. *See Coltec Indus., Inc. v. United States,* 454 F.3d at 1360. In an economic substance, SILO case, the United States District Court for the Northern District of Ohio wrote:

The relevant inquiry for the Court is not whether the taxpayer's predictions regarding the pretax profits are ultimately proven true, but rather whether the projections of cash flow and residual value are reason-

able at the time at which the taxpayer enters into the transaction. *See, e.g., Levy [v. Comm'r],* 91 T.C. at 858; *Torres [v. Comm'r],* 88 T.C. at 719. The taxpayer generally must only show a reasonably expected, minimal pre-tax profit in order to prove that a transaction has economic substance and is not required to show that its transaction will yield a higher pre-tax return than all other possible investment opportunities.

*AWG Leasing Trust v. United States,* 592 F.Supp.2d at 980; *see also Hines v. United States,* 912 F.2d at 741 (holding that the transaction at issue possessed economic substance because of an expected pretax profit, but denying the deduction because the court found that the sole motive of the plaintiff in entering the transaction was to gain tax benefits, "without any other business purpose").

As discussed above, CED, through CEL Trust, together with EZH, entered into a complex series of financial arrangements in order to effect the RoCa3 Transaction at issue in this case. In addition to the Transaction documents and extensive testimony, there also are numerous diagrams, charts and tables submitted by both parties describing the Transaction. The record establishes how EZH and CED, directly or through CEL Trust, executed a series of agreements, imposing rights and obligations on the parties to the Transaction. In substance, they agree, although there are a few, relatively minor discrepancies regarding dollar values.

Under the Lease Agreement, CEL Trust, as the lessee, is required to pay rent to EZH, the lessor, in two installments. The first installment (the Initial Basic Rent Payment) of $120,112,270.36 was due on the closing date of December 15, 1997, and consisted of CEL Trust's commitment of $39,320,000.00 (Investor's Contribution) and HBU's commitment of $80,792,270.36 (Lender's Contribution). HBU's commitment was in the form of a nonrecourse loan in the amount of $80,792,270.36 at 7.10% interest to CEL Trust, that was to mature on January 2, 2027. The Lease Agreement allocates the Initial Basic Rent Payment to the rent due on the periods ending January 2, 1998, January 2, 1999, January 2, 2000, January 2, 2001,

January 2, 2002, and part of the rental payment due for the rental period ending January 2, 2003. The second installment of rent (the Final Basic Rent Payment) is allocated to the remaining rent periods, including a payment in 2003. To effect the contribution from CEL Trust, on December 15, 1997, Con Ed was to wire $39,320,000.00 to the WTC on behalf of CEL, thereby funding the WTC Account, ROCA Facility Trust No. 2. HBU had on deposit its commitment of $80,792,270.36 to the Initial Basic Rent Payment in the ABN AMRO Account. HBU transferred and assigned its rights in the ABN AMRO Account to CEL Trust. CEL Trust made the Initial Basic Rent Payment by transferring and assigning to EZH both the WTC Account and the ABN AMRO Account.

The Final Basic Rent Payment, in the amount of approximately $831,525,734.00, is due on the Lease Termination Date, February 24, 2041. As noted, the Final Basic Rent Payment is allocated to the remaining rent periods of the Lease Term, including part of 2003 through 2041. If EZH exercises the Sublease Purchase Option, CEL Trust's obligation to pay the Final Basic Rent Payment will be terminated and EZH will pay the Sublease Purchase Option Price of $215,450,949.20, and assume all of CEL Trust's obligations under the Lease. However, if EZH does not exercise the Sublease Purchase Option, and CEL Trust exercises either the Sublease Renewal Option or the Retention Option, CEL Trust will be responsible for the Final Basic Rent Payment on February 24, 2041. The Final Basic Rent Payment is to be financed in a number of different ways, discussed above.

The Sublease Agreement, together with Appendix A of the Participation Agreement, establishes that CEL Trust subleases the undivided 47.47% interest in the RoCa3 Facility for a period of 20.1 years to EZH. Under the Sublease Agreement, EZH, the Sublessee, is to pay CEL Trust, the Sublessor, Sublease Rents on an annual basis for the 20.1 year term of the Sublease. The Sublease Rents are set at the following amounts: $0.00 due on December 15, 1997; $424,960.41 due on January 2, 1998;

$8,999,161.52 due on each January 2 from January 2, 1999 to January 2, 2007; $8,964,978.83 due on January 2, 2008; $7,358,487.86 due on January 2, 2009; $7,362,962.76 due on January 2, 2010; $7,362,950.30 due on January 2, 2011; and $7,362,950.33 due on each January 2 from 2012 to 2018. Under the Lease and Sublease Agreements, CEL Trust's obligation to pay Lease Rent and EZH's obligation to pay Sublease Rent are absolute and unconditional.

The Sublessee Loan Agreement provides that CEL Trust shall lend to EZH the amounts set forth on Schedule A of the Sublessee Loan Agreement, which is, on each stated date, an amount equal to the product of the value of the undivided 47.47% interest multiplied by the applicable percentage under the "Loans" caption on Schedule A, at an interest of 7.43% per annum. This was established because EZH deferred the Sublease Basic Rent Payments from 1998 through a portion of 2004. These deferred rental payments created the principal of the Sublessee Loan, the balance of which accrues interest at a fixed rate of 7.43%. The amounts borrowed by EZH pursuant to the Sublessee Loan Agreement were equal in amount and timing to the Sublease Basic Rent owed to CEL Trust from 1998–2003, and was equal to a portion of the Sublease Basic Rent paid by EZH to CEL Trust in 2004, with the following amounts due: $424,960.41, due on January 2, 1998; $8,999,161.52, due on each January 2, from January 2, 1999 to January 2, 2003; and $669,041.51, due on January 2, 2004. Under the Sublessee Loan Agreement, EZH is required to repay the Sublessee Loan, and the Sublessee Loan cannot be prepaid except as stated in the Operative Documents.

Pursuant to the Participation Agreement, two Security Agreements, referred to as defeasance deposits, were entered into in order to secure EZH's payment obligations under the Sublease and other Operative Documents: the Sublease Deposit (Debt Defeasance Deposit) and the IJssel Deposit (Equity Defeasance Deposit). On December 12, 1997, EZH established the Rotte Foundation to purchase debt instruments, make deposits and grant security interests in its assets to third parties, to secure EZH's payment obligations under the Sublease and other Operative Documents. The Rotte Foundation's payment obligations were limited to the Sublease Deposit. The managing Board of the Rotte Foundation consists of three members, an EZH employee and two trust companies, who appoint the members of the Board. In order to ensure continuity if a Sublease Event of Default were to occur and were to continue, CEL Trust may appoint an additional member to the Board. On the closing date, December 15, 1997, EZH paid the Rotte Foundation the "Sublease Deposit Amount" of $80,792,270.36 by transferring and assigning its rights in the ABN AMRO Account at an interest rate of 7.10%, compounded annually, or 6.98%, compounded semi-annually. In 1997, EZH was a Dutch company for which the functional currency was the Dutch Guilder. The Sublease Agreement, Sublease Deposit, Pledge and Repledge Agreement, and the Rotte Agreement provided that all payments due under the terms of those agreements were to be paid in United States dollars. As security for EZH's rental payment or other payment obligations under the Sublease, the Rotte Foundation granted to CEL Trust a first priority right of pledge in the Sublease Deposit. As security for its obligation to repay the Secured Amounts owed by CEL Trust to HBU, pursuant to the Loan Agreement and Loan Certificates, not in excess of the amount of Sublease Rent required to be paid pursuant to the terms of the Sublease Agreement, CEL Trust repledged the first priority right of pledge to HBU.

CEL Trust assigned to HBU a Lien of the Loan Agreement, including on the Lease Agreement, the Sublease Agreement, all rents, profits, revenues and other income from the property subjected to the Lien of the Loan Agreement, and CEL Trust's right to receive rent from EZH, in order to secure payment on the amounts due under the Loan Certificates issued under the Loan and Security Agreement. Moreover, so long as the Lien of the Loan Agreement had not been discharged, EZH was to pay its Sublease Rent payment obligations directly to HBU. The Sublease Deposit was to be used, to the

extent available, to pay EZH's annual rent obligations to CEL Trust during the Sublease Basic Term, and the scheduled payments made from the Sublease Deposit were calculated to be equal in amount to EZH's Sublease Basic Rent payments for the years 2005 through 2018. In 2004, the Sublease Deposit payments, if and when made, together with the proceeds from the Sublessee Loan, satisfied a portion of EZH's annual rent obligations to CEL Trust during the Sublease Basic Term.

The scheduled withdrawals from the Sublease Deposit were as follows: on each January 2, from January 2, 1998 to January 2, 2003: $0.00; on January 2, 2004: $8,330,120.01; on each January 2, from January 2, 2005 to January 2, 2007: $8,999,161.52; on January 2, 2008: $8,964,978.83; on January 2, 2009: $7,358,487.86; on January 2, 2010: $7,362,962.76; on January 2, 2011: $7,362,950.30; on each January 2 from January 2, 2012 to January 2, 2018: $7,362,950.33; on each January 2, from January 2, 2019 to January 2, 2026: $18,225,000.00; and on January 2, 2027: $14,546,488.00.

ABN AMRO agreed to make certain payments to HBU so long as the Sublease Deposit Pledge and Repledge Agreement exists with respect to the Sublease Deposit, or so long as the Lien of the Loan has not been discharged. If ABN AMRO makes those payment obligations, the remaining payments that ABN AMRO agreed to make at any time will equal the remaining principal and interest payments due on the HBU Loan.

EZH remains liable for all Sublease Obligations, notwithstanding the provisions of the Rotte Agreement. Moreover, if ABN AMRO's rating falls below A2 by Moody's or A by Standard and Poor's, EZH may replace the Sublease Deposit with Acceptable Substitute Credit Protection, at its own option and expense. EZH then would be required to provide CEL Trust and HBU a first priority security interest in such security. Under the terms of the Participation Agreement, EZH would need to arrange for one or more lenders to purchase the Loan Certificates from HBU for a purchase price of at least the principal remaining and any outstanding interest thereon, pursuant to the terms of that

provision. ABN AMRO may not use the Sublease Deposit to set off any amounts or obligations owed to ABN AMRO by HBU, the Rotte Foundation, CEL Trust, or EZH. Likewise, HBU may not use any part of the Sublease Deposit as a setoff against EZH or the Rotte Foundation. Upon termination of the Rotte Agreement, the Rotte Foundation shall transfer all securities held in the Sublease Deposit to EZH, or pay EZH an amount equal to the fair market value of those securities.

On December 12, 1997, EZH also established the IJssel Foundation, to purchase debt instruments, make deposits, and grant security interests in its assets to third parties to secure certain of EZH's payment obligations under the Sublease and other Operative Documents. The IJssel's Foundation's managing Board consists of three members, an EZH employee and two trust companies who appoint the members of the Board. In order to ensure continuity, if a Sublease Event of Default were to occur, and were to continue, CEL Trust may appoint an additional member to the Board. To secure its payment obligations under the Sublease and other Operative Documents, EZH transferred to the IJssel Foundation (also referred to as "Stichting IJssel"), on the day after the closing, December 16, 1997: $31,252,643.73, to be deposited and credited to the "Account," held by Credit Suisse First Boston, and used to purchase United States Government Obligations. The United States Government Obligations were United States Treasury Securities, including Treasury STRIPS. Treasury STRIPS are zero-coupon Treasury bonds with a face value payable at maturity. STRIPS are purchased at a discount from the face value at maturity and promise a fixed-rate of return for the life of the security, called the yield to maturity, i.e., the inherent interest rate. After the purchase and delivery of the United States Government Obligations, the IJssel Deposit contains fixed-rate zero coupon, United States Government Obligations, purchased by Credit Suisse First Boston as Custodian, for each amount of the Equity Portion of the Sublease Basic Rent, if made, and the Equity Portion of the Purchase Option Price, if paid,

with a maturity date prior to the date such amount is due, and with a value at maturity at least equal to such amount. The Treasury STRIPS were expected to mature at the following maturity dates and in the following amounts: November 15, 2011: $5,221,000.00; August 15, 2017: $7,363,000.00; February 15, 2018, May 15, 2018, August 15, 2018, and November 15, 2018: $22,959,000.00.

As stated above, in 1997, EZH was a Dutch company for which the functional currency was the Dutch Guilder, and the Sublease Agreement, Sublease Deposit, Pledge and Repledge Agreement, and the IJssel Agreement provided that all payments under the terms of those Agreements are due to be paid in United States dollars. EZH remains liable for all Payment Obligations, notwithstanding Stichting IJssel's agreement to make payments under the IJssel Agreement. As security for prompt payment of the Secured Obligations, Stichting IJssel granted a first priority security interest in the Credit Suisse First Boston Account, the United States Government Obligations, and any earnings thereon (referred to as the "IJssel Collateral") to EZH and CEL Trust. Wilmington Trust Company on behalf of CEL Trust, as Trustee, was granted a first priority right of pledge in the IJssel Collateral as security for prompt payment when due of all Trustee Secured Obligations. CEL was granted a second priority right of pledge in the IJssel Collateral, as security for prompt payment when due of all EZH and the IJssel's obligations to CEL under the operative documents, subordinated only to CEL Trust's first priority right of pledge in the Collateral. EZH was granted a third priority right of pledge in the IJssel Collateral, subordinated to CEL Trust and CEL's respective rights in the IJssel Collateral, as security for the prompt payment when due of all of the Sublessee Secured Obligations (i.e., all of the IJssel Foundation's obligations to return all monies and securities in the IJssel Deposit, upon termination of the IJssel Agreement). EZH may terminate the IJssel Agreement, and all funds may be transferred to EZH, but not prior to the termination of the Sublease and the Payment Obligation as defined in the IJssel Agreement.

EZH also was required to maintain one or more Letters of Credit in favor of CEL Trust and CEL, for the benefit of CEL Trust and CEL, to secure obligations of EZH to CEL Trust and CEL under the operative documents, including for security in the event of a Sublessee Event of Default. EZH caused such Letters of Credit to be issued.

The various calculations of investments and credits differ depending on which Option is exercised in 2018. Although not certain to occur, as discussed above, if EZH elects the Sublease Purchase Option, the Sublease Purchase Option Price is set at 143.63396613% of the appraised value of the undivided 47.47% interest, at the time of the end of the Sublease Basic Term, appraised at approximately $205 million by Deloitte. The Sublease Purchase Option Price equals $215,450,949.20. If EZH elects the Sublease Purchase Option in 2018, the Sublease Purchase Option Price of $215,450,949.20 can be paid (i) in cash or (ii) $123,615,472.00 in cash, plus the remaining United States Government Obligations from the IJssel Deposit, valued at their respective maturity dates. Under the Sublease Purchase Option, CEL Trust also will receive $7,326,950.33 as the Sublease Basic Rent Payment on January 2, 2018. The IJssel Deposit includes bonds with a maturity value of $7,326,950.33, which mature on January 2, 2018, and which EZH can use to pay the Sublease Basic Rent due on that date. EZH will assume CEL Trust's obligations under the Lease, including the obligation to make the Final Basic Rent Payment, and CEL Trust will transfer the Sublessee Loan to EZH, in accordance with its terms. Moreover, under the Sublease Purchase Option, CEL Trust will make arrangements to pay the remaining balance of the HBU Loan, equal to $123,615,472.00, and HBU will release the Lien on the Lease. EZH may withdraw $123,615,472.00 from the Sublease Deposit under the Sublease Deposit Pledge and Repledge Agreement on January 2, 2018, assuming that ABN AMRO complied with the terms of that agreement. The total amount receivable by CEL Trust, under the Sublease Purchase Option, after the release of the Lien on the Lease, will be $99,162,-427.53.00, which is equal to the final Sublease Basic Rent Payment (taken from the IJssel

Deposit) and the remaining STRIPS from the IJssel Deposit. The scheduled balance of the Sublease Deposit as of January 2, 2018, plus the value of the United States Government Obligations remaining in the IJssel Deposit together would equal the Sublease Purchase Option Price. If EZH exercises the Sublease Purchase Option, ABN AMRO will pay the balance of the Sublease Deposit to HBU. That payment will be credited toward EZH's payment of the Sublease Purchase Option Price to CEL Trust and, in turn, shall be credited toward CEL Trust's payment of its obligations under the HBU Loan. If ABN AMRO has made all the payments it is required to make under the Sublease Deposit to HBU, the HBU Loan will be paid in full. Under the Sublease Purchase Option, CEL Trust will be relieved of the responsibility to make the Final Basic Rent Payment and EZH will owe the Final Basic Rent Payment to itself.

If, however, the Sublease Renewal Option becomes operative, EZH will be required to make the Final Sublease Basic Rent Payment on January 2, 2018 of $7,362,950.33 and will then pay annual rents to CEL Trust, as follows: $18,225,000.00 on each January 2 from January 2, 2019 through January 2, 2034, and $8,251,875.00 on June 15, 2034. EZH also will be obligated to make payments to CEL Trust under the Sublessee Loan, as follows: $37,525,237.00 on January 2, 2018; $9,649,098.00 on January 2, 2032; $12,062,039.00 on January 2, 2033; $9,720,944.00 on January 2, 2034; $5,238,696.00 on June 15, 2034; $5,319,460.00 on January 2, 2035; $1,155,324.00 on January 2, 2036; $93,128,382.00 on January 2, 2041; and $414,931,341.00 on February 24, 2041.

In the event of a reset of the interest rate on the Loan Certificate or its purchase by another lender or the Sublessee, EZH will be obligated to arrange for a reset of the interest rate on the Loan Certificates or its purchase by another lender or the Sublessee. EZH also will be required to maintain an acceptable Letter of Credit, in favor of CEL and CEL Trust, securing its obligations under the Sublease Renewal Option, and EZH will be responsible for paying the fees associated with the maintenance of that Letter of

Credit. The schedule of investments and withdrawals will remain in effect for the Sublease Deposit, and EZH will be permitted to make withdrawals of $7,362,950.33 on January 2, 2018 and $18,225,000.00 on each January 2 from 2019 to 2026, and then $14,546,488.08 in 2027, at which point the Sublease Deposit will be exhausted. Additionally, the Loan and Security Agreement provides that CEL Trust will have continuing nonrecourse debt service payments to make in the amounts of $7,362,950.33 on January 2, 2018, $18,225,000.00 on each January 2, from 2019 to 2026, and payment of $14,546,488.00 on January 2, 2027. CEL Trust also will be required to make the Final Basic Rent Payment of $831,525,734.00 on February 24, 2041. If CEL Trust elects the Sublease Renewal Option, the Lease Agreement provides that CEL shall fund two deposits, the Lease Collateral Deposit and the Trustee Treasury Collateral, to provide collateral for the Final Basic Rent Payment, unless CEL or CEL Trust provides Acceptable Substitute Collateral. As Acceptable Substitute Collateral, CEL or CEL Trust may provide (1) a Letter of Credit, and (2) a first priority security interest in either cash or United States backed securities, or (3) any other collateral that is acceptable to EZH in its sole discretion.

Unless CEL or CEL Trust elects to use Acceptable Substitute Collateral, CEL will make deposits in the Lease Collateral Deposit, with an AA/Aa2 rated financial institution, which will bear a fixed rate of interest and will be available to make scheduled payments. The Lease Collateral Deposit will be pledged to EZH to secure the Final Basic Rent Payment owed it on February 24, 2041. The deposits will equal $3,678,511.92 on January 2, 2027 and $18,225,000.00 on each January 2 from 2028 to and including 2034, and then $8,251,875.00 on June 15, 2034, at which point the Lease Collateral Deposit is scheduled to have a balance of $176,210,292.09. Additionally, unless CEL or CEL Trust elects to use Acceptable Substitute Collateral, CEL will purchase United States Government Obligations on specific dates set forth in the Participation Agreement, with maturity amounts also set forth in the Participation Agreement, with the maturity dates close to,

but not later than, the Lease Termination Date, and will then deposit those United States Government Securities in a custodial account established by CEL, on behalf of CEL Trust, with a security interest in EZH's favor, as security for a portion of CEL Trust's obligation to make the Final Basic Rent Payment. The total amount of the final payment due pursuant to the Sublessee Loan Agreement ($414,931,341.00), plus the amount of the Trustee Treasury Collateral ($141,671,596.40) and the Lease Collateral Deposit would total $831,525,734.00 as of February 24, 2041, assuming that (i) CEL funds the Lease Collateral Deposit and the Trustee Treasury Collateral, and (ii) that CEL is able to earn an interest rate of 6.86% on the Lease Collateral Deposit from June 15, 2034 until February 24, 2041. The payment of the Final Basic Rent Payment of approximately $831,525,734.00 is a recourse liability to CEL Trust, to the extent of $141,671,596.40. This amount would be satisfied by the creation of the Trustee Treasury Collateral, or the Acceptable Substitute Collateral. CEL has a recourse liability to EZH for the remaining portion of the $831,525,734.00 to the extent of amounts, if any, CEL receives from the CEL Trust after the Sublease Basic Termination Date. At the end of the Sublease Renewal Term, CEL Trust may sublease the Facility to another party, to EZH, or it may take possession of the Facility itself, and have it operated at its own expense and for its own benefit for the remainder of the Lease Term (the Shirt–Tail Period).

In the event that CEL Trust exercises the Retention Option in 2018, EZH will return the Sublessee's Lease Interest to CEL Trust on January 2, 2018, and CEL Trust shall make arrangements acceptable to HBU for the payment of the principal amount of all Loan Certificates. If, however, CEL Trust fails to make such arrangements and HBU provides notice of this failure, CEL Trust will be deemed to have elected the Sublease Renewal Option. Under the Retention Option, EZH will be required to maintain an acceptable Letter of Credit in favor of CEL and CEL Trust, securing its obligations under the Sublessee Loan, and will be responsible for paying maintenance fees on the Letter of Credit. The Sublease Deposit, Pledge and Repledge Agreement will be terminated and the Sublease Deposit will come due, permitting EZH withdrawals of $7,362,950.33 on January 2, 2018 and $116,252,521.63 for the balance, at which point the Sublease Deposit will be exhausted. Under the Retention Option, CEL may fund the Trustee Treasury Collateral or the Incremental Collateral Pledge as security for the Final Basic Rent Payment. Alternatively, CEL or CEL Trust may provide Acceptable Substitute Collateral in the form of either (1) a Letter of Credit and (2) a first priority security interest in either cash or United States Government-backed securities, or (3) any other collateral that is acceptable to EZH in its sole discretion. If CEL chooses to fund the Trustee Treasury Collateral, the account would consist of United States Treasury obligations to be purchased on January 2, 2018, with maturities as close to, but not later than, the Lease Termination Date, with a maturity amount of $141,671,496.40. The amount that CEL will need to pay for the necessary collateral on January 2, 2018 will depend on the interest rates prevailing at that time. If CEL chooses to fund the Incremental Collateral Pledge, CEL will enter into a custody arrangement to hold, on behalf of EZH, either United States Government Obligations or other corporate bonds with ratings of at least Aa2 and AA. These deposits will bear a fixed rate of interest determined as of the date funded and will be available to make maturity payments in 2041 in an amount not less than the dollar amount equal to (i) the excess of the Final Basic Rent Payment over (ii) the sum of the Lease Collateral Deposit and Trustee Treasury Collateral maturity at February 24, 2041 and the scheduled payment of the Sublessee Loan, also on the Lease Expiration Date. This deposit will be pledged to EZH to secure the incremental shortfall on the Final Basic Rent Payment owed to it on February 24, 2041.

Under the Retention Option, CEL Trust is entitled to the final Sublease Basic Rent Payment on January 2, 2018. CEL Trust also is entitled to payments from EZH on the Sublessee Loan, as follows: $37,525,237.00 on January 2, 2018; $9,649,098.00 on January 2,

2032; $12,062,039.00 on January 2, 2033; $9,720,944.00 on January 2, 2034; $5,238,696.00 on June 15, 2034; $5,319,460.00 on January 2, 2035; $1,155,324.00 on January 2, 2036; $93,128,382.00 on January 2, 2041; and $414,931,341.00 on February 24, 2041.

Moreover, EZH is entitled to the Final Basic Rent Payment of $831,525,734.00 on February 24, 2041. The total amount of the final payment due pursuant to the Sublessee Loan Agreement ($414,931,341.00), plus the amount of the Lease Collateral Deposit and Trustee Treasury Collateral and the projected value of the Incremental Collateral Pledge, will total $831,525,734.00 as of February 24, 2041, assuming that (i) CEL elects to fund the Incremental Collateral Pledge and the Trustee Treasury Collateral, and (ii) that CEL is able to earn an interest rate of 6.86% on the Incremental Collateral Pledge from the date funded until February 24, 2041. The payment of the Final Basic Rent Payment is a recourse liability of CEL Trust to the extent of $141,671,596.40. This amount would be satisfied by the creation of the Trustee Treasury Collateral if CEL, on behalf of CEL Trust, chooses to create that account. In addition, CEL has a recourse liability to EZH for the remaining portion of the $831,525,734.00 Final Basic Rent Payment, to the extent of amounts, if any, CEL receives from CEL Trust after the Sublease Basic Termination Date.

Objectively, the plaintiff expected a pretax profit under each of the possible Options structured in the Transaction. Admittedly, the potential for profit was greater under some Options than others, however, profit was a realistic, strategic goal on the plaintiff's part when it entered into the RoCa3 Transaction in 1997. In *Emershaw v. Commissioner of Internal Revenue*, the Tax Court stated:

> In order to produce a pretax profit, [plaintiff] must realize shared rent and residual value in excess of ... the amount of its negative cash flow from the sale and lease-back transaction.

*Emershaw v. Comm'r*, T.C.Memo. 1990–246, 59 T.C.M. (CCH) 621, 625 (1990), *aff'd*, 949 F.2d 841 (6th Cir.1991), *reh'g denied* (6th Cir.1992).

While no specific minimum pretax profit has been established for recognizing the economic substance of a leasing transaction, a pretax profit of 3.4% or "more than 3%" has been accepted as sufficient to imbue a transaction with economic substance. *See, e.g., AWG Leasing Trust v. United States*, 592 F.Supp.2d at 980. In the present case, both the plaintiff's leasing expert, Dr. Ellis, and the defendant's leasing experts, Mr. Bent and Mr. Ray, confirmed that pretax yields falling between 2% and 4% of the transaction's value are not uncommon for leasing deals. The court in *AWG* noted that the banks involved in the AWG transaction "typically receive internal rates of return between 2.5% and 3.5%." *Id.* In *AWG Leasing Trust*, even though, as noted earlier, the court held that the transaction would not be respected for tax purposes because the transaction had no valid business purpose other than to gain tax advantages, the court, nonetheless, found that the transaction in that case possessed economic substance because it would run a pretax rate of return of 3.4%, even if the purchase option was exercised. The *AWG* court indicated that a 3.4% pretax profit was sufficient to show that the transaction had some "'practicable economic effects other than the creation of income tax losses.'" *Id.* (quoting *Rose v. Comm'r*, 868 F.2d 851, 853 (6th Cir.1989)).

The formula the plaintiff used to calculate the plaintiff's pretax profits compares CEL Trust's equity investment, plus the direct costs of financing, to the cash flow from rent and residual value. The plaintiff, with the help of outside experts, projected, that if EZH were to exercise the Sublease Purchase Option, the pretax yield, at a minimum, would be 4.44%, which is above the amount cases have previously acknowledged as sufficient pretax profit. The plaintiff asserts that, absent the occurrence of a "Premature Termination," the plaintiff was projected to earn a minimum of approximately $61 million, which would be in addition to the recovery of its initial $43 million equity investment in the RoCa3 Facility. Based on the pricing runs generated by Cornerstone in advance of the Transaction, even if EZH exercises the Sublease Purchase Option in 2018, CEL

Trust would expect to earn a pretax cash flow profit of $60,974,397.00, and $39,633,358.00 after-tax cash flow profit.

The profit expected from the RoCa3 Transaction is calculated with respect to the various rights and obligations of the parties. If EZH elects to exercise the Sublease Purchase Option, the Sublease Purchase Option Price of $215,450,949.20 will be due to be paid to CEL Trust on January 2, 2018. The scheduled balance of the Sublease Deposit as of January 2, 2018, plus the value of the remaining Treasury STRIPS in the IJssel Deposit would equal the Sublease Purchase Price of $215,450,949.20. This amount can be paid either (i) in cash, or (ii) with $123,615,472.00 in cash, plus the delivery of the remaining STRIPS from the IJssel Deposit, valued at their maturity dates, and totaling $91,835,477.24 in 2018. Additionally, EZH will be required to pay $7,326,950.33 as a Final Sublease Basic Rent Payment, which is equal to one of the Treasury STRIPS, in addition to those used to pay the Sublease Purchase Option Price, which matures on January 2, 2018. This is in addition to the $5,220,969.87 that CEL Trust will have received on January 2, 2012, the earlier maturity date of one of the STRIPS in the IJssel Deposit. If EZH exercises the Sublease Purchase Option, ABN AMRO will pay the balance of the Sublease Deposit to HBU. That payment will be credited toward EZH's payment of the Sublease Purchase Option Price to CEL Trust and, in turn, will be credited toward CEL Trust's payment of its obligations under the HBU Loan. If ABN AMRO has made all the payments it is required to make under the Sublease Deposit to HBU, the HBU Loan will be paid in full. HBU then will release its Lien of the Loan. CEL Trust then will receive the final Sublease Basic Rent Payment ($7,326,950.33), plus the subsequent payments from the IJssel Deposit (totaling $91,835,477.24). The total amount receivable by CEL, from CEL Trust, will, therefore, equal $99,162,427.57 plus the $5,220,969.87 from the first Treasury STRIPS, with a maturity date of January 2, 2012. After subtracting CEL Trust's initial equity investment of $43 million, CEL Trust should receive a pretax profit of $60,974,397.00.

According to testimony in the record, the development company's consultant, Cornerstone, generated pricing runs which did not assume that only the Sublease Purchase Option would be exercised by EZH. Cornerstone also projected that, if CEL Trust exercises the Sublease Renewal Option, it can expect to earn a pretax profit of approximately $101,538,462.00, which could be higher or lower depending on the residual value left to CEL Trust at the end of the Sublease Renewal Term in 2034 and the cost to CEL Trust of operating the RoCa3 Facility at the end of the Sublease Renewal Term for the Shirt–Tail Period from 2034–2041. Projections for the Shirt–Tail Period were considered unknown, given possible intervening occurrences, at the time of the Transaction. Even residual value was hard to project in 1997 and, therefore, was not included in the calculations. During the Shirt–Tail Period, plaintiff can either operate the RoCa3 Facility itself or sublease it to another party.

If CEL Trust exercises the Retention Option, the potential to earn a pretax profit would be even greater, as would the risk of loss, and both would depend on the performance of the RoCa3 Facility during the Retention Option Period. The plaintiff also would have to pay a proportional share of expenses. Under the Retention Option, EZH would be required to return the undivided 47.47% interest to CEL Trust from 2018 through 2041, and make the Final Sublease Basic Rent Payment due on January 2, 2018. During that period, plaintiff would be exposed to a large variety of risks and opportunities with respect to operations of the RoCa3 Facility. The Retention Option requires prepayment of the nonrecourse loan, and failure to prepay the loan results in the Sublease Renewal Option being deemed exercised.

The defendant argues that the plaintiff, reasonably, could not have expected to achieve any net economic benefit from the cash flows of the RoCa3 Transaction, based on its expert's (Dr. LaRue's) analysis of the cash flow pricing run materials. The defendant maintains that, on a discounted cash flow basis, "the RoCa3 LILO was incapable of generating any economic profit to CED

absent the tax benefits." Dr. LaRue, who similarly arrived at the 4.44% pretax profit figure, then applied a discount interest rate to the equation of 6.183% to arrive at a cash flow of less than "zero." [32] In his report, Dr. LaRue admits that the discount rate he applied was a theoretical rate, and that there is no such thing as a risk free investment. Defendant relies on language in *ACM Partnership v. Commissioner of Internal Revenue*, 157 F.3d at 259, to argue that, in transactions designed to yield deferred, not immediate, profits, present value adjustments are the method by which to calculate a transaction's actual and anticipated profits.

The plaintiff rejects the defendant's assertion that a discount rate should be applied to the pretax profit projection. The plaintiff argues that the opportunity to make a higher profit with other investments that would be more profitable is not evidence that the activity in question is not profitable. Moreover, evidence presented throughout the course of the trial, including the testimony at trial, and exhibits entered into the record, demonstrate that the plaintiff had numerous business objectives in mind when it entered the RoCa3 Transaction, so that a discount rate, which considers only profitability in monetary terms, is not the only, or necessarily the best, measure of the transaction.

The case on which the defendant relies, *ACM Partnership v. Commissioner of Internal Revenue*, 157 F.3d at 236, does not direct the use of a discount rate in profit calculations, but acknowledges that some courts have allowed the use of a discount rate in appropriate circumstances. In *ACM Partnership v. Commissioner of Internal Revenue*, the court stated:

> We reject ACM's contention that *Estate of Thomas [Thomas v. Comm'r*, 84 T.C. 412, 1985 WL 15324], which construed Treasury Regulations under I.R.C. § 183, precludes

present value adjustments in the prospect-for profit analysis under the judicially created economic substance doctrine. In transactions that are designed to yield deferred rather than immediate returns, present value adjustments are, as the courts have recognized, an appropriate means of assessing the transactions' actual and anticipated economic effects. *See, e.g., Hilton v. Commissioner*, 671 F.2d 316, 317 (9th Cir.1982) (affirming economic substance determination based on the present value analysis of taxpayer's investments); [33] *Citizens & Southern Corp. v. Commissioner*, 91 T.C. 463, 498, 1988 WL 90987 (1988) (noting that value of an acquired asset may be determined based on future income likely to be generated that [sic] by that asset discounted to present value), *aff'd*, 919 F.2d 1492 (11th Cir.1990); *Gianaris v. Commissioner*, 64 T.C.M. (CCH) 1229, 1234 (1992) ("[W]e have consistently discounted ... income streams produced by [an investment] in determining whether the taxpayer had a profit objective.") (citations omitted).

> We find no basis in the law for precluding a tax court's reliance on a present value adjustment where such an adjustment, under the surrounding circumstances, will serve as an accurate gauge of the reasonably expected economic consequences of the transaction.

*Id.* at 259 (footnotes in opinion omitted). Even the *ACM* court did not direct use of a "present value adjustment"; the court simply did not "preclude" its use. *Id.* at 259. Moreover, the only clear conclusion to be drawn from the statement by the court in *ACM Partnership v. Commissioner*, is that, as is true with respect to all aspects of an evaluation of the economic substance sufficiency of a LILO transaction for tax deduc-

---

**32.** In its brief, the defendant assumes the reason for discounting as, "[t]he present value concept recognizes that a rational investor would prefer receiving $1 today over receiving $1 a year from now. The investor could invest the $1 received today at a specified rate of return and have more than $1 in a year."

**33.** In fact, the *Thomas* court specifically declined to rule on whether, "in determining to rule on

the viability of the instant transaction, we are required to discount the expected value of the equipment back to 1975 dollars. In the absence of a statutory mandate, we decline to do so," because the matter had not been briefed by the parties and because the court's comments in *Hilton v. Commissioner* were dictum "in the context of circumstances bordering on the egregious." *Thomas v. Comm'r*, 84 T.C. at 444 n. 52.

tion purposes, the analysis must depend on the specific and unique characteristics and conditions of the individual transaction under review.

The defendant also argues that the plaintiff had no reasonable expectation of profit aside from tax benefits and no expectation of a residual value. The defendant contends that, "the Sublease Purchase Option is the designed outcome" in the RoCa3 Transaction. The court has already addressed this assertion and has found that exercise of the Sublease Purchase Option was not pre-ordained when the plaintiff entered into the RoCa3 Transaction. The plaintiff analyzed and understood the Transaction as including the residual value or possible projected benefits of the RoCa3 Transaction during the Sublease Renewal Option or Retention Option. At trial, the plaintiff agreed that some of the pre-Transaction analyses included an assumption of a zero residual value, as is not uncommon in leveraged and simple leases. Documents in the record indicate that, for RoCa3 Transaction analysis purposes, pricing runs were considered a "base case" analysis, and assumed no additional revenue for the seven year residual period at the end of the Sublease Renewal Term. However, the Deloitte appraisal analyzed and included a discussion of the residual value of the Facility and estimated pretax cash flows during the Shirt–Tail Period, including the possibility for the greatest pretax profit during the Retention Option Period.

Of the "particularly significant" factors to be considered when determining whether a transaction possesses economic substance, apart from tax benefits, an inquiry into "the reasonableness of the income and residual value projections," has been recognized as a "particularly significant" factor, in *Levy v. Commissioner of Internal Revenue*, 91 T.C. at 856 (citing *Rice's Toyota World, Inc. v. Comm'r*, 81 T.C. 184, 204–207, 1983 WL 14860 (1983)). As part of the analytical process, in which plaintiff engaged prior to closing the Transaction in 1997, the plaintiff estimated residual value in the future in a conservative fashion, and identified profit potential under each option. The year 2018 was far enough in the future from when the Transaction was finalized, in a changing reg-

ulatory environment in the United States and The Netherlands, such that all eventualities were possible.

In their briefs, and in subsequent filings with the court, the parties have discussed or noted a number of federal court decisions concerning LILO and SILO transactions, originating in different jurisdictions. Although not binding on this court and in each case distinguishable, they are of interest. These cases include: *Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Company*, 588 F.Supp.2d 919 (S.D.Ind.2008), *stay denied*, No. 108–1560, 2008 WL 5092964 (S.D.Ind. Nov.26, 2008), *order superseded*, 2008 WL 5216027 (S.D.Ind. Dec.11, 2008), *aff'd*, 582 F.3d 721 (7th Cir.2009); *BB & T Corporation v. United States*, No. 1:04–0941, 2007 WL 37798 (M.D.N.C. Jan. 4, 2007), *aff'd*, 523 F.3d 461 (4th Cir.2008); *AWG Leasing Trust v. United States*, 592 F.Supp.2d 953 (N.D.Ohio 2008); *Fifth Third Bancorp & Subsidiaries v. United States*, No. 05–350 (S.D.Ohio Apr. 18, 2008) (jury verdict); and *Altria Group, Inc. v. United States*, No. 06–9430 (S.D.N.Y. Jul. 9, 2009) (jury verdict). Each of these cases was ultimately decided against the taxpayer, however, as indicated throughout this opinion, considerations of economic substance are factually specific to the transaction involved.

In *BB & T Corporation v. United States*, 523 F.3d 461 (4th Cir.2008), the United States Court of Appeals for the Fourth Circuit affirmed the decision of the United States District Court for the Middle District of North Carolina. The District Court granted summary judgment in favor of the government. No trial was held. The court reviewed the LILO transaction, entered into between BB & T, a United States "financial services company based in the Southeast," with Sodra Cell AB (Sodra), a "Swedish cooperative recognized as one of the world's leading wood pulp manufacturers." *Id.* at 465. The District Court concluded, and the Fourth Circuit affirmed, that BB & T "did not actually acquire a genuine leasehold interest or incur genuine indebtedness as a result of the transaction...." *Id.* at 464. The *BB & T* court found that the transaction

lacked economic substance, as the taxpayer failed to show any " 'business or regulatory realities' that 'compelled or encouraged,'... the structure of the transaction." *Id.* at 473 (quoting *Frank Lyon Co. v. United States,* 435 U.S. at 583, 98 S.Ct. 1291). The court also found in *BB & T*: "... nor has it [BB & T] established that its LILO is 'imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached.'" *Id.* at 473 (quoting *Frank Lyon Co. v. United States,* 435 U.S. at 583, 98 S.Ct. 1291).

The facts presented in the *BB & T* case are unique, as are the facts presented in the *Con Ed* litigation. The taxpayer, BB & T, was approached about entering a LILO transaction with Sodra. Before entering the transaction, BB & T "performed an independent evaluation of the transaction," during which the CFO of BB & T specifically determined that it was a " 'tax-driven deal' with an after-tax investment yield 'largely generated by tax benefits associated with accelerated tax deductions' of rent." *BB & T Corp. v. United States,* 523 F.3d at 465. Moreover, the CFO of BB & T noted that " 'if there were no tax benefits,' BB & T would '[p]robably not' have moved forward with the LILO" transaction, although the CFO of BB & T stated that he was " 'intrigued by the transaction,'" in part, because it was " 'looking to grow loans and diversify [its] loan portfolio.'" *Id.* at 465–66.

In brief, on the closing date of the LILO transaction at issue in the *BB & T* case, BB & T and Sodra executed a series of interrelated agreements, including a " 'Head Lease,' a Sublease, a Debt Payment Undertaking Agreement ('Debt PUA'), and an Equity Payment Undertaking Agreement ('Equity PUA').'" *Id.* at 466. The structure of the *BB & T* transaction was established such that, under the Head Lease, BB & T leased the equipment from Sodra for a period of 36 years and, under the Sublease, Sodra subleased the equipment back to BB & T for a period of 15.5 years. *Id.* The 15.5 year period was referred to as the Basic Lease Term, during which Sodra continued to use, maintain and improve the equipment. *Id.* At the end of the Basic Lease Term in 2013, Sodra

has the option to buy back BB & T's remaining interest in the Head Lease, thereby terminating the transaction. *Id.* Under the terms of the agreements between BB & T and Sodra, if Sodra does not exercise the purchase option, BB & T may (1) require Sodra to extend the Sublease an additional 13.3 years, after which BB & T would possess the remaining interest for a period of 7.2 years; (2) lease the equipment to a third party, subject to certain requirements; or (3) take possession of the equipment and use it "at its own expense and for its own benefit" for the remainder of the Head Lease. *Id.* at 466–67. BB & T implemented the transaction through a trust and financed the transaction with its own funds and a nonrecourse loan. *Id.* at 467. A sum of $6,228,702.00 was transferred from the trustee of the trust to Sodra, as Sodra's "incentive for doing the deal." *Id.* BB & T was required to make two lease payments, an "Advance Head Lease Payment," which came from BB & T's upfront investment and a nonrecourse loan placed in a trust account. *Id.* A second, Deferred Head Lease Payment, was set to be due in 2038, at the expiration of the Head Lease, and is to be paid, depending on future events and which option is exercised at the end of the basic lease term. At closing, pursuant to the Debt PUA, Fleet National Bank (Fleet) immediately transferred $68,008,236, the same amount contributed by ABN AMRO, into a defeased account, the "Debt PUA account," the funds of which "became an asset solely of ABN AMRO, unreachable by Sodra, BB & T, or other respective creditors." *Id.* The trustee in the transaction purchased Treasury bonds at the transaction closing, to be held by the Equity PUA, and to be used to partially fund the purchase price on Sodra's purchase option, if Sodra elects to exercise its purchase option. *Id.* at 468. The remainder of the purchase price is to be funded by the final payment under the Debt PUA, which also will retire the HBU loan. *Id.*

The *BB & T* court found that:

although Sodra is required to make annual rental payments during this term, Sodra does not supply any additional funds to satisfy this obligation. Instead, ABN [ABN AMRO Bank, N.V.], in its capacity

as Debt PUA Issuer, makes the payments on Sodra's behalf from the funds it received at closing. BB & T does not receive any of these rental payments because BB & T assigned the right to receive rent from Sodra to HBU [Hollandsche Bank-Unie N.V.] as part of providing collateral for the HBU loan. Accordingly, ABN, acting as "Debt PUA Issuer" makes the annual payments directly to HBU from the Debt PUA account. Through 2012, these annual payments exactly equal the remaining principal and interest due on the loan. Because ABN, not HBU, provided the funds for the loan, however, ABN is actually paying itself from the $68,008,236 (the sum equal to the loan proceeds) that it received at closing. The net result is that no funds change hands during this period; only a circular intrabank transfer occurs. On its own books, therefore, ABN treats the loan as an off-balance sheet transaction carrying zero risk.

*Id.* at 467–68 (footnote omitted). In sum, the court concluded that "[t]he net result was that no funds change hands during this period; only a circular intrabank transfer occurs," *Id.* at 468, and that "the transaction is a financing arrangement, not a genuine lease and sublease." *Id.* at 475.

If Sodra exercises the purchase option, the purchase price will be funded from resources supplied by BB & T at closing. BB & T also will be relieved from having to make the Deferred Head Lease Payment. *Id.* at 469. In addition, the court discussed BB & T's options in the event that Sodra does not exercise the purchase option, and found that BB & T's Deferred Head Lease Payment either would be fully funded, or would be without risk due to Sodra's lack of recourse against BB & T for any deficiency. *Id.* at 468–69. The court also found that "BB & T, therefore, does not expect Sodra to 'walk away' from the Equipment .... [and] regardless of whether Sodra bucks this expectation, the structure of the transaction insulates BB & T from any risk of losing its initial $12,833,846 investment in the government bonds or incurring the obligation to invest additional funds." *Id.* at 473. Significantly, as noted above, "[b]efore Sodra entered into this agreement, however, Sodra's

tax advisors characterized the transaction as a financing arrangement that did not affect Sodra's interests in the Equipment, apparently anticipating that Sodra would not surrender control of the Equipment to BB & T." *Id.* at 469 n. 10. Moreover, as stated in the court's opinion, "BB & T has conceded, however, that it entered into the transaction believing that 'the most likely thing is [Sodra] would not walk away from the property.'" *Id.* at 469. With respect to the "financing arrangement," and particularly the loan in the *BB & T* case, the court based its conclusions on the fact that "Sodra has no economic incentive to decline the purchase option," and that "BB & T does not expect Sodra to surrender control of the Equipment." *Id.* at 476.

The Fourth Circuit, therefore, concluded that:

> in substance, the transaction is a financing arrangement, not a genuine lease and sublease. All that BB & T has done is paid Sodra approximately $6 million dollars to sign documents meeting the formal requirements of a lease and sublease, arranged a circular transfer of funds from and then back to ABN, and invested approximately $12 million in government bonds. Sodra, meanwhile, maintains uninterrupted possession and control of the Equipment, and has no economic incentive to cede control to BB & T.

*Id.* at 475.

The *BB & T* court found that BB & T failed to incur the rights, obligations and risks that resemble a traditional lease relationship, because Sodra's exercise of the purchase option was expected by the framers of the transaction, and considered virtually certain. Therefore, the court concluded that risks did not exist for BB & T, even if Sodra failed to exercise its purchase option. In the case currently before this court, however, as discussed above, no such definite result was foreseen or foreseeable in 1997 when the RoCa3 Transaction was formulated. Based on the facts of the case before the court, EZH is not certain to exercise the Sublease Purchase Option, and if EZH does not exercise the Sublease Purchase Option, both the

residual value risk and potential profit are present for the plaintiff.

The *BB & T* court also found that,

> unlike the taxpayer in *Frank Lyon Co.*, BB & T has failed to show any "business or regulatory realities" that "compelled or encouraged," [*Frank Lyon Co. v. United States*, 435 U.S. at 583, 98 S.Ct. 1291], the structure of the transaction at issue here, nor has it established that its LILO is "imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached," *id.* at 583–84, 98 S.Ct. 1291.... To the contrary, BB & T has offered no regulatory or economic reality driving the transaction's simultaneous conveyance and retraction of rights and obligations, nor has it offered any non-tax related purpose for structuring the transaction in this manner.

*BB & T Corp. v. United States*, 523 F.3d at 473–74.

Unlike the *BB & T* case, the plaintiff in the case currently before this court, after a lengthy trial, as opposed to summary proceedings on a motion in *BB & T*, was able to prove that the form of the transaction created a genuine ownership interest in a leasehold, which possessed economic substance, with "tax-independent considerations," *Frank Lyon Co. v. United States*, 435 U.S. at 584, 98 S.Ct. 1291, based on other "business" and/or "regulatory realities." *Id.* at 583, 98 S.Ct. 1291. Furthermore, in *BB & T*, the court "decline[d] to resolve whether this transaction as a whole lacked economic substance," *BB & T Corp. v. United States*, 523 F.3d at 477, but, instead, decided the case based on its findings that the form of the BB & T "transaction is a financing arrangement, and not a genuine lease and sublease." *Id.* at 475, 479.[34]

Unlike the *BB & T* plaintiff, the *Con Ed* plaintiff involved in the current RoCa3 Transaction has established a number of non-tax, business reasons for entering the RoCa3 Transaction, including making a pretax profit; obtaining favorable accounting benefits under FAS 13, with front-loaded and near term earnings; having the potential opportunity to take possession of, and operate the RoCa3 Facility, and derive profits from the operation of the Facility if the Sublease Renewal Option or Retention Option comes into effect; entering the Western European, including the Dutch, utility markets in a deregulated environment; learning about and sharing technology in its own utility "core competency"; gaining expertise and goodwill from an environmentally friendly energy company and, thereby, improving its own, somewhat tarnished, environmental image. These were all substantial and valuable business purposes that the *Con Ed* plaintiff sought to derive from the RoCa3 Transaction. Because BB & T was a financial services provider entering a transaction with a wood pulp manufacturer, it could not have had any intention or objective reality to benefit from the transaction in ways similar to those in which Con Ed, an energy company, could hope to benefit from the RoCa3 Transaction, which was a transaction between two energy-producing companies.

In the case currently before the court, there also is sufficient testimony and documentary evidence to persuade this court that the choice of Options is not predestined and that Con Ed could take control of and ably manage the RoCa3 Facility during the Shirt–Tail Period under the Sublease Renewal Option or during the Retention Period, EZH, or a subsequent owner of EZH, would not have to fear diminution of the Facility in the hands of Con Ed, another major utility, so as to be forced into exercising the Sublease Purchase Option, in order to preserve its asset for the remainder of its useful life.

The case of *AWG Leasing Trust v. United States*, 592 F.Supp.2d 953, involved a sale-in/lease-out (SILO) transaction, entered into in 1999, and was decided by the United States District Court for the Northern District of Ohio after a trial. The court de-

---

**34.** The United States Court of Appeals for the Fourth Circuit, in *BB & T*, also noted that, "whether a particular transaction is a sham lacking economic substance is an 'issue of fact.' The district court did not address this factual issue in its summary judgment ruling....[W]e too, will leave the economic-substance question unanswered." *BB & T Corp. v. United States*, 523 F.3d at 472 n. 12 (quoting *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 92 (4th Cir.1985)).

scribed SILO transactions as "a modified version of their tax-driven financial predecessors, lease-in/lease-out ('LILO') transactions." *Id.* at 959. The IRS disallowed tax deductions for rental payments, depreciation, amortization and interest payments on nonrecourse loans the Trust had obtained from two German banks. *Id.* In the *AWG* case, Abfallwirtschaftgesellschaft mbH Wuppertal (AWG Wuppertal) was the municipal owner of a waste-to-energy facility in Germany, which made its revenue from the operation of the facility. *Id.* at 960. AWG Leasing Trust (the Trust) consisted of two United States banks, Key Global Finance (KSP) and PNC Financial Services Group, Inc. (PNC). *Id.* at 961. KSP and PNC invested in the Trust through a Delaware business Trust called AWG Leasing Trust. *Id.* at 965.

The AWG transaction was structured with a Head Lease Agreement, by which the Trust plaintiffs obtained the facility from the prior owners for a period of 75 years, in exchange for $423 million at closing, and a lease-back agreement. *Id.* at 966–67. The Trust argued it should be allowed depreciation on the Wuppertal plant and interest on the nonrecourse loans obtained to finance the transaction between AWG Wuppertal and the Trust. In a footnote, the court wrote, "[d]espite the fact that the Head Lease has a term of 75 years, the Facility's estimated remaining useful life was only valued at 46 years." *Id.* at 967 n. 8. The court also noted that the Head Lease "contains a provision stating that if the actual economic useful life of the Facility is ever deemed to be longer than 75 years, then the term of the Head Lease is automatically extended to be 125% of the new expected useful life of the Facility." *Id.* The Head Lease was to be treated as a sale as of the closing date under United States federal income tax law, but was not recorded as a proper sale under German law. Moreover, AWG Wuppertal continued to take depreciation deductions for tax purposes under German tax law. *Id.* at 967.

Pursuant to the lease-back agreement, the Trust leased the facility back to AWG Wuppertal until January 1, 2024 in exchange for annual rent payments (the Initial Leaseback Period), under which AWG Wuppertal remains responsible for the costs of operating the facility, including taxes, insurance and maintenance expenses, and pursuant to which AWG Wuppertal was entitled to sole possession and operation of the facility and to the profits generated from the facility during the Initial Leaseback Period. *Id.* Nonrecourse loans and a relatively small contribution from the plaintiffs funded the closing of the deal. *Id.* at 967–68. Moreover, AWG Wuppertal was required to put the money it obtained from the loans into Debt Payment Undertaking Accounts (Debt PUAs), which act as Defeasance Accounts, created to pay AWG Wuppertal's obligations under the sublease and to apply those payments to plaintiffs' debts that are incurred under the transaction. *Id.* at 969.

At the end of the Initial Leaseback Period in 2024, AWG Wuppertal can exercise one of two options: the Fixed Purchase Option, or the Service Contract Option. *Id.* at 970–73. The Fixed Purchase Option entitles AWG Wuppertal to regain the Trust's interest in the facility for a price of $521 million, which would be funded by the Debt PUAs and the Equity PUA. *Id.* The proceeds of the loans, therefore, will return to the lenders, and neither AWG Wuppertal nor the Trust will have to provide cash to repay the loans. *Id.* at 970–71. If AWG Wuppertal does not exercise the Fixed Purchase Option, AWG Wuppertal and the Trust, or its designee, must enter into a waste disposal service contract at the end of the Leaseback Term. This is the Service Contract Option, under which AWG Wuppertal agrees to purchase solid waste disposal services from a third party provider, chosen by the plaintiffs, from January 1, 2024 until September 23, 2036. *Id.* at 971. To do this, AWG Wuppertal must first arrange nonrecourse refinancing of the nonrecourse debt that will be outstanding in 2024, and pay a number of charges, including borrowing costs associated with the nonrecourse loan and Operation Agreement Loans. *Id.* at 971–72. During the Service Contract Term, AWG Wuppertal also must pay a periodic service fee to the Trust or its designee. If AWG Wuppertal exercises the Service Contract Option, then it also gets a second option to repurchase the facility by terminating the Head Lease and, at the end of the

Service Contract in 2036, paying the Trust money equivalent to the fair market value of the facility. *Id.* at 972. The court found that although the AWG SILO transaction did have "some economic substance apart from tax benefits," and is expected to make a small, but guaranteed, pretax profit with a small chance of a large profit, if AWG Wuppertal exercises the Service Contract Option, "the transaction's stated form as a 'sale' is not consistent with its economic reality." *Id.* at 976. The *AWG* court concluded that AWG Wuppertal's Fixed Purchase Option "nearly certain[ly]" will be exercised and that the plaintiffs were virtually certain of this outcome when they closed the transaction. *Id.* at 981–82. The court based its conclusion on its finding that the Fixed Purchase Option is the only economically feasible and economically dominant option for AWG Wuppertal. *Id.* As a result, the *AWG* court stated that:

> the AWG transaction does not allocate the rights, responsibilities, and risks between AWG and the Plaintiffs in a way that resembles a traditional sale. Further, as in the *BB & T* case, the Plaintiffs here have "failed to show any 'business or regulatory realities' that 'compelled or encouraged' the structure of the transaction at issue here, nor has it established that its [SILO] is 'imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached.'" *BB & T Corp. v. United States*, 523 F.3d 461, 473 (4th Cir. 2008) (other citations omitted).

*Id.* at 990.

The court further pointed out that under German tax law, the AWG transaction was not a sale of ownership in the facility. *Id.* at 972–73. The court was concerned that not only does AWG Wuppertal continue to list the plant as an asset on its financial statements, it also receives depreciation deductions for German taxes, and that the Trust was aware of the German tax treatment:

> In fact, AWG Wuppertal represented to the German tax authorities that:
> the head lease and the sublease are entered into simultaneously, so that possession, uses and obligations will at no time—not even for one legal second—be trans-

ferred to the U.S. Trust, if [AWG] exercises the [Fixed Purchase Option].

*Id.* at 973.

The *AWG* court found that, "[a]fter examining the totality of the circumstances that existed in [December] 1999, the Court concludes that the Plaintiffs could have reasonably expected to make a small but guaranteed, pre-tax profit that is sufficient to show that the transaction had some 'practicable economic effects other than the creation of income tax losses,'" and is, therefore, "not an economic sham." *Id.* at 980, 981 (citation omitted). The court concluded, however, that no substantive benefits or burdens of ownership were exchanged between the parties during the initial lease-back period, no significant cash flows occurred between the parties during the initial leaseback period, the plaintiffs incurred minimal risk during the Head Lease period, and "most importantly, it is nearly certain" that the Fixed Price Purchase Option will be exercised, "thus ensuring that the plaintiffs never actually acquire[d] economic ownership of the facility." *Id.* at 981–82. The court, therefore, disallowed the deductions the plaintiff claimed.

The *AWG* case can be distinguished on the facts from the case currently before the court. First, the *AWG* case is focused on a SILO transaction, which generates a different, primary focus, with the finding that no sale occurred. The plaintiffs in the *AWG* case intended to structure the transaction so it would not be a sale under German law, although it purported to be a sale for United States tax purposes. *Id.* at 973, 983. This became a critical consideration for the court on the issue of ownership and as part of its analysis of the financing arrangements. *Id.* at 993. Second, the court determined that it was a near certainty that AWG Wuppertal will exercise the Fixed Purchase Option in 2024, and determined that its analysis of near certainty was the most important reason for the court's conclusion that "the AWG transaction does not allocate the rights, responsibilities, and risks between AWG and the Plaintiffs in a way that resembles a traditional sale." *Id.* at 990. The *AWG* court also noted that the transaction had a guaranty from the municipal members of AWG Wup-

pertal, backed by the German federal government, *id.* at 984, and the AWG court analyzed both the German tax law consequences and the German political climate as dictating against a decision to exercise the Service Contract Option, but instead to exercise the Fixed Purchase Option. *Id.* at 988–90. The *AWG* court further found that the underlying debt from nonrecourse loans was not genuine and that the Trust was not entitled to deduct interest expenses on that debt, pursuant to 26 U.S.C. § 163(a), in that "[t]he underlying loans do not constitute genuine indebtedness because the Plaintiffs, at no point in time, will be required to use their own funds to repay the debt to the German banks." *Id.* at 994.

An additional significant distinction between the AWG and *Con Ed* cases is that the *AWG* transaction closed on December 7, 1999, which was after Revenue Ruling 99–14, 1999–1 C.B. 835, was published on March 29, 1999, and the final regulation, 64 Fed.Reg. 26845, pursuant to 26 U.S.C. § 467, was published on May 18, 1999. Unlike the *Con Ed* plaintiff, AWG Trust undertook the transaction with knowledge of the final, published IRS position, which more directly discredited the proposed AWG transaction. The Judge in AWG acknowledged that the ruling and regulations "significantly reduc[ed] the tax benefits commonly associated with LILO structures." *Id.* at 959.

The defendant's assertion that *AWG* and *BB & T* are "nearly identical" to the current case is not correct. Each tax case, and each LILO or SILO case, must undergo a very fact specific analysis. The *Con Ed* case is unlike the *BB & T* case, which found that "Sodra, through the purchase option, can unwind the transaction without ever losing dominion and control over the Equipment or having surrendered any of its own funds to BB & T, and has no economic incentive to do otherwise." *BB & T v. United States,* 523 F.3d at 473. The *Con Ed* case also is unlike the *AWG* case, in which the court found the exercise of the right to repurchase its asset at the end of the initial sublease period "extremely likely," *AWG Leasing Trust v. United States,* 592 F.Supp.2d at 979; "nearly certain," *id.* at 985; "highly likely," "will" be

exercised, *id.* at 981–82, and that "the parties intended this result when they closed the AWG deal on December 7, 1999," *id.* at 985, having "included requirements in the 1999 Transaction that make a decision by AWG to enter the Service Contract near impossible." *Id.* at 981. Each case individually presents distinguishing factual circumstances, such that a blanket disallowance of deductions taken in all LILO—or SILO-type cases would be contrary to the intent of the statutes, regulations and case precedent. Although it certainly would be easier for a court to follow the earlier opinions and to disallow the tax benefits claimed by plaintiff, the parties have presented volumes of exhibits and testimony, including expert testimony, unique to the RoCa3 Transaction. After reviewing all this information, unlike in *AWG* and *BB & T*, exercise of the Sublease Purchase Option in the RoCa3 Transaction was not all but certain. Based on the testimony and documents presented in the case before this court, basing a ruling on prognostication is too speculative. Although in 2018, it may turn out that there are some advantages for EZH to exercise the Sublease Purchase Option, in an uncertain and changing economic, energy resource, and regulatory environment, nothing can be pre-determined with certainty. Even if EZH exercises the Sublease Purchase Option, some profit, together with benefits derived from numerous other business purposes, are achievable through the RoCa3 Transaction. Moreover, additional profit potential and risk exist for plaintiff if EZH chooses not to exercise the Sublease Purchase Option in 2018.

The case of *Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Company,* 582 F.3d 721 (7th Cir. 2009), affirmed the prior decision of the United States District Court for the Southern District of Indiana, 588 F.Supp.2d 919 (S.D.Ind.2008), which was decided on a motion for preliminary injunction, seeking to enjoin John Hancock Life Insurance Company, and several other companies, from demanding a payment based on a deemed default. The most recent decision in the case was issued by the United States Court of Appeals for the Seventh Circuit and, like the decisions in *AWG* and *BB & T,* is not binding

on this court. Moreover, the posture of the case, the facts presented and the disposition in the *Hoosier Energy* case are sufficiently dissimilar from the current case so that the *Hoosier Energy* case has little, if any, bearing on the case currently before this court. Perhaps the only lesson to be learned from the *Hoosier Energy* case is the acknowledgment of some risk to those involved in LILO or SILO transactions, in the event the banks involved fail and the monetary protections, which are part of the transactions, are implicated.

The District Court in *Hoosier Energy* granted a preliminary injunction. The Seventh Circuit, reviewing the District Court action, stated that its appellate review "is deferential at the preliminary injunction stage, and we lack an adequate basis on which to disagree with the district court's assessment." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d at 726. The only question for the Seventh Circuit was "whether Hoosier Energy has a plausible theory on the merits ... to justify exposing John Hancock to financial risks until the district court can decide the merits," which it answered in the affirmative. *Id.* at 726; *see also* 730.

The plaintiff, Hoosier Energy, is a cooperative made up of rural electric cooperative members, and is the owner of an energy plant, which does not earn significant profits. *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 588 F.Supp.2d at 922. The defendant, John Hancock, was an investor in a SILO transaction. *Id.* The action arose from the fact that after the credit crisis in 2008, Hoosier Energy was unable to find a suitable credit substitute for Ambac Credit Products, Inc., which controlled funds in the payment cycle and guarantees, given Ambac's declining credit rating. The defendant, John Hancock, "pulled the plug" on the transaction and requested an early termination payment from Hoosier Energy in the amount of approximately $120 million. *Id.* at 924–26. The plaintiff then sought "a preliminary injunction to enjoin defendants ... from making any demand or any payment pursuant to any assertion that a default has occurred and enjoining John Hancock from asserting that a default has occurred." *Id.* at 922.

By way of introduction to the case, the District Court, with obvious distaste for the type of business transaction, but only a limited record, stated:

> This case provides a case study of some of the worst aspects of modern finance. The case arises from an elaborate transaction that combines the sometimes toxic intricacies of credit default swaps and investment derivatives with a blatantly abusive tax shelter. Investment bankers and lawyers have made more than $12 million in fees for putting together the paper transaction known as a "sale in-lease out" or "SILO" transaction of an electrical generating plant. Although all parties have been making all payments required under the contracts, the transaction is now in crisis because credit rating agencies have downgraded the credit ratings of one of the parties.

*Id.* at 921.

The District Court granted the injunction, based on Hoosier showing "a reasonable likelihood of success on the merits on two independent theories for relief: the essential illegality of the Merom SILO transaction, and temporary commercial impracticability." *Id.* at 927–28. Despite acknowledging repeatedly that, due to the injunctive nature of the case, the court's "findings of fact and conclusions of law are tentative because they are the result of an expedited process," *id.* at 921–22, the court again reiterated its negative, first impression, of the deal:

> This deal was an attempt to create an appearance of a sale but without any real economic substance.
>
> . . .
>
> It [the SILO transaction] appears to have been a pure, abusive tax shelter, with no economic substance to the transaction at all, despite the elaborate and expensive window dressing. This deal was the attempted sale of tax deductions and no more than that; it appears to have been rotten to the core, so that the illegality affects every portion of the deal.

*Id.* at 927–28. The court also indicated that it made a "tentative conclusion," *id.* at 930, arrived at, "in the limited time the court has had to examine the issue." *Id.* at 924.

The Seventh Circuit's opinion in *Hoosier Energy,* affirming the District Court's grant of an injunction, noted that, whether or not a leveraged lease lacks economic substance for tax purposes, the District Court erred in calling the transaction "illegal" as a matter of contract law, even if the main or sole reason for structuring a transaction as a sale-leaseback, rather than a loan, is for the tax benefits. *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d at 727–28. Indeed, the Seventh Circuit specifically noted that "John Hancock's taxes are a matter for it to resolve with the IRS; that John Hancock may have set out to take larger deductions than the law allows does not affect Hoosier Energy's contractual duties." *Id.* at 728–29.[35] The remainder of the Seventh Circuit's opinion addressed the application of New York contract law with respect to the doctrine of temporary commercial impracticability. Given the injunctive relief nature of the case and decisions, with acknowledged, tentative conclusions, as well as the absence of any in-depth analysis of the transaction documents necessary to understand the dynamics of a complex LILO or SILO transaction, this court is not persuaded that much of an analogy can be drawn from the *Hoosier Energy* case to assist the court in its analysis of the RoCa3 Transaction under review.

*Fifth Third Bancorp & Subsidiaries v. United States,* No. 05–350 (S.D.Ohio Apr. 18, 2008) and *Altria Group, Inc. v. United States,* 06–9430 (S.D.N.Y. Jul. 9, 2009), both resulted in jury trials, in which unanimous jury verdicts were rendered in favor of the United States. No final judgment, however, has been entered in *Fifth Third,* and the taxpayer's post-trial motions for judgment as a matter of law or for a new trial are pending

in *Altria.* Both cases initially began with motions for summary judgment, but the motions were denied, based on the fact specific nature of the types of transactions at issue.

In *Fifth Third Bancorp,* No. 05–350 (S.D.Ohio Apr. 18, 2008), the jury answered "Special Interrogatories" by unanimous vote, finding that "Fifth Third, in substance, obtain[ed] a genuine leasehold interest" in various pieces of equipment, "that entitles Fifth Third to claim a deduction for rent expense and other transaction fees for that taxable year." *Id.* The jury, however, found the loans on each of these pieces of equipment that Fifth Third took from various banks did not "constitute genuine indebtedness for tax purposes that entitles Fifth Third to claim an interest expense deduction." *Id.* Finally, the jury found that Fifth Third did not prove that the various transactions "appreciably affected its beneficial economic interest, aside from tax benefits." *Id.*[36] As instructed by the directions on the Special Interrogatories, if the jury answered in the negative to the question immediately above, the jury was not to respond to the question of whether Fifth Third had proven that "it had a non-tax business purpose because it was at least partially motivated by profit to participate in the [particular] Transaction[s]." *Id.*

In *Altria Group, Inc. v. United States,* No. 06–9430 (S.D.N.Y. July 9, 2009), the jury answered questions supplied on a "Verdict Form" with respect to each of four transactions the plaintiff had entered. For each transaction, the jury answered the questions posed, concluding that Altria did not "in substance, obtain a genuine ownership interest in [any of the facilities in issue], so that it may claim a depreciation deduction and a deduction for transaction expenses for the 1997 tax year." *Id.* The jury also found in the negative as to whether "Altria, in substance, incur[red] genuine indebtedness in connection with the [various transactions at

---

**35.** The plaintiff in the present case has indicated that the "taxpayer in the *Hoosier* case petitioned the Tax Court on March 16, 2009, and the Commissioner answered on May 20, 2009. No dispositive motions have been filed and no trial date has been set." *See John Hancock Life Ins. Co. v. Comm'r,* T.C. Docket No. 6404–09 (2009).

**36.** Plaintiff argues that the jury's finding in the *Fifth Third* case was inconsistent because the jury concluded that Fifth Third had obtained "genuine leasehold interests," but also concluded that these interests did not appreciably affect Fifth Third's "beneficial economic interest."

issue], so that it may claim a loan interest deduction for the 1997 tax year." Finally, the jury also found in the negative that "Altria prove[d] that [the transactions at issue] ha[d] economic substance." *Id.*[37]

Because the disposition in both of these cases—which involved extremely complex transactions, like the one at issue in the current case—was rendered by a jury verdict, without explanation or analysis, the court is not able to review the reasoning that led to the jury's conclusion in each case. As discussed throughout this opinion, cases involving LILO and SILO transactions are extremely fact dependent, complex and vary from transaction to transaction. With no written opinions in the cases and no opportunity to understand the jury deliberations, the court is reluctant to rely on the decisions in the *Fifth Third* case or the *Altria Group* case for instruction in the case currently before this court. *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 543 (7th Cir.1998). With no criticism of the undoubtedly hard working jurors in both of these cases, given the complexity of the transactions at issue, the court cannot possibly discern, from the sparse verdict sheets submitted to this court in each case, whether the jurors actually understood the interwoven and sometimes obtuse, transaction documents, expert opinions and testimony which contributed to their decision in the cases before them, and what facts motivated their decisions.

## CONCLUSION

As discussed above, the standard for review of economic substance in the case currently before this court emanates from statements by the United States Supreme Court in *Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550. The Court wrote:

> where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts.

*Id.* at 583–84, 98 S.Ct. 1291. In essence, this language in *Frank Lyon* specifically requires analysis of the facts in "any particular case" and directs review of the "multiple-party" transaction regarding whether or not that transaction was "compelled or encouraged by business or regulatory realities," or was "shaped solely by tax-avoidance features that have meaningless labels attached." *Id.* Applying this standard, the Supreme Court, in *Frank Lyon,* affirmed the trial court, which, after a trial, without a jury, had found for the investor, and rejected the United States Court of Appeals for the Eighth Circuit's reversal of the District Court. *Id.* at 569–70, 584, 98 S.Ct. 1291.

As a pronouncement by the highest court in the federal system, the *Frank Lyon* case is binding precedent on this court. Such is not the case, however, with respect to the decisions of federal District Courts or federal Circuit Courts, other than the United States Court of Appeals for the Federal Circuit. As discussed above, the other key case regarding economic substance, which is binding on this court, *Coltec Industries, Inc. v. United States,* 454 F.3d 1340, emanates from the United States Court of Appeals for the Federal Circuit. The *Coltec* case refers to the *Frank Lyon* case sparsely, only four times, twice in footnotes, with only a "see" or "see also" reference. *Coltec Indus., Inc. v. Unit-*

---

**37.** Plaintiff argues that, with respect to the *Altria* case, the "jury's verdict was based upon several erroneous instructions, beginning with the business purpose aspect of economic substance," and that, because part of the jury instructions "misstate[d] the language of the cases from which it [was] taken," "the jury was permitted to reach a verdict under an erroneous statement of the governing test," in addition to other erroneous instructions from the District Court concerning the role of net present value computations, the treatment of purchase options, and the requirements of equity investment and residual value.

ed States, 454 F.3d at 1352, 1355 n. 14, 1356 n. 16 & 1357. The *Coltec* case appears to rely more heavily on language in an earlier Supreme Court case, *Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), especially for the following proposition:

> "[if] ... the *Gregory [v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) ] [38] case is viewed as a precedent for the disregard of a transfer of assets without a business purpose ... it gives support to the natural conclusion that transactions, *which do not vary control or change the flow of economic benefits*, are to be dismissed from consideration." *Higgins v. Smith*, 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

*Coltec Indus., Inc. v. United States*, 454 F.3d at 1355 (emphasis, brackets and omissions in original). As also discussed above, *Coltec* expands on the guidance in *Frank Lyon*, offering a methodology to analyze economic substance by reviewing whether the taxpayer's sole motivation was tax avoidance, which party bears the burden of proof and, if the evidence does not demonstrate that the taxpayer's sole motive was tax avoidance, a requirement for objective evidence of economic substance in the transaction at issue.

The *Gregory, Frank Lyon, Higgins* and *Coltec* cases are not inconsistent. Not one of the cases suggests that, without reference to the specific facts of the entire transaction at issue, a challenge to economic substance can be properly reviewed by a court. Therefore, it is the specific facts of the RoCa3 Transac-

tion which must determine the result in the case before the court. Similarly, all the cases dealing with leveraged lease transactions support the concept that the transaction at issue must be viewed as a whole, in order to review the "multiple-party" transaction, *Frank Lyon Co. v. United States*, 435 U.S. at 583, 98 S.Ct. 1291, and to determine whether the transaction is "encouraged by business or regulatory realities, is imbued with tax-independent consideration, and is not shaped solely by tax-avoidance features that have meaningless labels attached," *id.* at 583–84, 98 S.Ct. 1291, as well as whether the transaction "var[ies] control or change[s] the flow of economic benefits." *Coltec Indus., Inc. v. United States*, 454 F.3d at 1355. Furthermore, the precedential cases do not identify definitively one characteristic of a transaction as more determinative of economic substance than another. Instead, these cases all identify rather general standards and give open-ended directions for evaluation. None of the cases automatically disqualifies a LILO transaction, consummated, as was the RoCa3 Transaction in 1997, prior to the issuance of the 1999 Revenue Ruling, 1999 regulation and 2004 statute.[39] *See Frank Lyon Co. v. United States*, 435 U.S. at 584, 98 S.Ct. 1291 ("What those attributes are in any particular case will necessarily depend upon its facts.").

In the case currently before the court, both parties stood up highly competent counsel with notable legal and litigation skills, demonstrating a deep understanding of the subject matter. The extensive trial and volu-

---

**38.** In *Gregory v. Helvering*, the Supreme Court rejected a corporate reorganization to reduce income taxes as having "no business or corporate purpose—a mere device which put on the form of corporate reorganization as a disguise for concealing its real character...." *Gregory v. Helvering*, 293 U.S. at 469, 55 S.Ct. 266.

**39.** Although regulatory and statutory guidance has been offered as to the permissibility of leveraged lease transactions, including LILOs and SILOs, *see, e.g.*, 64 Fed.Reg. 26846 (May 18, 1999) (codified at 26 C.F.R. § 1.467 (Apr. 1, 2000)); Rev. Rul. 2002–69, 2002–2 C.B. 760 (Nov. 4, 2002); Rev. Rul. 99–14, 1999–1 C.B. 835 (Mar. 29, 1999); 61 Fed.Reg. 27834 (June 3, 1996), none of this guidance controls the case currently before the court. This guidance became effective after the RoCa3 Transaction was finalized. Moreover, in effect, these materials do not pro-

vide much additional substance beyond the previous judicial and administrative guidance. The regulations and Revenue Rulings reiterate that leveraged lease transactions will be evaluated under the doctrines of economic substance and substance over form and will be disqualified if they fail to comply with either doctrine. In 2004, well after the RoCa3 Transaction was finalized, Congress enacted IRC § 470. The purpose of section 470 was to "curtail leasing transactions by which taxable U.S. persons purport to acquire tax benefits with respect to property of a tax-exempt organization or foreign person." Boris I. Bittker & Lawrence Lokken, Fed. Taxation of Income, Estates And Gifts, ¶ 28.13, *Limitation on Losses with Respect to Property Leased to Governments or Other Tax–Exempt Entities* (W.G. & L.2005).

minous evidence provided to the court, as well as the lengthy briefing materials, were excellent showcases for these competencies and very instructive. At the same time, this also provided opportunities for the parties to submit materials which, on a few occasions, stretched, or omitted a necessary degree of objectivity in order to support their aggressive, individual, adversarial positions. To be sure, the referee function, determining the right answer for the right reasons, is the responsibility of the court in our judicial system. The court has painstakingly attempted to verify each source in the trial transcripts, exhibits, and briefing materials. To this effect, some of the submissions by both parties were extremely helpful, although, given their length, could have been more so and expedited the proceedings, if there had been more attention paid to specific citations to the trial transcripts and exhibits, as well as pinpoint citations to the cases.

After presiding over the lengthy trial, examining and reexamining the trial transcripts and exhibits entered into the record and reviewing the written submissions of the parties, the court is persuaded, as is evident throughout this opinion, that the plaintiff has established, through its witnesses and the exhibits, that the RoCa3 Transaction was a unique LILO transaction, which provided tax and bookkeeping advantages to the plaintiff; was, in form, a true lease; possessed economic substance; and, therefore, should be respected as qualifying for the tax deductions claimed. Plaintiff's witnesses, other than the evidence and testimony offered by Mr. Scher, were for the most part credible when put side-by-side with the documents in the record. The IRS takes a dim view of LILO transactions, and the law was subsequently modified in 2004 regarding the permissibility of deductions available for LILO transactions. Nonetheless, when considered as a whole, the plaintiff, Con Ed, demonstrated multiple, objective, "tax-independent," purposes for the RoCa3 Transaction and presented a financial transaction that, although insulated to minimize risk, was not without risk. The Transaction presented the opportunity for profit during the life of the Transaction, through direct economic benefits and accounting advantages. The RoCa3 Transac-

tion also presented the ability to achieve other business purposes, such as to encourage technology transfer to and from Con Ed and the RoCa3 Facility, to improve plaintiff's competency in the industry, to expand into and achieve a better position in new markets in an era of deregulation and an increasingly trans-global world, to gain a better understanding of deregulation at home and abroad, to gain environmental expertise and, perhaps, even to improve plaintiff's environmental image. To achieve these corporate goals, if not achieved through the RoCa3 Transaction, would have resulted in financial costs to the company. Therefore, the opportunity to reach these goals through the RoCa3 Transaction creates an additional positive cash flow benefit of not having to make alternate expenditures. The RoCa3 Transaction presented three separate, viable Options that could be exercised at the end of the Sublease Basic Term, none of which was guaranteed or inevitable at the time the Transaction was consummated, and each of which Options offered some potential economic profit, as well as the other benefits discussed throughout this opinion.

Other than the court's previously articulated concerns about the testimony and statements offered by Mr. Scher, the defendant has failed to refute the credibility of the plaintiff's evidence. The record establishes that the RoCa3 Transaction was one of substance and the Transaction represented an agreement with multiple Options for the future, entered into for legitimate, non-tax business purposes, and potential profit. The plaintiff, relying on expertise well within its sphere of understanding, booked a conservative Transaction, in a conservative, stable, Western European environment. At the time of finalization of the Transaction, there was no proof presented or certainty that EZH would necessarily exercise the Sublease Purchase Option. Moreover, if Con Ed were to be in a position to supervise the RoCa3 Facility, it was well within the competency of one energy-producing company to manage the operations of another energy-producing company. In addition, the plaintiff established a reasonable expectation of profit from the Transaction, as well as numerous other non-

tax business purposes for wanting to enter the RoCa3 Transaction. Plaintiff's management team was careful in its considerations of, planning for, and execution of the RoCa3 Transaction, and created a true lease transaction that possessed economic substance. For the reasons discussed throughout this opinion, the deductions plaintiff claims in its complaint filed in this court are allowable.

IT IS SO ORDERED.